**No. 12-35266**

Order Dated: August 13, 2013
Panel Members: Kozinski, Tashima and M. Smith

---

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

THE INSTITUTE OF CETACEAN RESEARCH, a Japanese research foundation; KYODO SENPAKU KAISHA, LTD., a Japanese corporation; TOMOYUKI OGAWA, an individual; and TOSHIYUKI MIURA, an individual,

Plaintiffs-Appellants,

v.

SEA SHEPHERD CONSERVATION SOCIETY, an Oregon nonprofit corporation; PAUL WATSON, an individual,

Defendants-Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE
(D.C. No. 2:11-cv-2043-RAJ)

---

**NON-PARTY SUSAN HARTLAND'S
PETITION FOR REHEARING OR REHEARING *EN BANC***

---

Claire Loebs Davis
Katie Smith Matison
LANE POWELL PC
1420 Fifth Avenue, Suite 4200
P.O. Box 91302
Seattle, WA 98111-9402
(206) 223-7000
*Attorneys For Non-Party Susan Hartland*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    NECESSITY FOR REHEARING ............................................................1

II.    ISSUES FOR REHEARING .....................................................................3

III.    BACKGROUND ........................................................................................3

IV.    ARGUMENT.............................................................................................7

    A.    The Panel's Order and Opinion Conflict with *Kiobel* ........................8

        1.    *Kiobel* Forecloses ATS Jurisdiction in This Action ...................8

        2.    No Exception to *Kiobel* Applies to the Claims
                Asserted Here.......................................................................... 11

    B.    The Order Ignores *Erie*'s Limits on Diversity Jurisdiction............. 14

IV.    CONCLUSION....................................................................................... 18

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.,*
  709 F.3d 872 (9th Cir. 2013) ...............................................................15

*Am. Triticale, Inc. v. Nytco Servs., Inc.,*
  664 F.2d 1136 (9th Cir. 1981) ............................................................14

*Balintulo v. Daimler AG,*
  __ F.3d __, No. 09-2778-cv(L), 2013 WL 4437057
  (2d Cir. August 21, 2013) ..........................................................9, 16, 17

*Bigio v. Coca-Cola Co.,*
  239 F.3d 440 (2d Cir. 2000) ...............................................................18

*Day & Zimmermann, Inc. v. Challoner,*
  423 U.S. 3 (1975).................................................................................15

*Erie R.R. Co. v. Tompkins,*
  304 U.S. 64 (1938).......................................................................*passim*

*Giraldo v. Drummond Co.,*
  No. 2:09-CV-1041-RDP, 2013 WL 3873960
  (N.D. Ala. July 25, 2013).................................................................8, 17

*Hoffman v. Citibank (South Dakota), N.A.,*
  546 F.3d 1078 (9th Cir. 2008) ............................................................15

*Humane Society Int'l, Inc. v. Kyodo Senpaku Kaisha Ltd.*
  [2008] FCA 3 (Austl.).............................................................................4

*Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y,*
  708 F.3d 1099 (9th Cir. 2013) .....................................................*passim*

*Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y,*
  860 F. Supp. 2d 1216 (W.D. Wash. 2012) ...................................*passim*

*Kiobel v. Royal Dutch Petroleum Co.*,
  133 S. Ct. 1659 (2013).................................................................*passim*

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
  313 U.S. 487 (1941)...........................................................................15

*Landsman v. Funk PC v. Skinder-Strauss Assocs.*,
  640 F.3d 72, 82 (3d Cir. 2011) .........................................................16

*Sarei v. Rio Tinto, PLC*,
  671 F.3d 736 (9th Cir. 2011) ................................................9, 13, 16

*Shimari v. CACI Int'l, Inc.*,
  No. 1:08-cv-827, 2013 WL 3229720 (E.D. Va. June 25, 2013) .......18

*Sims Snowboards, Inc. v. Kelly*,
  863 F.2d 643 (9th Cir. 1988) ............................................................16

*Sosa v. Alvarez-Machain*,
  542 U.S. 692 (2004)...................................................................*passim*

*Tilden-Coil Constructors, Inc. v. Landmark Am. Ins. Co.*,
  721 F. Supp. 2d 1007 (W.D. Wash. 2010) .......................................15

*U.S. Catholic Conference v. Abortion Rights Mobilization, Inc.*,
  487 U.S. 72 (1988).............................................................................7

*United States v. Dire*,
  680 F.3d 446 (4th Cir. 2012) ............................................................13

*United States v. Said*,
  757 F. Supp. 2d 554 (E.D. Va. 2010) ...............................................13

*United States v. Smith*,
  18 U.S. 153 (1820).............................................................................12

**STATUTES**

28 U.S.C. § 1332 ..............................................................................7, 17

28 U.S.C. § 1350 ...................................................................................8

47 U.S.C. § 227 ..................................................................................16

**COURT RULES**

Fed. R. App. P. 35 .................................................................................2

**OTHER AUTHORITIES**

U.S. Department of State, *Antarctic* (March 22, 2007) ..........................................10

## I.    NECESSITY FOR REHEARING

Non-party Susan Hartland seeks rehearing or rehearing *en banc* because the Panel's Order[1] and preceding Opinion[2] contravene two landmark U.S. Supreme Court decisions, and a multitude of this Court's opinions.  The *Panel Opinion* conflicts with *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013), which held that the Alien Tort Statute ("ATS") does not provide jurisdiction over extraterritorial conduct.  In light of *Kiobel*, the Panel does not have authority under the ATS to enforce an injunction over conduct abroad.  But rather than vacating the extraterritorial injunction issued under the ATS, and dismissing the contempt proceedings against Hartland, the Panel tried to save the injunction with the Order, in which it concluded that diversity jurisdiction could support an injunction originally predicated on a federal claim for alleged violations of international law.  That conclusion flouts 75 years of federal jurisprudence, beginning with the Supreme Court's decision in *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), which established that federal courts sitting in diversity must apply state law.

---

[1] Dkt. 206 ("Order") (attached as Exhibit A).

[2] *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 708 F.3d 1099, 1101 (9th Cir. 2013) ("*Panel Opinion*") (attached as Exhibit B), *amended and superseded on denial of rehearing en banc*, No. 12-35266, 2013 WL 2278588 (9th Cir. May 24, 2013).

Because the Order conflicts with *Kiobel* and *Erie*, "consideration by the full court is therefore necessary to secure and maintain uniformity of the court's decisions." Fed. R. App. P. 35(b)(1)(A).[3]  The Order also implicates issues of "exceptional importance." Fed. R. App. P. 35(b)(1)(B).  Indeed, it has profound implications.  By extending diversity jurisdiction to reach federal common law actions that purport to apply international law, the Order disregards the precepts of jurisdiction and federalism on which our court system is based.  In effect, the Order would allow courts to revive the extraterritorial reach of the ATS any time the defendant is a U.S. citizen or corporation.  This violates the central holding of *Kiobel*, and disregards the Supreme Court's repeated admonition that federal courts must respect the separation of powers and exercise restraint in the area of foreign affairs.  *Kiobel*, 133 S. Ct. at 1669; *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727 (2004).

---

[3] Sea Shepherd Conservation Society and Paul Watson, the Appellees in this action, previously filed petitions for rehearing of the *Panel Opinion*, Dkt. 62 and Dkt. 104, before *Kiobel* was decided.  In response, the Panel indicated no further petitions for rehearing should be filed.  Dkt. 149 at 5.  However, this is Hartland's first petition for rehearing; it seeks rehearing of the Order denying her motion to dismiss; and it is the only petition for rehearing to address *Kiobel*.

## II.     ISSUES FOR REHEARING

1.      Whether the Panel's Order and Opinion conflict with the Supreme Court's decision in *Kiobel* by imposing and enforcing an extraterritorial injunction that is based on customary international law.

2.      Whether the Panel's Order conflicts with the Supreme Court's decision in *Erie*, and its progeny, by using diversity jurisdiction to sustain an injunction based on federal common law, rather than state law.

## III.     BACKGROUND

Plaintiffs-Appellees (the "Whalers") are all citizens of Japan or Japanese entities.  Japan is a member of the International Whaling Commission ("IWC"), which passed a moratorium on commercial whaling in 1986.  Nevertheless, Japan has continued to kill whales, exploiting a loophole allowing for whales to be taken for "scientific purposes."  *See Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 860 F. Supp. 2d 1216, 1220-21 (W.D. Wash. 2012) ("*DC Opinion*"), *rev'd*, *Panel Opinion*.  Over the past several years, the Whalers have used "scientific" permits to kill thousands of whales for their meat.  *Id.*  The IWC and many of its member nations, including the United States, have repeatedly criticized this misuse of the scientific permit.  *Id*.  Hearings concluded last month in

the International Court of Justice ("ICJ"), in an action brought by Australia against Japan, challenging the legality of its whaling.

Australia has actively opposed the annual whale hunt that Japan conducts in the Southern Ocean.  In 1999, it created the Australian Whale Sanctuary ("AWS"), encompassing waters within 200 miles of Australia's Antarctic Territory. *Id.* at 1221.  In 2008, the Australian Federal Court issued a permanent injunction banning the Whalers from killing whales in the AWS.  *Humane Society Int'l, Inc. v. Kyodo Senpaku Kaisha Ltd*. [2008] FCA 3 (Austl.).  The Whalers have defied this injunction by hunting whales in the AWS every year since.  *DC Opinion*, at 1221.

Sea Shepherd Conservation Society ("SSCS") is a non-profit Oregon corporation with headquarters in Washington, dedicated to protecting marine wildlife.  From 2005 until 2012, SSCS coordinated whale defense campaigns in the Southern Ocean, in conjunction with independent foreign organizations, including Sea Shepherd Australia.  These campaigns directly interfered with, and publicized, the Japanese whale hunt.  *Id.* at 1222-25.  In recent years, the campaigns have used Dutch- and Australian-flagged vessels launched from Australian ports and staffed by captains and crew from around the world.  *Id*. at 1222.  The campaigns have used a variety of tactics to impede the hunt, none of which targeted, or have injured, people.  *Id.* at 1222-25, 1235.

4

In December 2011, the Whalers filed a complaint in the Western District of Washington against SSCS and Watson, seeking an injunction under the ATS to restrain SSCS's activities in the Southern Ocean, contending they violated international law.  The complaint also asserted a state law claim related to SSCS's fundraising activities in Washington.  *Id.* at 1227.

Ruling before *Kiobel*, the district court held it had jurisdiction over the Whalers' allegations under the ATS, but found that most of their claims were not likely to succeed, and that none met the standard for a preliminary injunction.  *Id.* at 1228-1235, 1242-1246.  The court also refused to issue an injunction under admiralty or diversity jurisdiction.[4]  *Id.* at 1226-1228.  Specifically, the court found the Whalers' state law claim "cannot support the injunction they request," noting the Whalers had "made no attempt" to show that Washington law authorized an injunction over conduct in the Southern Ocean.  *Id.* at 1228.  The Whalers appealed the denial of the injunction under the ATS, but did not contest the findings on the state law claim.  Dkt. 10.

---

[4] The district court found that the Whalers' "pro forma" claim of admiralty jurisdiction under 28 U.S.C. § 1333(1) failed to show that admiralty "recognizes both the substantive norms they rely on and the remedies they seek."  *DC Opinion*, at 1236-37.  Critically, the court found that under admiralty's choice-of-law analysis, "United States law would not apply to the whalers' causes of action based on Sea Shepherd's conduct in the Southern Ocean."  *Id.* at 1236.  This finding was not challenged on appeal, nor addressed by the Panel.  Dkt. 10.

The Panel issued an injunction pending appeal, enjoining SSCS, Watson, "and any party acting in concert with them" from approaching the Whalers' vessels closer than 500 yards while in the Southern Ocean, and from endangering the safe navigation of, or physically attacking, their vessels. Dkt. 31. Two months later – and still before *Kiobel* – the Panel issued an Opinion supporting the injunction, which assumed, without analysis, that it had jurisdiction under the ATS, identifying no other jurisdictional basis. *Panel Opinion*, at 1101. The *Panel Opinion* held that the Whalers were entitled to an injunction under the ATS, based on their allegations that SSCS had violated customary international law norms against piracy and endangering safe navigation. *Id.* at 1103-06.

On February 11, 2013, the Whalers filed a motion for contempt against SSCS, which the Panel referred to an Appellate Commissioner. Dkt. 37; Dkt. 44. A hearing is scheduled in October on the Whalers' Second Amended Motion for Contempt, which seeks to hold SSCS, Watson, and seven non-parties – including Hartland, SSCS's administrative director, and six current and former members of the SSCS board – in contempt for actions taken by other parties, including Sea Shepherd Australia, in the Southern Ocean. Dkt. 105; Dkt. 115.

Following *Kiobel*, Hartland filed a motion to dismiss the contempt proceedings for lack of jurisdiction. Dkt. 128. The Appellate Commissioner

6

denied the motion without opinion, granting Hartland permission to move the Panel for reconsideration, Dkt. 151, which she did. Dkt. 164. The Panel denied Hartland's motion in a two-paragraph Order, holding that "[e]ven assuming Hartland's interpretation of <u>Kiobel</u> is correct," the Panel still has jurisdiction to maintain the injunction based on diversity of citizenship, under 28 U.S.C. § 1332(a)(2). Order at 1-2.

## IV.   ARGUMENT

The *Panel Opinion* invoked the ATS as the sole jurisdictional basis, and customary international law as the sole foundation, for an injunction restraining conduct on foreign-flagged vessels in the Southern Ocean. *Panel Opinion*, at 1101. After *Kiobel*, the Panel lacks jurisdiction to enforce this injunction. If the Panel does not have jurisdiction to issue the injunction, then not only is the injunction void, but alleged violations of the injunction cannot form the basis of a civil contempt action. *See U.S. Catholic Conference v. Abortion Rights Mobilization, Inc.*, 487 U.S. 72, 76 (1988). Rehearing is necessary because the Order evades *Kiobel* through the misuse of diversity jurisdiction, in violation of *Erie*.

**A.      The Panel's Order and Opinion Conflict with *Kiobel***

**1.      *Kiobel* Forecloses ATS Jurisdiction in This Action**

First passed in 1789, the ATS provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations[.]" 28 U.S.C. § 1350.  Before *Kiobel*, the Supreme Court held the ATS was a "jurisdictional" statute, which could only be used to enforce a "narrow class of international norms" that are "'specific, universal, and obligatory'" and possess "definite content and acceptance among civilized nations." *Sosa*, 542 U.S. at 712, 729, 732.  *Kiobel* held that the ATS does not give federal courts jurisdiction over conduct occurring outside the United States.  133 S. Ct. at 1664-65, 1669.  The Court applied the presumption against extraterritorial application, which provides that "'[w]hen a statute gives no clear indication of an extraterritorial application, it has none[.]'" *Id*. at 1664 (internal citation omitted).  Because the ATS lacks such a clear indication, it does not confer extraterritorial jurisdiction. *Id.* at 1669.

*Kiobel* caused a "seismic shift" in the ATS legal landscape.  *Giraldo v. Drummond Co.*, No. 2:09-CV-1041-RDP, 2013 WL 3873960, at *1 (N.D. Ala. July 25, 2013).  It has forced courts to reverse earlier precedent that the ATS applies extraterritorially, and already led to the dismissal of many ATS suits.  *See, e.g.,*

*Balintulo v. Daimler AG*, __ F.3d __, No. 09-2778-cv(L), 2013 WL 4437057, at *1-2 & n.3 (2d Cir. August 21, 2013). In this Court, *Kiobel* reversed a 2011 *en banc* ruling, and prompted dismissal of that action. *Sarei v. Rio Tinto, PLC*, 671 F.3d 736, 747 (9th Cir. 2011), *vacated*, 133 S. Ct. 1995 (2013), *dismissed*, 2013 WL 3357740 (9th Cir. June 28, 2013).

*Kiobel* similarly forecloses ATS jurisdiction in this case, which involves international law claims based on extraterritorial conduct. By extension, the Panel does not have jurisdiction to enforce an injunction supported by these claims and restraining conduct that takes place entirely (1) on vessels bearing the flags of Australia, the Netherlands, and Japan (over which those countries exercise jurisdiction); (2) within the AWS (over which Australia asserts sovereignty); and (3) on the high seas (in regard to which courts apply the presumption against extraterritoriality). Nor does *Kiobel* permit the Panel to forbid extraterritorial conduct that does not violate any arguable international norm with an injunction that bans SSCS vessels from approaching the Whalers "closer than 500 yards." Dkt. 31.

Indeed, the injunction illustrates the rationale behind the presumption against extraterritoriality, which "guards against our courts triggering such serious foreign policy consequences, and instead defers such decisions, quite appropriately, to the

9

political branches." *Kiobel*, 133 S. Ct. at 1669. The injunction injects the U.S. courts into international controversies over whaling and Antarctica,[5] and intrudes on Australian sovereignty. It relates to whaling that takes place in the AWS, which Australia has tried to stop by issuing an injunction against the Whalers, and by bringing suit against Japan. Australia also has the closest ties to the anti-whaling campaigns: Sea Shepherd Australia has long been instrumental in, and now leads, the campaigns, which focus on the AWS, using Australian- and Dutch-flagged vessels that depart from Australian ports, under permits from an Australian agency. *See DC Opinion*, at 1221-22; Dkt. 32 at 15; Dkt. 79 at 6.

Despite this clear nexus, the Whalers have not brought suit in Australia to enjoin the anti-whaling activities of either SSCS or Sea Shepherd Australia. Rather, the Order and *Panel Opinion* have created a "uniquely hospitable forum for

---

[5] The Panel contended that comity toward Australia, and recognition of its injunction against the Whalers, was not warranted, because the United States does not recognize Australia's claim to the AWS. *Panel Opinion*, at 1105. But sovereignty over Antarctica is anything but black-and-white – it is a sensitive and complex diplomatic issue. U.S. policy on Antarctica is governed by several treaties, and coordinated by multiple executive agencies through participation in international bodies. *See* U.S. Department of State, *Antarctic* (March 22, 2007), http://www.state.gov/e/oes/ocns/opa/c6528.htm. Although the United States does not officially recognize *any* nation's claims to sovereignty over Antarctica, it also does not affirmatively challenge them – it avoids open conflict by indefinitely deferring resolution of the issue. *Id.* This delicate balance is potentially compromised by a U.S. court's proactive rejection of Australia's claim to the Antarctic territory.

the enforcement of international norms," *Kiobel*, 133 S. Ct. at 1668, allowing the

Whalers to engage in international forum shopping, enabling them to seek an

injunction here, even while defying the injunction against them in Australia. This

sis a situation that *Kiobel* seeks to avoid. *Id.* at 1664 (presumption against

extraterritoriality reflects principle that U.S. law "governs domestically but does not

rule the world") (citation omitted).

## 2. No Exception to *Kiobel* Applies to the Claims Asserted Here

The Whalers have contended that *Kiobel* "left alive the extraterritorial

application of ATS claims for piracy." Dkt. 200 at 19. This is a misreading of

*Kiobel*.[6] But even if an exception did exist, none of the conduct alleged here would

constitute "piracy," or, in any event, violate a "specific, universal, and obligatory"

international norm, as required for ATS jurisdiction by *Sosa* and *Kiobel*.

---

[6] *Kiobel* observed that piracy was one of "three principal offenses against the law of nations" recognized at the time of the ATS. 133 S. Ct. at 1666. It reasoned that if the ATS were originally meant to cover piracy, then "pirates may well be a category unto themselves" because piracy took place "on the high seas, beyond the territorial jurisdiction of the United States or any other country." *Id.* at 1667. Notwithstanding this *dicta*, the reasoning and rule of *Kiobel* require that the presumption against extraterritoriality be applied to piracy. *See id.* (the Court has "generally treated the high seas the same as foreign soil for purposes of the presumption against extraterritorial application"); *id.* at 1672-73 (Breyer, J., concurring) (piracy *does* take place within a jurisdiction, since "a ship is like land, in that it falls within the jurisdiction of the nation whose flag it flies").

11

To the extent that *Kiobel*'s *dicta* suggests the ATS may treat piracy differently, it refers only to piracy as it was understood in 1789. This limit is mandated by *Kiobel*'s defining principle – that U.S. courts may not create extraterritorial jurisdiction, but may only exercise it as explicitly directed by Congress. 133 S. Ct. at 1664-65. If the 1789 Congress meant to create extraterritorial jurisdiction over tort claims for piracy, it could only have meant to do so in regard to piracy as it was then understood. For this reason, both the *Kiobel* majority and the four-justice concurrence discuss piracy as it was defined in 1789. *See id.* at 1667, 1672 (citing 4 W. Blackstone, Commentaries on the Laws of England 72 (1769)); *see also id.* at 1671 (Breyer, J., concurring) (referring to the "18th-century paradigm" of piracy). In 1789, piracy was robbery at sea. *Id.* at 1667 (quoting Blackstone's definition); *see, e.g.*, *United States v. Smith*, 18 U.S. 153, 162 (1820) ("piracy, by the law of nations, is robbery upon the sea").

The Panel's definition of "piracy" exceeds this limiting historical antecedent. The Whalers have not accused SSCS of robbery at sea. Rather, their allegations only constitute "piracy" under the Panel's impermissible interpretation of the term. The Panel's view is built upon the definition of piracy from the United Nations Convention on the Law of the Sea ("UNCLOS") – a treaty the United States has not ratified. *Panel Opinion*, at 1101; *DC Opinion*, at 1231. UNCLOS defines piracy as

12

"illegal acts of violence . . . committed for private ends . . . on the high seas[.]"
*Panel Opinion*, at 1101. This definition significantly expands upon the traditional view of piracy, and is far from universally accepted. *See United States v. Said*, 757 F. Supp. 2d 554, 564-66 (E.D. Va. 2010), *vacated*, 680 F.3d 374 (4th Cir. 2012) (discussing lack of agreement on the UNCLOS definition). And because there is no international consensus on how to interpret the UNCLOS definition, the Panel had to be creative. It used *Webster's Dictionary* to posit that "violence" extends "to malicious acts against inanimate objects," and *Webster's* and a Belgian court opinion to assert that "private ends" includes ends "pursued on personal, moral or philosophical grounds, such as Sea Shepherd's professed environmental goals." *Panel Opinion*, at 1102.

Moreover, the Panel's unique take on piracy is not a "universal" international norm.[7] The Panel did not cite to any judicial, legislative, or international legal authority to support its interpretation of "violence." And many authorities disagree with its view of "private ends." *See, e.g.*, *Said*, 757 F. Supp. 2d at 564; *United States v. Dire*, 680 F.3d 446, 463 (4th Cir. 2012) (scholars disagree about meaning of "private ends"). Instead, the Panel created a novel definition of "piracy" under

---

[7] The Panel also disregarded this Court's precedent, requiring that before exercising ATS jurisdiction over a corporation, courts must "consider separately each violation of international law alleged and which actors may violate it." *Sarei*, 671 F.3d at 748. The Panel conducted no such analysis before enjoining SSCS.

federal common law – ignoring the Supreme Court's warnings against exercising

such "innovative authority" under the ATS.  *Sosa*, 542 U.S. at 725-26, 732.  Since

the Panel has "no congressional mandate to seek out and define new and debatable

violations of the law of nations," its creative interpretation of "piracy" violates

*Sosa*.  *Id.* at 728.[8]

## B.     The Order Ignores *Erie*'s Limits on Diversity Jurisdiction

The *Erie* doctrine dictates that a federal court sitting in diversity must apply

state law.  *Erie*, 304 U.S. at 78; *Am. Triticale, Inc. v. Nytco Servs., Inc.*, 664 F.2d

1136, 1141 (9th Cir. 1981) ("It is well settled that a federal court exercising

diversity jurisdiction must apply substantive state law.").  But there is no mention

of state law in the Order or *Panel Opinion.*  Although the Whalers initially brought

a state law claim, the district court found it "cannot support the injunction they

request."  *DC Opinion*, at 1228.  Since that claim focuses on SSCS's Washington-

based fundraising, the court concluded it could not support an injunction that did

---

[8] For the same reasons, *Kiobel* does not allow the Panel extraterritorial jurisdiction over safe navigation – first recognized as an ATS claim this case – as defined by the Convention for the Suppression of Unlawful Acts Against the Safety of Maritime Navigation ("SUA"), and the Convention on the International Regulations for Preventing Collisions at Sea ("COLREGS").  *Panel Opinion*, at 1103-06.  This claim is not related to "piracy," so there is no argument that it survives the presumption against extraterritoriality.  *See id.* at 1103-04.  And under *Kiobel*, courts may not unilaterally implement treaties that are not self-executing by *creating* private rights of action.  133 S. Ct. at 1664-65.

not target that fundraising, but sought direct control over activities in the Southern Ocean.  *Id.*  This holding was not contested by the Whalers on appeal, and the Panel did not even note the existence of the state law claim, much less analyze it as required under diversity jurisdiction.

To properly analyze diversity jurisdiction, federal courts must first look to the forum state's choice-of-law rules to determine the substantive law of decision. *Klaxon Co. v. Stentor Elec. Mfg. Co*., 313 U.S. 487, 496 (1941); *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*, 709 F.3d 872, 887 n.54 (9th Cir. 2013). Those rules dictate whether a claim is governed by the law of the forum state, another state, or a foreign country. *Day & Zimmermann, Inc. v. Challoner*, 423 U.S. 3, 4 (1975).  Since the Whalers filed their complaint in Washington, they are subject to Washington's choice-of-law rules.  *Klaxon*, 313 U.S. at 496.  Washington has adopted the Restatement's "most significant relationship" test in tort cases, which considers several factors, including the location of the injury and the conduct causing the injury, and the nationality and/or place of business of the parties. *Tilden-Coil Constructors, Inc. v. Landmark Am. Ins. Co.*, 721 F. Supp. 2d 1007, 1016 (W.D. Wash. 2010).

Neither the district court nor this Court applied Washington's choice-of-law analysis to the diversity claims.  This is clear error.  *See Hoffman v. Citibank N.A.*,

546 F.3d 1078, 1082-83 (9th Cir. 2008) (reversing where court failed to properly analyze choice of law).  Without such analysis, the Panel cannot simply assume that its injunction remains viable post-*Kiobel* on the basis of diversity jurisdiction.  Indeed, the Panel has never addressed the question of whether the Whalers' state law claims can support *any* injunction – much less the injunction that it issued.  *See Sims Snowboards, Inc. v. Kelly*, 863 F.2d 643, 647 (9th Cir. 1988) ("The general equitable powers of federal courts should not enable a party suing in diversity to obtain an injunction if state law clearly rejects the availability of that remedy.")

Rather than analyzing the application of diversity jurisdiction, the Panel simply invoked it *post hoc* as support for its ATS injunction.  Order at 1-2.  This defies *Erie*'s admonition that federal courts may not use diversity jurisdiction to impose federal common law.[9]  The ATS "places federal judges in an unusual lawmaking role as creators of federal common law."  *Balintulo*, 2013 WL 4437057, at *5 (citing *Sosa*, 542 U.S. at 724-25); *see also Sarei*, 671 F.3d at 751 ("we read *Sosa* to permit courts to develop the federal common law by incorporating into it

---

[9] There are exceptions, but none are applicable here.  For example, this is not a case where Congress has provided a private right of action in state court for violation of a federal statute. *See, e.g.*, 47 U.S.C. § 227(b).  In that unique situation, a federal court sitting in diversity applies federal law – as does a state court.  See *Landsman v. Funk PC v. Skinder-Strauss Assocs.*, 640 F.3d 72, 82 (3d Cir. 2011).  Here, no statute creates an action in state court for violation of customary international law.  Even if it did, both the state and federal courts would be bound by *Kiobel*'s limitation on extraterritorial jurisdiction.

certain claims that derive from norms of international law").  But under *Erie*, federal courts are generally forbidden from applying "federal common law" in diversity cases.  304 U.S. at 78.  By foisting a common law interpretation of international law upon the shoulders of diversity jurisdiction, the Order conflicts with *Erie* and "invade[s] rights which . . . are reserved by the Constitution to the several states."  *Id.* at 80.

At the same time, the Order eviscerates *Kiobel* by effectively recognizing an exception to the extraterritorial limits of the ATS whenever the parties are diverse. Because an ATS claim can only be brought by an "alien," diversity jurisdiction would often exist when the defendants are U.S. citizens or corporations.  28 U.S.C. § 1332(a)(2).  The Order gives ATS plaintiffs exactly what *Kiobel* forbids:  the right to proceed in actions against U.S. citizens or corporations, using diversity to claim extraterritorial jurisdiction over violations of international law.  *Kiobel*, 133 S. Ct. at 1664-65, 1669.  This is clear error, because *Kiobel* "plainly bars common-law suits, like this one, alleging violations of customary international law based solely on conduct occurring abroad."  *Balintulo*, 2013 WL 4437057, at *2, *7 & n.24 (rejecting argument that *Kiobel* allows extraterritorial claims against U.S.

17

corporations); *Giraldo*, 2013 WL 3873960, at *3-6 (same).[10]

## V.    CONCLUSION

Without jurisdiction, the injunction cannot stand.  It should be vacated, the contempt proceedings should be dismissed, and the action should be remanded to district court for further consideration of the non-ATS claims (which have not been fully examined by any court, or briefed by the parties).  The full Court should grant rehearing, and reject the Panel's effort to perform an end-run around *Kiobel* to resuscitate its ATS injunction through the misuse of diversity jurisdiction.

RESPECTFULLY SUBMITTED this 27th day of August 2013.

LANE POWELL PC

By /Claire Loebs Davis
   Claire Loebs Davis
   Katie Smith Matison
   LANE POWELL PC
   1420 Fifth Avenue, Suite 4200
   Seattle, WA 98101-2338
   Phone: 206-223-7000
   *Attorneys for Non-Party Susan Hartland*

---

[10] Indeed, before and after *Kiobel*, courts have recognized that diversity jurisdiction cannot serve as a stand-in for the ATS, and have analyzed claims brought under diversity separately – under state law.  *See Bigio v. Coca-Cola Co.*, 239 F.3d 440, 449 (2d Cir. 2000) (dismissing ATS claims and remanding state-law claims); *Shimari v. CACI Int'l, Inc.*, No. 1:08-cv-827, 2013 WL 3229720, *10-15 (E.D. Va. June 25, 2013) (dismissing international law claims in light of *Kiobel*; dismissing state claims after choice-of-law analysis).

18

## **CERTIFICATE OF COMPLIANCE**

I certify that pursuant to Circuit Rule 35-4 and 40-1, this petition for rehearing *en banc* is proportionally spaced, has a typeface of 14 points in a Times New Roman font, and contains 4,194 words, including headings and footnotes, and exclusive of the table of contents, table of authorities, signature, certificates, and exhibits, as counted by the Microsoft Word word-processing program used to generate this petition.

Dated this 27th day of August 2013.

LANE POWELL, PC


By    s/Claire Loebs Davis
      Claire Loebs Davis
      *Attorney for Non-Party Susan Hartland*

## <u>CERTIFICATE OF SERVICE</u>

U.S. Court of Appeals Docket Number 12-35266

I, Claire Loebs Davis, hereby certify that on the 27th day of August 2013, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated this 27th day of August 2013.

By   s/Claire Loebs Davis

# EXHIBIT A

**FILED**

NOT FOR PUBLICATION

AUG 13 2013

UNITED STATES COURT OF APPEALS

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| **INSTITUTE OF CETACEAN RESEARCH, a Japanese research foundation; KYODO SENPAKU KAISHA, LTD., a Japanese corporation; TOMOYUKI OGAWA, an individual; TOSHIYUKI MIURA, an individual,**<br><br>        Plaintiffs - Appellants,<br><br>  v.<br><br>**SEA SHEPHERD CONSERVATION SOCIETY, an Oregon nonprofit corporation; PAUL WATSON, an individual,**<br><br>        Defendants - Appellees. | No. 12-35266<br><br>D.C. No. 2:11-cv-02043-RAJ<br><br><br>**ORDER** |

Before:    **KOZINSKI**, Chief Judge, **TASHIMA** and **M. SMITH**, Circuit
Judges.

Non-party Susan Hartland argues that because we lack jurisdiction to file the

injunction "[i]n light of <u>Kiobel</u> [v. <u>Royal Dutch Shell Petroleum Co.</u>, 133 S. Ct.

1659 (2013)], . . . . the injunction should be vacated and the contempt proceedings

dismissed." Hartland Motion at 5. Even assuming Hartland's interpretation of

page 2

Kiobel is correct, "[d]ismissal for lack of jurisdiction is not warranted to the extent that the complaint pleads facts from which federal jurisdiction clearly may be inferred." Demarest v. United States, 718 F.2d 964, 965 (9th Cir. 1983). The district court here had subject matter jurisdiction in the case based on diversity of citizenship. 28 U.S.C. § 1332(a)(2).

Appellees Sea Shepherd and Watson are American citizens, and appellants are all foreign citizens; thus, section 1332's complete diversity requirement is met. See Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 580 n.2 (1999). In addition, the district court found that the amount in controversy exceeds $75,000; Hartland does not argue that this finding is clearly erroneous, and plainly it is not. See Crum v. Circus Circus Enters., 231 F.3d 1129, 1130 (9th Cir. 2000).

The Appellate Commissioner's ruling denying dismissal of the contempt proceedings is affirmed.

# EXHIBIT B

Institute of Cetacean Research v. Sea Shepherd Conservation Soc., 708 F.3d 1099 (2013)

2013 A.M.C. 305, 13 Cal. Daily Op. Serv. 2117, 2013 Daily Journal D.A.R. 2467

708 F.3d 1099
United States Court of Appeals,
Ninth Circuit.

INSTITUTE OF CETACEAN RESEARCH, a
Japanese research foundation; Kyodo Senpaku
Kaisha, Ltd., a Japanese corporation; Tomoyuki
Ogawa, an individual; Toshiyuki Miura, an
individual, Plaintiffs–Appellants,
v.
SEA SHEPHERD CONSERVATION SOCIETY, an
Oregon nonprofit corporation; Paul Watson, an
individual, Defendants–Appellees.

No. 12–35266. | Argued and Submitted Oct. 9, 2012.
| Filed Feb. 25, 2013.

**Synopsis**

**Background:** Whalers brought action against
Washington-based conservation organization, which
engaged in frequent confrontations with whalers in
Southern Ocean, under Alien Tort Statute (ATS) and
Washington law, alleging a violation of their right to free
navigation at sea and piracy. The United States District
Court for the Western District of Washington, Richard A.
Jones, J., 860 F.Supp.2d 1216, denied whalers' request for
a preliminary injunction requiring organization's ships
and boats to stay at least 800 meters from their vessels,
and prohibiting attacks on whaling crew members or its
ships, and dismissed its piracy claims. Whalers appealed,
and were granted injunction pending their appeal, 702
F.3d 573.

**Holdings:** The Court of Appeals, Kozinski, Chief Judge,
held that:

[1] organization engaged in acts of piracy;

[2] whalers were likely to succeed on merits of its claim
that organization violated the Convention for the
Suppression of Unlawful Acts Against the Safety of
Maritime Navigation;

[3] whalers would likely suffer irreparable harm in
absence of preliminary injunction;

[4] balance of equities favored preliminary injunction;

[5] public interest supported grant of the preliminary
injunction; and

[6] doctrine of unclean hands did not preclude issuance of
the preliminary injunction.

Reversed.

M. Smith, Circuit Judge, filed an opinion concurring in
part and dissenting in part.

**Attorneys and Law Firms**
**\*1100** Martha Christie Helmer, John Neupert (argued)
and James L. Phillips, Miller Nash, LLP, Portland, OR,
for appellants.

Rachel Eve Buker, Daniel P. Harris (argued) and Charles
Philip Moure, Harris & Moure, PLLC, Seattle, WA, for
appellees.

Appeal from the United States District Court for the
Western District of Washington, Richard A. Jones,
District Judge, Presiding. D.C. No. 2:11–cv–02043–RAJ.

Before: KOZINSKI, Chief Judge, TASHIMA and
MILAN D. SMITH, JR., Circuit Judges.

**Opinion**

**\*1101 OPINION**

KOZINSKI, Chief Judge:
You don't need a peg leg or an eye patch. When you ram
ships; hurl glass containers of acid; drag metal-reinforced
ropes in the water to damage propellers and rudders;
launch smoke bombs and flares with hooks; and point
high-powered lasers at other ships, you are, without a
doubt, a pirate, no matter how high-minded you believe
your purpose to be.

Plaintiffs–Appellants (collectively, "Cetacean") are
Japanese researchers who hunt whales in the Southern
Ocean. The United States, Japan and many other nations
are signatories to the International Convention for the
Regulation of Whaling art. VIII, Dec. 2, 1946, 62 Stat.
1716, 161 U.N.T.S. 74, which authorizes whale hunting
when conducted in compliance with a research permit
issued by a signatory. Cetacean has such a permit from
Japan. Nonetheless, it has been hounded on the high seas
for years by a group calling itself Sea Shepherd
Conservation Society and its eccentric founder, Paul
Watson (collectively "Sea Shepherd"). Sea Shepherd's
tactics include all of those listed in the previous
paragraph.

Cetacean sued under the Alien Tort Statute, 28 U.S.C. § 1350, for injunctive and declaratory relief. The statute provides a cause of action for "a tort ... committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. Cetacean argues that Sea Shepherd's acts amount to piracy and violate international agreements regulating conduct on the high seas. The district court denied Cetacean's request for a preliminary injunction and dismissed its piracy claims. We have jurisdiction over the order denying the injunction pursuant to 28 U.S.C. § 1292(a). We also have jurisdiction to review the dismissal of the piracy claims because the district court's reasoning for dismissing them is "inextricably intertwined with" its reasons for denying the preliminary injunction. *Smith v. Arthur Andersen LLP, 421 F.3d 989, 998 (9th Cir.2005)* (internal quotation marks omitted).

**I. DISMISSAL OF THE PIRACY CLAIMS**

[1] We review the district court's dismissal of Cetacean's piracy claims de novo. *Manzarek v. St. Paul Fire & Marine Ins. Co.,* 519 F.3d 1025, 1030 (9th Cir.2008). "[T]he definition of piracy under the law of nations ... [is] spelled out in the UNCLOS, as well as the High Seas Convention," which provide almost identical definitions. *United States v. Dire,* 680 F.3d 446, 469 (4th Cir.2012); *see* United Nations Convention on the Law of the Sea ("UNCLOS"), art. 101, Dec. 10, 1982, 1833 U.N.T.S. 397; Convention on the High Seas, art. 15, Apr. 29, 1958, 13 U.S.T. 2312, 450 U.N.T.S. 82. The UNCLOS defines "piracy" as "illegal acts of *violence* or detention, or any act of depredation, committed for *private ends* by the crew or the passengers of a private ship ... and directed ... on the high seas, against another ship ... or against persons or property on board such ship." UNCLOS art. 101 (emphasis added); *see also* Convention on the High Seas art. 15.

The district court's analysis turns on an erroneous interpretation of "private ends" and "violence." The district court construed "private ends" as limited to those pursued for "financial enrichment." But the common understanding of "private" is far broader. The term is normally used as an antonym to "public" (e.g., private attorney general) and often refers to matters of a personal nature that are not necessarily connected to finance (e.g., private property, private entrance, private understanding and invasion of privacy). *See Webster's* \*1102 *New Int'l Dictionary* 1969 (2d. ed.1939) (defining "private" to mean "[b]elonging to, or concerning, an individual person, company, or interest").

We give words their ordinary meaning unless the context requires otherwise. *See Leocal v. Ashcroft,* 543 U.S. 1, 8–9, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 69 (2012). The context here is provided by the rich history of piracy law, which defines acts taken for private ends as those not taken on behalf of a state. *See* Douglas Guilfoyle, *Piracy Off Somalia: UN Security Council Resolution 1816 and IMO Regional Counter–Piracy Efforts,* 57 Int'l & Comp. L.Q. 690, 693 (2008) (discussing the High Seas Convention); Michael Bahar, *Attaining Optimal Deterrence at Sea: A Legal and Strategic Theory for Naval Anti–Piracy Operations,* 40 Vand. J. Transnat'l L. 1, 32 (2007); *see also Harmony v. United States,* 43 U.S. (2 How.) 210, 232, 11 L.Ed. 239 (1844) ("The law looks to [piracy] as an act of hostility ... being committed by a vessel not commissioned and engaged in lawful warfare."). Belgian courts, perhaps the only ones to have previously considered the issue, have held that environmental activism qualifies as a private end. *See* Cour de Cassation [Cass.] [Court of Cassation] *Castle John v. NV Mabeco,* Dec. 19, 1986, 77 I.L.R. 537 (Belg.). This interpretation is "entitled to considerable weight." *Abbott v. Abbott,* 560 U.S. 1, 130 S.Ct. 1983, 1993, 176 L.Ed.2d 789 (2010) (internal quotation marks omitted). We conclude that "private ends" include those pursued on personal, moral or philosophical grounds, such as Sea Shepherd's professed environmental goals. That the perpetrators believe themselves to be serving the public good does not render their ends public.

The district court's interpretation of "violence" was equally off-base. Citing no precedent, it held that Sea Shepherd's conduct is not violent because it targets ships and equipment rather than people. This runs afoul of the UNCLOS itself, which prohibits "violence ... against another ship" and "violence ... against persons or property." UNCLOS art. 101. Reading "violence" as extending to malicious acts against inanimate objects also comports with the commonsense understanding of the term, *see Webster's New Int'l Dictionary* 2846, as when a man violently pounds a table with his fist. Ramming ships, fouling propellers and hurling fiery and acid-filled projectiles easily qualify as violent activities, even if they could somehow be directed only at inanimate objects.

Regardless, Sea Shepherd's acts fit even the district court's constricted definition. The projectiles directly endanger Cetacean's crew, as the district court itself recognized. And damaging Cetacean's ships could cause them to sink or become stranded in glacier-filled, Antarctic waters, jeopardizing the safety of the crew.

Institute of Cetacean Research v. Sea Shepherd Conservation Soc., 708 F.3d 1099 (2013)

2013 A.M.C. 305, 13 Cal. Daily Op. Serv. 2117, 2013 Daily Journal D.A.R. 2467

The activities that Cetacean alleges Sea Shepherd has engaged in are clear instances of violent acts for private ends, the very embodiment of piracy. The district court erred in dismissing Cetacean's piracy claims.

## II. PRELIMINARY INJUNCTION

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). We review the district court's denial of the preliminary injunction for **\*1103** abuse of discretion. *Harris v. Bd. of Supervisors, L.A. Cnty.,* 366 F.3d 754, 760 (9th Cir.2004). "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990).

### A. Likelihood of Success

Cetacean sought its injunction pursuant to three international agreements: the Convention for the Suppression of Unlawful Acts Against the Safety of Maritime Navigation ("SUA Convention"), art. 3, Mar. 10, 1988, S. Treaty Doc. No. 101–1, 1678 U.N.T.S. 222, the UNCLOS and the Convention on the International Regulations for Preventing Collisions at Sea ("COLREGS"), Oct. 20, 1972, 28 U.S.T. 3459, 1050 U.N.T.S. 18.

### 1. The SUA Convention

[2] The SUA Convention prohibits acts that endanger, or attempt to endanger, the safe navigation of a ship. SUA Convention art. 3. Cetacean presented uncontradicted evidence that Sea Shepherd's tactics could seriously impair its ability to navigate. The district court nonetheless concluded that, since Sea Shepherd has not yet disabled any of Cetacean's ships, it's unlikely it would succeed in the future. This was clear error. The district court overlooked the actual language of the Convention, which prohibits "endanger [ing]" safe navigation. *Id.* This requires only that Sea Shepherd create dangerous conditions, regardless of whether the harmful consequences ever come about. *See Webster's New Int'l Dictionary* 843. As to whether Sea Shepherd's tactics

actually are dangerous, the record discloses that it has rammed and sunk several other whaling vessels in the past. *See* Appendix.

The district court also erred by failing to recognize that Sea Shepherd, at the very least, *attempted* to endanger the navigation of Cetacean's ships. An attempt is sufficient to invoke the SUA Convention, even if unsuccessful. Sea Shepherd's repeated claims that its efforts are merely "symbolic" and "employed so as to ensure maximum safety" are disingenuous. How else can it explain that it has switched to metal-reinforced prop-fouling ropes? Reinforced ropes carry the same symbolic meaning as normal ropes, but they are far more destructive. Nor does symbolism require Sea Shepherd to bring its ships dangerously close to Cetacean's. The district court's conclusion that Cetacean wasn't likely to succeed on its SUA Convention claims rested on an implausible determination of the facts and an erroneous application of law; it was an abuse of discretion. *United States v. Hinkson,* 585 F.3d 1247, 1251 (9th Cir.2009) (en banc).

### 2. The UNCLOS

For the reasons explained above, Part I, *supra,* the district court erred in its assessment of Cetacean's UNCLOS piracy claims, and consequently abused its discretion in assessing the likelihood of success on these claims. *See Cooter & Gell,* 496 U.S. at 405, 110 S.Ct. 2447.

### 3. The COLREGS

The district court did find that Cetacean is likely to succeed on the merits of its claims under the COLREGS. The COLREGS state obligatory and universal norms for navigating ships so as to avoid collision. *Crowley Marine Services, Inc. v. Maritrans, Inc.,* 530 F.3d 1169, 1172–73 (9th Cir.2008). Sea Shepherd deliberately navigates its ships dangerously close to Cetacean's ships. The district court's finding that this is likely a violation of the **\*1104** COLREGS is adequately supported by the record. *See Hinkson,* 585 F.3d at 1251.

### B. LIKELIHOOD OF IRREPARABLE HARM

[3] The district court determined that "injury is possible, but not likely," even though it found that the projectiles Sea Shepherd launches at Cetacean's ships "are an obvious hazard to anyone who [sic] they might hit" and that Sea Shepherd navigates its ships "in such a way that a

Institute of Cetacean Research v. Sea Shepherd Conservation Soc., 708 F.3d 1099 (2013)

2013 A.M.C. 305, 13 Cal. Daily Op. Serv. 2117, 2013 Daily Journal D.A.R. 2467

collision is highly likely." Sea Shepherd itself adorns the hulls of its ships with the names and national flags of the numerous whaling vessels it has rammed and sunk. *See* Appendix. The district court's observation that Cetacean hasn't yet suffered these injuries is beside the point. *See Helling v. McKinney,* 509 U.S. 25, 33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). Cetacean's uncontradicted evidence is that Sea Shepherd's tactics could immobilize Cetacean's ships in treacherous Antarctic waters, and this is confirmed by common sense: A dangerous act, if committed often enough, will inevitably lead to harm, which could easily be irreparable. *Harris,* 366 F.3d at 766.

**C. BALANCE OF EQUITIES**

[4] The district court correctly found that the balance of equities favors Cetacean. As it noted, "[a]bsent an injunction, the whalers will continue to be the victims of Sea Shepherd's harassment," but "Sea Shepherd ... points to no hardship that it will suffer if the court imposes an injunction."

**D. PUBLIC INTEREST**

[5] "The public interest inquiry primarily addresses impact on non-parties rather than parties." *Bernhardt v. L.A. Cnty.,* 339 F.3d 920, 931 (9th Cir.2003) (internal quotation marks omitted). This is particularly the case where "the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences." *Stormans, Inc. v. Selecky,* 586 F.3d 1109, 1139 (9th Cir.2009). The primary public interests at issue here are the health of the marine ecosystem, *Winter,* 555 U.S. at 25–26, 129 S.Ct. 365; *see also Earth Island Inst. v. U.S. Forest Serv.,* 442 F.3d 1147, 1177 (9th Cir.2006), and the safety of international waterways.

Where a valid law speaks to the proper level of deference to a particular public interest, it controls. *See Golden Gate Rest. Ass'n v. City & Cnty. of S.F.,* 512 F.3d 1112, 1126–27 (9th Cir.2008). Our laws defining the public interest in regards to whaling are the Whaling Convention Act and the Marine Mammal Protection Act, both of which permit whaling pursuant to scientific permits issued under the Whaling Convention. 16 U.S.C. § 1372; 16 U.S.C. § 916c. Cetacean's activities are covered by such a permit and thus are consistent with congressional policy as to the marine ecosystem.

Our laws also reflect a strong public interest in safe navigation on the high seas. As already discussed, Sea Shepherd's activities clearly violate the UNCLOS, the SUA Convention and the COLREGS. *See* Part II.A, *supra*. As such, they are at loggerheads with the public interest of the United States and all other seafaring nations in safe navigation of the high seas.

The district court also considered the interest in keeping U.S. courts out of the international political controversy surrounding whaling. But enjoining piracy sends no message about whaling; it sends the message that we will not tolerate piracy. This is hardly a controversial view, as evidenced by a joint statement from the United States, Australia, the Netherlands and New Zealand condemning dangerous **1105** activities in the Southern Ocean. Joint Statement on Whaling and Safety at Sea from the Governments of Australia, the Netherlands, New Zealand, and the United States: Call for Responsible Behavior in the Southern Ocean Whale Sanctuary (Dec. 13, 2011), *available at* http://www.state.gov/r/pa/prs/ps/2011/12/178704.htm. Refusing the injunction sends the far more troublesome message that we condone violent vigilantism by U.S. nationals in international waters.

The district court also rejected Cetacean's claims on international comity grounds. While there is a public interest in maintaining harmonious international relations, it's not a factor here. An Australian court has entered default judgment against Cetacean, purporting to enjoin it from whaling in Antarctic coastal waters over which Australia claims sovereignty. The district court's deference to Australia's judgment in that case was an abuse of discretion. *Asvesta v. Petroutsas,* 580 F.3d 1000, 1009 (9th Cir.2009). To begin, the district court misunderstood the Australian judgment, which addressed the legality of Cetacean's activities, not Sea Shepherd's. Whatever the status of Cetacean's whaling under Australian law, it gives Sea Shepherd no license to engage in piracy. It is for Australia, not Sea Shepherd, to police Australia's court orders.

Additionally, comity applies only if the foreign court has competent jurisdiction. *Id.* at 1011. But the United States doesn't recognize Australia's claims of sovereignty over Antarctic waters. *See* Note from U.S. Deputy Representative to the United Nations, to Secretary–General of the United Nations (Dec. 3, 2004); Note from Embassy of the United States, to Australian Department of Foreign Affairs and Trade (Mar. 31, 1995). By according comity to Australia's judgment, we would implicitly recognize Australia's jurisdiction, in contravention of the stated position of our government. The conduct of foreign affairs is within the exclusive province of the Executive, *see United States v. Hooker,* 607 F.2d 286, 289 (9th Cir.1979), and we must defer to its

2013 A.M.C. 305, 13 Cal. Daily Op. Serv. 2117, 2013 Daily Journal D.A.R. 2467

views, *see Williams v. Suffolk Ins. Co.,* 38 U.S. (13 Pet.) 415, 420, 10 L.Ed. 226 (1839); *cf. 77 I.L.R. 537; Mingtai Fire Ins. Co. v. United Parcel Serv.,* 177 F.3d 1142, 1147 (9th Cir.1999).

## E. UNCLEAN HANDS

[6] An injunction is an equitable remedy. *Winter,* 555 U.S. at 32, 129 S.Ct. 365. While the *Winter* factors "are pertinent in assessing the propriety of any injunctive relief," *id.,* traditional equitable considerations such as laches, duress and unclean hands may militate against issuing an injunction that otherwise meets *Winter 's* requirements. Here, however, the district court abused its discretion in denying the injunction based on unclean hands. *Seller Agency Council, Inc. v. Kennedy Ctr. for Real Estate Educ., Inc.,* 621 F.3d 981, 986 (9th Cir.2010).

The district court held that Cetacean's hands are unclean because, "[i]n flouting the Australian injunction, the whalers demonstrate their disrespect for a judgment of a domestic court." Because neither the United States nor Japan recognizes Australia's jurisdiction over any portion of the Southern Ocean, Cetacean owes no respect to the Australian order. Moreover, the unclean hands doctrine requires that the plaintiff have "dirtied [his hands] in acquiring the right he now asserts, or that the manner of dirtying renders inequitable the assertion of such rights against the defendant." *Republic Molding Corp. v. B.W. Photo Utils.,* 319 F.2d 347, 349 (9th Cir.1963). Cetacean has done nothing to acquire the rights to safe navigation and protection from pirate attacks; they flow automatically from **1106 customary international law and treaties. Nor is there anything remotely inequitable in seeking to navigate the sea lanes without interference from pirates.

* * *

The district court's orders denying Cetacean's preliminary injunction and dismissing its piracy claims are **REVERSED.** The preliminary injunction we issued on December 17, 2012, *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y,* 702 F.3d 573 (9th Cir.2012), will remain in effect until further order of this court. The district judge's numerous, serious and obvious errors identified in our opinion raise doubts as to whether he will be perceived as impartial in presiding over this high-profile case. The appearance of justice would be served if the case were transferred to another district judge, drawn at random, and we so order in accordance with the standing orders of the Western District of Washington. The panel retains jurisdiction over any further appeals or writs involving this case.

M. SMITH, Circuit Judge, concurring in part and dissenting in part:

I concur in both the reasoning and the judgment of the panel opinion, reversing the district court's dismissal of Cetacean's piracy claims, and its failure to grant Cetacean a preliminary injunction. Even if one believes it is barbaric to harvest whales for any purpose at the beginning of the 21st century, as practiced by Cetacean, it is clearly permitted under international law. *See* International Convention for the Regulation of Whaling art. VIII, Dec. 2, 1946, 62 Stat. 1716, 161 U.N.T.S. 74. Sea Shepherd's piracy is not. *See* Maj. Op. at 1101–05.

However, I respectfully dissent from the majority's decision to reassign this case to a different district judge. "We remand to a different judge only in unusual circumstances or when required to preserve the interests of justice." *United States v. Wolf Child,* 699 F.3d 1082, 1102 (9th Cir.2012) (citing *United States v. Quach,* 302 F.3d 1096, 1103 (9th Cir.2002)). Specifically, we employ a three-factor test to determine whether to remand a case to a different district judge:

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Id.; see also Wyler Summit P'ship v. Turner Broad. Sys., Inc.,* 235 F.3d 1184, 1196 (9th Cir.2000).

Applying these factors, I see no basis for reassigning this case. Our panel opinion is well-articulated, succinct, and absolutely clear as to what is required of the district judge on remand. Importantly, it leaves no room for any district judge to "have substantial difficulty ... putting out of his or her mind previously expressed views." *Wolf Child,* 699 F.3d at 1102. The Sea Shepherds are pirates. Period. No district judge could fail to grasp the clarity and firmness of our opinion.

Institute of Cetacean Research v. Sea Shepherd Conservation Soc., 708 F.3d 1099 (2013)

2013 A.M.C. 305, 13 Cal. Daily Op. Serv. 2117, 2013 Daily Journal D.A.R. 2467

Moreover, the "appearance of justice" does not require reassignment. We have previously reserved reassignment for only the most egregious cases.[1] While the district **\*1107** judge clearly erred in finding for the Sea Shepherds, there is absolutely no evidence in this record to suggest that he did so for an improper purpose, such as bias or prejudice.

Finally, because I do not believe "preserving the appearance of fairness" requires reassignment, the majority's decision will necessarily "entail waste and duplication out of proportion" to any benefits. *Wolf Child, 699 F.3d at 1102.* District judges, like circuit judges, occasionally make mistakes. Where, as here, there is no reason to suspect that the district judge will repeat those mistakes on remand, reassignment is inappropriate.

I respectfully dissent from the majority's decision to reassign this case to a different district judge.

**\*1108** *Appendix*



**ER 279**

**\*1109**

Institute of Cetacean Research v. Sea Shepherd Conservation Soc., 708 F.3d 1099 (2013)

2013 A.M.C. 305, 13 Cal. Daily Op. Serv. 2117, 2013 Daily Journal D.A.R. 2467



**ER 281**

2013 A.M.C. 305, 13 Cal. Daily Op. Serv. 2117, 2013 Daily Journal D.A.R. 2467

**Parallel Citations**

Footnotes

1    *See, e.g., United States v. Working,* 287 F.3d 801, 809–10 (9th Cir.2002) (reassigning to different district judge where district court sentenced defendant to one day in jail following conviction for assault with the intent to commit first degree murder); *Quach,* 302 F.3d at 1103–04 (reassigning where district court previously suggested that the defendant was "fortunate" not to receive the death penalty, and where the court indicated that had the government moved for a downward departure, it would have denied the motion); *United Nat. Ins. Co. v. R & D Latex Corp.,* 141 F.3d 916, 919–20 (reassigning where district judge had "twice granted summary judgment" to a party without articulating any reasons); *cf. Wyler Summit Partnership,* 235 F.3d at 1196 (refusing to remand to a different district judge even though district judge "adopted verbatim" one party's clearly biased proposed order); *United States v. Waknine,* 543 F.3d 546, 560 (9th Cir.2008) (refusing to reassign to a different district judge despite commission of significant procedural errors).

---

**End of Document**                                      © 2013 Thomson Reuters. No claim to original U.S. Government Works.

 © 2013 Thomson Reuters. No claim to original U.S. Government Works.