FILED

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

JAN 31 2014

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

|  |  |
|---|---|
| INSTITUTE OF CETACEAN RESEARCH, a Japanese research foundation; et al., | No. 12-35266 |
| Plaintiffs - Appellants, | D.C. No. 2:11-cv-02043-RAJ Western District of Washington, Seattle |
| v. | |
| SEA SHEPHERD CONSERVATION SOCIETY, an Oregon nonprofit corporation; PAUL WATSON, an individual, | REPORT AND RECOMMENDATION |
| Defendants - Appellees. | |

Before: Peter L. Shaw, Appellate Commissioner.

On December 17, 2012, the Ninth Circuit issued an injunction prohibiting

the Sea Shepherd Conservation Society ("SSCS"), its Executive Director Paul

Watson, and parties acting in concert with them from interfering with the whaling

activities of Plaintiffs. In response to the injunction, SSCS and Watson withdrew

financial and administrative support from the imminent Sea Shepherd whale

defense campaign, recognizing that it would be directed and controlled by Sea

Shepherd Australia ("SSAL"), an independent foreign entity with a separate board of directors and independent financial resources.

SSCS had, with financial and logistical support from SSAL and other foreign Sea Shepherd entities, recruited crew and fueled and outfitted four ships for the whale defense campaign. SSAL took over control of the campaign, and the captains of the ships – citizens of foreign nations (except one who is a dual citizen of Sweden and the United States) – then took actions prohibited by the injunction.

The question in this contempt proceeding brought by Plaintiffs against SSCS, Watson, the SSCS board of directors, and the SSCS Administrative Director, is whether Plaintiffs have shown by clear and convincing evidence that SSCS's withdrawal action was insufficient and that the alleged contemnors should be held in contempt of the injunction.

I
Findings of Fact

**A. Background**

Dissatisfied with what he perceived as lax enforcement of laws designed to protect marine wildlife, Paul Watson founded SSCS in 1977.[1] In 1981, SSCS became an Oregon nonprofit corporation that is a tax-exempt charitable

---

[1] Watson 1763:1-14.

organization under section 501(c)(3) of the Internal Revenue Code. Its principal place of business is Friday Harbor, Washington. SSCS is governed by an unpaid volunteer board of directors.[2]

The stated goal of SSCS is to "defend, conserve, and protect the world's marine wildlife species and marine wilderness ecosystems."[3] SSCS has sponsored various missions throughout the world to advance its goal, and has spawned entities in other countries that also use the "Sea Shepherd" name. These include entities organized and governed under the laws of Australia, Belgium, France, Germany, the Netherlands, and the United Kingdom.[4] The various Sea Shepherd entities consider themselves to be part of a loosely organized conservation movement.[5] Each of these Sea Shepherd entities has its own board of directors and

---

[2] "Admitted Facts," Pre-Hearing Order ("PHO"), Dkt. #245 at 10.

[3] Ex. 114 at 5.

[4] Exs. 506-507, 512-517.

[5] Wintner 938:15-25, 963:17-965:11; Hansen 1593:21-1594:16, 1634:14-1635:17; Watson 1765:18-25, 1767:2-16.

its own separate bank accounts.[6]  Watson was on the board of directors of most if not all of the Sea Shepherd entities.[7]

Both before and during the events at issue here, SSCS identified itself as a global or international nonprofit marine wildlife organization in its administrative materials and on its website.[8]  SSCS coordinated and cooperated with other Sea Shepherd entities on many campaigns, functioned as the administrative center for many Sea Shepherd projects, and shared policy ideas and administrative strategies with the other Sea Shepherd entities.[9]

Plaintiff Institute of Cetacean Research ("ICR") has for many years received permits from the government of Japan that authorize the taking of whales for research purposes, and ICR again received a permit from the government of Japan to take whales in the Southern Ocean during the period December 20, 2012 to March 31, 2013.[10]  These permits are permissible under the International

_____

[6] Exs. 512-517; Hartland 281:3-282:13; Zuckerman 350:1-8; Rieman 1300:1-11; Hansen 1631:9-25, 1633:15-18, 1701:18-1702:1

[7] Ex. 192; Watson 1842:8-1843:8.

[8] Exs. 114, 182, 314.

[9] Hartland 283:9-285:2.

[10] PHO, Dkt. #245 at 12.

Convention for the Regulation of Whaling.[11]  To facilitate its mission, ICR

chartered from plaintiff Kyodo Senpaku Kaisha, Ltd. the ship *Nisshin Maru*, and

its three escorts, the *Yushin Maru*, Nos. 1, 2, and 3.  In addition, ICR also chartered

the *Sun Laurel*, a refueling tanker.

The most prominent Sea Shepherd mission has been a yearly campaign to

prevent ICR from killing whales in the Southern Ocean.  Since 2004, Sea Shepherd

vessels have employed direct action strategy to interfere with the Japanese whaling

efforts.  Beginning with the 2007-2008 campaign, the anti-whaling efforts have

been documented on the reality television series *Whale Wars*, which is shown on

the Animal Planet cable network.  As described in the February 25, 2013 opinion

in this case, Sea Shepherd's tactics have included hurling smoke bombs and glass

containers of acid and dragging metal-reinforced ropes in the water to damage

propellers and rudders.[12]

---

[11]  Int'l Conv. for the Regulation of Whaling, Art. VIII, § 1, Dec. 2, 1946, 62 Stat. 1716, 161 U.N.T.S. 72.

[12]  Butyric acid does not sting or burn, but it has a strong and unpleasant odor and taste and therefore taints any whale meat exposed to it.  Hansen 1596:22-1597:14, 1700:21-1701:1.  Watson testified that Sea Shepherd stopped using butyric acid the "year before last" because the Dutch Registry of Shipping had requested that they not use it.  Watson 1872:20-1873:2.

In an attempt to end the Sea Shepherd interference, Plaintiffs filed suit on

December 8, 2011 in the Western District of Washington seeking to enjoin SSCS

and its founder and Executive Director, Paul Watson, from attacking and

endangering the safety of the vessels and crew engaged in whaling research in the

Southern Ocean.  Judge Jones denied Plaintiffs' request for a preliminary

injunction on March 19, 2012, and ruled that Plaintiffs were unlikely to succeed on

the merits of their complaint.  *See Inst. of Cetacean Research v. Sea Shepherd*

*Conservation Soc'y*. 860 F.Supp.2d 1216 (W.D. Wash. 2012), *rev'd*, 725 F.3d 940

(9th Cir. 2013).  Plaintiffs filed a notice of appeal on April 10, 2012.

**B. Operation Zero Tolerance**

In reliance on Judge Jones's ruling, Watson and the other members of the

SSCS board prepared in earnest to conduct the ninth annual whale defense

campaign in 2012-2013, entitled "Operation Zero Tolerance" ("OZT").[13]  As in

previous years, SSCS took the leading administrative role in preparing for OZT,

and in funding those preparations.  SSCS's Finance Director, Nic Makhani,

coordinated the sharing of resources from Sea Shepherd organizations around the

---

[13]  Zuckerman 540:20-22, 579:12-15; Gaede 628:18-629-1; Watson
1776:15-24.  Wintner testified that Judge Jones's ruling gave him confidence in his
decision to join the SSCS board on what turned out to be the eve of the injunction.
Wintner 972:3-13.

world to fund OZT.[14]  Makhani was aware of the other entities' budgets, but he did

not have a role in approving those budgets, nor did he manage their day-to-day

expenses.[15]  Makhani and the SSCS board of directors viewed the financial

contributions of other Sea Shepherd entities as donations made at the discretion of

the other entities' boards.[16]

With this assistance from foreign Sea Shepherd entities, SSCS recruited

volunteer and paid crew, and outfitted and fueled four vessels for OZT:  the *Bob

Barker*, the *Steve Irwin*, the *Sam Simon*, and the *Brigitte Bardot*.  As had been the

case in previous whale defense campaigns, SSAL took a leading logistical role in

preparing for OZT.[17]

SSAL is an Australian public company limited by guarantee, registered

under the laws of Australia on January 5, 2007.  At the time the injunction issued,

SSAL had four paid employees, several hundred volunteers, and sixteen local

_____

[14]  Rieman 1301:16-1302:11; Hansen 1625:12-22; Watson 1851:2-24.

[15]  Ex. 346 (Makhani dep. designations) 50:7-14; 53:17-54:4; Hansen 1706:16-1708:6.

[16]  Ex. 346 (Makhani dep. designations) 24:2-21; 55:15-56:5; Rieman 1303:2-16.

[17]  Hammarstedt 926:1-13; Brown 1563:14-24; Hansen 1603:13-1604:15, 1649:11-14.

chapters in Australia.[18]  The Sea Shepherd vessels' long-term berths are in

Williamstown, Australia, where SSAL provides a ship operations base and

logistical support for the Southern Ocean campaigns.[19]  The whale defense

campaigns enjoy popular support in Australia because the whales are often seen off

the shores of Australia, and the campaigns seek to protect the Australian Whale

Sanctuary from conduct by Plaintiffs that was specifically enjoined in 2008 by the

Australian Federal Court.[20]  About half of the OZT crew members were

Australian.[21]

　　　Watson had been the campaign leader for all previous whale defense

campaigns.  His involvement in the preparations for OZT was limited by his legal

difficulties.[22]  At all times material to this proceeding, Watson was the subject of

an INTERPOL Red Notice that put him at risk of arrest and extradition to Costa

Rica or Japan.[23]  Although Watson had planned to be the campaign leader for OZT,

---

[18]  Hansen 1615:22-1616:22, 1620:7-11.

[19]  Hammarstedt 872:15-24; McMullan 1119:19-1120:16; Hansen 1647:4-1648:16.

[20]  Hansen 1645:20-1646:16; Watson 1773:24-1774:9.

[21]  Hammarstedt 871:21-22.

[22]  Ex. 96; Gaede 561:2-9; Rieman 1310:4-9; Watson 1778:13-1779:12.

[23]  Ex. 731; Watson 1759:4-11, 1760:10-14.

it was unknown whether he would be able to do so or to resume his post as captain of the *Steve Irwin*.[24]  In his absence, Siddharth Chakravarty, a citizen of India, had functioned as captain of the *Steve Irwin*.[25]  If Watson had been unable to rejoin the OZT fleet, Chakravarty would have remained captain of the *Steve Irwin*, and Peter Hammarstedt, the captain of the *Bob Barker* and a veteran of multiple Southern Ocean campaigns, would have assumed the role of campaign leader.[26]  Watson did, however, rejoin the *Steve Irwin* at sea near American Samoa on November 29, 2012, at which point he again became captain of the *Steve Irwin* and campaign leader of OZT.[27]

When the injunction issued on December 17, 2012, all four Sea Shepherd ships were fully crewed, waiting for Plaintiffs' whaling ships to leave port in Japan.[28]  The *Bob Barker* was in port in Wellington, New Zealand, captained by

---

[24]  Hammarstedt 873:14-23; Watson 1780:24-1781:3.

[25]  Chakravarty 1400:9-16; Watson 1779:24-1780:6, 1781:20-1782:19.

[26]  Chakravarty 1404:5-13; Watson 1781:5-17.

[27]  Chakravarty 1442:12-18; Watson 1781:19-1782:10.  Both Chakravarty and Watson testified that for all day-to-day operational purposes, Chakravarty remained the captain of the *Steve Irwin*.  Chakravarty 1406:20-1407:3; Watson 1782:13-23.

[28]  Exs. 567, 569.

Hammarstedt, a dual citizen of the United States and Sweden.[29]  In addition to captaining the *Bob Barker*, Hammarstedt served as director of ship operations, and in that capacity he oversaw crewing, budgeting, provisioning, and overall preparation of the ships.[30] The *Sam Simon* was in Hobart, Tasmania, and it was captained by Luis Pinho, an Australian citizen.[31]  The *Steve Irwin* and the *Brigitte Bardot* were at sea, captained respectively by Watson and Jean-Yves Terlain, a French citizen.[32]

The bulk of OZT had already been funded before the injunction.  SSCS had spent $2,224,534 on OZT, and it had incurred an additional $348,565 in further obligations.[33]  These prior obligations included fuel orders for the *Sam Simon* and the *Bob Barker*, which SSCS had placed before the injunction issued.[34]  Expenses incurred for OZT after the injunction issued totaled $163,405.[35]  The largest

---

[29]  Hammarstedt 862:19-21, 874:16-19; Watson 1784:19-21.

[30]  Hammarstedt 867:3-21, 870:21-872:3.

[31]  Watson 1780:1-13.

[32]  Hammarstedt 878:10-13, 878:25-879:4; Watson 1780:15-18, 1784:4-18.

[33]  Exs. 778, 779, 782, 800, 801; McMaster 1238:17-1245:9.

[34]  Exs. 725-727, 782, 802.

[35]  Ex. 801; McMaster 1245:10-13.

component of these post-injunction expenses was a fuel order for the *Steve Irwin* in the amount of $106,830, which was invoiced and paid on December 31, 2012.[36]

## C. Initial Response to the Injunction

On October 9, 2012, the Ninth Circuit heard oral argument in ICR's appeal of the district court's denial of a preliminary injunction. SSCS's administrative director, Susan Hartland, attended the oral argument. Hartland reported to the board at its October 16, 2012 meeting that the Ninth Circuit had appeared antagonistic towards SSCS's position at the oral argument.[37] On December 17, 2012, pursuant to Federal Rule of Appellate Procedure 8 and Federal Rule of Civil Procedure 62(g), the court issued the following injunction pending appeal:

> Defendants Sea Shepherd Conservation Society and Paul Watson, and any party acting in concert with them (collectively "defendants"), are enjoined from physically attacking any vessel engaged by Plaintiffs the Institute of Cetacean Research, Kyodo Senpaku Kaisha, Ltd., Tomoyuki Ogawa or Toshiyuki Miura in the Southern Ocean or any person on any such vessel (collectively "plaintiffs") or from navigating in a manner that is likely to endanger the safe navigation of any such vessel. In no event shall defendants approach plaintiffs any closer than 500 yards.

---

[36] Ex. 802; McMaster 1253:16-1254:23.

[37] Hartland 145:4-146:10.

Dkt. #31. The Ninth Circuit's sua sponte injunction came as a shock to the SSCS staff and board.[38]

Watson learned of the injunction on December 18, and contacted SSCS's counsel immediately.[39] Shortly thereafter, Watson called a meeting of the crew on the *Steve Irwin* and informed them that they would have to find a way to comply with the injunction and that the *Steve Irwin* would not approach within 500 yards of any of the Japanese whaling vessels.[40] Watson testified that in the first few days after learning of the injunction, he was looking for ways in which OZT could still go forward while he and SSCS remained in compliance with the injunction.[41]

The evolution of Watson's thinking about how to respond to the injunction is reflected in a number of emails. One of the first emails expressed dismay at the injunction and asserted that the larger international Sea Shepherd movement would

---

[38] Hartland 185:5-9; Zuckerman 363:19-24; Rieman 1305:11-13; Watson 1785:2-7.

[39] Watson 1786: 12-17, 1915:23-1916:24 Although Watson testified that he learned of the injunction on December 18, the dates on various email that reference the injunction suggests that he learned of it on the day it issued, December 17, which would have been December 18 in Australia.

[40] Chakravarty 1407:8-1408:11; Watson 1786:18-1787:9.

[41] Watson 1788:9-1789:24.

maintain its commitment to preventing the killing of whales.[42]  A subsequent email proposed cabling the Sea Shepherd ships together and keeping them 500 yards away from the Japanese ships.[43]

In the same email that proposed the cabling plan, Watson noted that "what will be best most likely is to turn the entire campaign over to the Bob Brown Foundation or a new organization headed by Bob Brown."  Brown, a world-renowned and decorated environmentalist, is a former Australian senator who founded the Australian Greens Party in 1992, and served on the SSAL board of advisers.[44]  Brown had spearheaded SSAL's 2012 Operation Kimberley Minimbi, which successfully opposed a proposed gas factory that would have adversely affected a humpback whale nursery.[45]  In another email, Watson reported to SSCS's counsel Charles Mouré that Brown was willing to take over the anti-

---

[42]  Ex. 125.

[43]  Ex. 132.  The SSCS board members were not copied on this email.  The cabling suggestion was rejected as unworkable by Peter Hammarstedt.  Ex. 359; Watson 1917:2-24.

[44]  Brown 1512:16-1513:4, 1515:25-1517:7, 1532:10-24.

[45]  Brown 1529:7-1532:9.

whaling campaign, and Mouré replied that SSCS's other counsel, Dan Harris, had some "good ideas" on the subject.[46]

At approximately the same time that Watson was consulting with Brown and SSCS's counsel, Watson formulated a strategy that he presented to the SSCS board as a "proposal."[47]  There is more than one version of this "proposal," but the key element of the proposed strategy is that SSCS would comply with the injunction by withdrawing from OZT.  The major variation between the drafts of the proposal involves statements about the other Sea Shepherd entities.  In one draft that Watson circulated in advance of the December 20 board meeting, Watson proposed that SSCS advise the other Sea Shepherd organizations to comply with the injunction while recognizing that the decision to comply rested with the boards of the other organizations.[48]  In an email to Watson and the other board members, SSCS's counsel Dan Harris stated that SSCS should not be advising any of the other Sea Shepherd organizations because it lacked control over any of those organizations.[49]  In the second draft, the proposal emphasizes SSCS's lack of control over the other

---

[46]  Ex. 131.

[47]  Exs. 127, 139; Gaede 633:9-634:20; Watson 1790:17-1791:6.

[48]  Ex. 139.

[49]  Ex. 784 at 4 of 11.

entities.[50]  Watson's proposals are consistent with the "separation" strategy that SSCS's counsel presented to the board at its December 20 meeting.

Hartland and the board learned of the injunction through email.[51]  Marnie Gaede, who was vice president of the board, called a telephonic board meeting for December 20, 2013, at which SSCS's attorneys, Dan Harris and Charles Mouré, would discuss the legal significance of the injunction and survey the organization's legal options.[52]  The board included Watson, who also served as the paid Executive Director, and volunteer members Lani Blazier, Marnie Gaede, Bob Talbot, Robert Wintner, Ben Zuckerman, and Peter Rieman.  Blazier, Gaede, Rieman, and Wintner had joined the board in 2012, although Gaede had previously served on the board from 2000 to 2002.  Zuckerman had served on the board since 2002, and Talbot had served since sometime in 2005 or 2006.  Susan Hartland had joined SSCS as administrative director in January 2012.[53]

---

[50]  Ex. 127.

[51]  Exs. 573, 575.

[52]  Ex. 574; Gaede 556:22-557:25, 632:7-633:4.

[53]  PHO, Dkt. #245 at 10-11.  Blazier, Gaede, Talbot, Wintner and Zuckerman are represented in this proceeding by the same counsel, and are referred to as the "Volunteer Directors."  For most purposes, Rieman is also part of this group, but he was represented by separate counsel, as he was not a member of the SSCS board after February 11, 2013.

Hartland and the Volunteer Directors approached the December 20 meeting with many questions about what the injunction meant and what actions were necessary for compliance with the injunction.  None of the SSCS board members was an attorney and, as a group, they had little experience with litigation.[54]  The questions included:  (a) whether the injunction applied to foreign organizations and individuals;[55] (b) whether SSCS could go forward with OZT and remain in compliance with the injunction;[56] (c) whether SSCS needed to cut off funding for OZT and, if so, when;[57] (d) what SSCS should do about donations already received and earmarked for OZT;[58] (e) what SSCS should do about employees, contractors, and volunteers who were committed to staying on the boats;[59] and (f) what SSCS should do about vessels that were located thousands of miles away and captained

_____

[54]  Zuckerman 530:15-531:3; Gaede 583:10-19; Blazier 814:24-815:3; Wintner 979:7-10; Talbot 1186:11-17; Rieman 1313:10-18.

[55]  Gaede 581:19-582:3; Blazier 833:1-8.

[56]  Zuckerman 357:11-358:3, Wintner 974:18-975:24; Rieman 1314:1-3.

[57]  Zuckerman 369:12-370:6, 393:15-394:3.

[58]  Zuckerman 419:4-16; Rieman 1369:10-16.

[59]  Zuckerman 390:22-391:6.

and largely crewed by non-U.S. citizens who were strongly committed to preventing the killing of whales.[60]

**D. The December 20, 2013 SSCS Board Meeting**

All of the above-named Volunteer Directors participated in the December 20 meeting, along with Watson, Hartland, and SSCS Finance Director Nic Makhani, and they were joined by Dan Harris and Charles Mouré, at this time counsel for both SSCS and Paul Watson.[61] SSCS's counsel discussed the legal posture of the case, including a possible writ to the Supreme Court.[62] Counsel explained the severity of the consequences of violating the injunction.[63] The SSCS board all agreed that SSCS had to comply with the injunction and sought advice from counsel on how to do so.[64]

SSCS's counsel offered a plan of action to the SSCS board and addressed the specific steps SSCS would take in the face of the injunction.[65] Counsel

---

[60] Gaede 641:21-642:9; Blazier 816:21-817:4.

[61] Ex. 135.

[62] Ex. 785; Zuckerman 385:11-17; Rieman 1314:25-1315:8.

[63] Ex. 785; Blazier 796:14-17; Talbot 1178:14-22.

[64] Gaede 640:11-18, 724:13-19; Blazier 796:17-20; Wintner 948:10-12; Talbot 1178:3-4; Rieman 1316:2-14; Watson 1793:16-20.

[65] Zuckerman 363:15-17; Gaede 644:24-646:15; Rieman 1317:4-15.

explained that the foreign Sea Shepherd organizations were independent entities.[66]

Counsel advised the board that SSCS needed to divorce itself from the campaign

and eliminate all connections with the Southern Ocean campaign.[67]  Counsel also

explained that all four ships participating in OZT were flagged in other countries,

and three of them had already been granted to the foreign entities SSAL or SSNL

before the injunction.[68]  As part of the unfolding "separation" strategy, Mouré

wrote Makhani, recommending that SSCS grant the *Bob Barker* to SSNL, and

Makhani subsequently recommended that action to Gaede.[69]

By the end of the December 20 meeting, there was a consensus that SSCS

would comply with the injunction by severing SSCS's ties with OZT.  The SSCS

board believed this was the only option available to it that would fulfill its

fiduciary responsibility of protecting the organization from the consequences of

_____

[66]  Ex. 785; Zuckerman 383:7-384:2; Gaede 643:20-644:23.

[67]  Ex. 785; Zuckerman 390:13-391:6; Talbot 1179:1-9; Rieman 1314:11-18.

[68]  Zuckerman 378:10-19, 394:16-25.

[69]  Ex. 141; Gaede 667:18-668:7.  The email exchanges between Mouré and
Makhani, which also involved Watson and the head of SSNL, took place on
December 20, but is unclear whether the grant of the *Bob Barker* was discussed at
the December 20 SSCS board meeting.

others violating the injunction.[70] The board believed that it could not control the actions of the foreign-flagged ships, captained and crewed by environmental activists dedicated to proceeding with the whale defense campaign.[71] The Volunteer Directors relied on the advice of SSCS's counsel in reaching this decision.[72]

The SSCS board did not formally adopt this course of action at the December 20 meeting, at least in part because the whaling fleet had not yet left port and, given the late date in the season, it was unclear whether the fleet would head to the Southern Ocean at all, and therefore whether Sea Shepherd vessels would even attempt to engage them.[73] SSCS's counsel advised the board that it

_____

[70] Zuckerman 399:16-400:6; Gaede 722:12-723:15; Blazier 820:8-821:3; Talbot 1212:25-1213:15; Rieman 1368:19-1369:16.

[71] Zuckerman 377:21-378:5, 421:9-20, 423:1-24; Gaede 641:21-642:9, 647:16-648:12; Blazier 816:21-817:4, 820:11-821:12, 844:7-15, 846:18-847:11; Wintner 950:21-951:3; Talbot 1203:17-1204:9; Rieman 1319:8-18, 1366:14-19; Watson 1864:6-16.

[72] Zuckerman 399:16-400:6; Gaede 646:12-15; Blazier 819:24-820:7; Wintner 984:11-16; Talbot 1208:16-1209:4; Rieman 1317:19-25, 1318:18-1319:4.

[73] Zuckerman 347:20-348:6; Gaede 649:21-25, 771:22-25; Talbot 1209:5-16; Rieman 1315:9-14.

should wait to see if the Japanese ships set sail before they undertook the formal separation from OZT.[74]

Although the SSCS board had made no formal resolution to separate itself from OZT, preparations for the separation began immediately.[75] On December 21, 2013, Watson wrote an email to the ship captains and managers announcing that he would resign as president of the SSCS board and its executive director and that he would step down as leader of the OZT campaign.[76] He also stated that SSCS would "officially withdraw from Operation Zero Tolerance in compliance with the injunction."

**E. The Role of Sea Shepherd Australia**

At the time the injunction issued, Jeff Hansen was the managing director of SSAL, a position he has held since March 2008.[77] In addition to Watson and Hansen, the board of SSAL on December 17, 2012 included John McMullan and Laura Dakin.[78]

_____

[74] Ex. 785; Zuckerman 393:12-394:3, 434:18-24.

[75] Hartland 300:25-301:6; Gaede 651:8-22.

[76] Ex. 145.

[77] Hansen 1586:5-7; 1599:19-24.

[78] McMullan 1094:10-19; Hansen 1632:19-23.

SSAL sought legal opinions as soon as it learned of the injunction.[79] Both SSAL board member McMullan, who is an attorney, and Melbourne barrister Debbie Mortimer, who is now an Australian federal judge, reached the same conclusion: the injunction did not bind SSAL and Australian courts were unlikely to enforce it in view of the 2008 Australian federal court order enjoining Plaintiffs from conducting whaling operations in the Southern Ocean Whale Sanctuary.[80] Hansen discussed the matter with Brown, the former senator and member of the SSAL board of advisors and, in the days that followed, Brown and Hansen had numerous discussions about the possibility of SSAL leading OZT.[81] The plan for SSAL to take over sole management responsibility for OZT crystallized by December 21 or 22.[82] On December 21, Brown visited the *Sam Simon* in Hobart to reassure the crew that the injunction would not impede SSAL's ability to proceed with OZT and uphold Australian law.[83]

---

[79] Ex. 576; McMullan 1083:3-14; Brown 1534:3-1535:9; Hansen 1657:5-12.

[80] McMullan 1083:15-1086:23; Brown 1535:23-1036:3, Hansen 1657:13-22.

[81] Brown 1537:10-19; Hansen 1657:25-1659:24, 1723:17-1724:8.

[82] Ex. 148; Hansen 1659:17-24.

[83] Brown 1537:20-1538:14.

The SSAL board first discussed the prospect of taking over OZT in a December 24 phone call.[84] On December 27 (Melbourne time), the SSAL board met and voted to move forward with OZT.[85] SSCS counsel Mouré also attended the meeting, but did not vote.[86] At the meeting, Watson submitted his resignation from the SSAL board and Brown became a member of the board.[87] On December 31, 2012 the SSAL board resolved that Brown and Hansen had become the leaders of OZT.[88]

## F. The Sailing of the Japanese Fleet and the December 30, 2012 SSCS Board Meeting

On or about December 27, 2012, several of Plaintiffs' whaling ships departed Shimonoseki Harbor, Japan for the Southern Ocean.[89] In response to the news that the Japanese ships had left port, Watson sent an email on December 27,

_____

[84] Ex. 586; McMullan 1090:19-1091:5, 1092:5-14.

[85] Ex. 589; McMullan 1093:16-23; Hansen 1662:7-13.

[86] McMullan 1098:9-21.

[87] Ex. 589. It is unclear whether Watson voted on any or all of the resolutions presented that day. *Compare* Hansen 1665:1-2; Watson 1804:9-20 *with* McMullan 1098:23-1099:4, 1140:9-11.

[88] Ex. 602.

[89] PHO, Dkt. #245 at 13.

2012 informing the SSCS board and several others of this development.[90]  In his

email, Watson stated: "All four Sea Shepherd ships and their crew will be ready to

greet the Japanese whalers when they arrive.  They intend to kill whales and Sea

Shepherd's objective is to see that not a single whale is slain. . . .  It appears that

the hunt is on and we intend to hunt whalers."

The Volunteer Directors understood that the sailing of the whaling fleet

meant that SSCS would move forward with its plans to sever ties with OZT.[91]  On

the next day, Watson submitted his formal resignation from his various roles with

SSCS and as expedition leader for OZT, effective midnight on December 31,

2012.[92]  Watson did not receive a salary, health benefits, or any other compensation

from SSCS after this time.[93]  Watson surrendered command of the *Steve Irwin* to

Chakravarty on or about December 31, 2012, and Chakravarty served as captain of

the vessel throughout the remainder of the campaign.[94]  On or about December 28,

2012, Peter Hammarstedt and two other SSCS employees participating in OZT,

---

[90]  Ex. 154; Gaede 652:25-653:6;

[91]  Zuckerman 401:13-24; Gaede 653:7-13.

[92]  Ex. 123.

[93]  Gaede 656:12-17; Watson 1802:3-17.

[94]  Chakravarty 1432:12-133:3; Watson 1802:18-23.

Tim Pierce and Kelly Higgins, also tendered their resignations to the SSCS board.[95]
SSCS accepted the resignations and stopped paying independent contractors
serving as captains and crew members in OZT.[96]

Watson's resignation prompted Gaede to call a telephonic board meeting for
December 30.[97]  At the meeting, the board accepted Watson's resignation and
elected new board leadership as follows: Marnie Gaede, President; Robert Wintner,
Vice-President; Lani Blazier, Secretary; and Peter Rieman, Treasurer.[98]  On
January 8, 2013, the SSCS board voted that it would sever all ties, including
financial and other forms of support, for Operation Zero Tolerance, effective
January 16, 2013, in order to comply with the injunction.[99]

The board agreed that staff would contact donors who had given money
restricted to OZT and, if a donor was not willing to allow SSCS to use the donation

---

[95]  PHO, Dkt. #245 at 14.  The three resigning employees received three-
month severance payments in conformance with SSCS's established practice.  Exs.
532-534' Blazier 819:2-23; Hammarstedt 905:5-11.

[96]  Gaede 687:20-688:9; Chakravarty 1471:10-14.

[97]  Gaede 593:5-22.

[98]  PHO, Dkt. #245 at 14.

[99]  Zuckerman 417:1-22.

for other purposes, the funds would be returned.[100]  The board also agreed that the
SSCS website and social media must be separated from OZT.[101]

## G.  SSCS's Further "Separation" Efforts

As part of the "separation" strategy, the SSCS board also decided, on the
advice of counsel, to grant the *Bob Barker* to SSNL, and to grant certain equipment
on the *Bob Barker* and the *Steve Irwin* to SSNL and other equipment on the
*Brigitte Bardot* to SSAL.[102]  The board was advised by Makhani that the
organization's by-laws required formal resolutions for some of their "separation"
actions.[103]  Makhani drafted the resolutions, but the actual grants were drafted by
SSCS's counsel.[104]  On or about January 8, 2013, Gaede circulated resolutions
addressing: (1) the grant of certain "depreciated assets to the respective legal
owners of the vessels"; (2) the acceptance of Watson's resignation; and (3) the
board's resolution to sever all ties with OZT effective January 16, 2013.[105]  The

---

[100]  Ex. 786; Zuckerman 419:4-23.

[101]  Ex. 786; Zuckerman 418:3-16.

[102]  Exs. 197, 582, 615; Gaede 666:12-668:9.

[103]  Gaede 669:19-670:15.

[104]  Ex. 346 (Makhani dep. Designations) 150:7-155:6.

[105]  Ex. 197.

January 16 date was the earliest date SSCS staff believed that separation could be achieved.[106]  All of the directors voted in the affirmative.[107]

On or about January 13, 2013, SSCS granted the *Bob Barker* to SSNL.  The grant agreement for the *Bob Barker*, like the 2010 and 2012 grant agreements for the *Brigitte Bardot* and the *Sam Simon*, reserved to SSCS the right to revoke the grant and obtain prompt return of the granted property should that property be used for any purpose other than SSCS's mission of "global marine wildlife conservation."[108]

In addition to the grant of vessels and equipment, SSCS sought to separate itself from OZT and those participating in it in a variety of other ways.  Hartland's role was to implement the "separation" strategy adopted by the board, and she had no role in the choice of strategy.[109]  As administrative director, Hartland's duties included office management, human resources management, and anything

_____

[106]  Gaede 671:18-23.

[107]  Gaede 671:24-672:1.

[108]  Exs. 200, 519, 521.  The 2012 grant agreement for the *Steve Irwin* is materially different, as it implemented a three-way exchange by which legal ownership was transferred from Sea Shepherd United Kingdom to SSNL with SSCS retaining beneficial ownership for tax purposes.  There is no revocation clause, and the agreement vested in SSNL a right of ownership that is "unconditional."  Ex. 539 at 9 of 10.

[109]  Hartland 296:20-297:4; 298:9-14.

involving paperwork.[110] Hartland provided administrative support to other Sea Shepherd entities, but neither the directors of those entities nor the ship captains reported to her before or after the injunction.[111]

Hartland organized a meeting to inform the executives of other Sea Shepherd organizations that SSCS would not be able to pay any crew or media wages.[112] Hartland also oversaw the removal of any references on SSCS's website that could lead to donations intended for OZT, and she instructed the staff to contact monthly donors to inform them that SSCS could no longer use their recurring donations to support OZT.[113] Separate web pages and YouTube channels were implemented for SSAL and OZT, and SSCS staff assisted SSAL with that process.[114]

SSCS and Hartland made a good faith effort to implement the separation policy, but the process proved difficult in certain ways. In January 2013, a SSCS vendor mistakenly mailed a mass solicitation seeking donations for OZT that had

---

[110] Hartland 133:15-21, 276:23-277:9.

[111] Hartland 279:7-280:14, 283:9-20; 304:4-13.

[112] Hartland 221:18-223:10; Hansen 1668:17-24, 1675:22-25.

[113] Exs. 622-624; Gaede 663:11-24.

[114] Exs. 215, 620; Gaede 677:1-14; Hansen 1667:19-1668:5.

been drafted and ordered in November 2012, but had been delayed by the vendor, and SSCS failed to cancel it after the injunction issued.[115]  To correct the error, SSCS called every person who donated money to OZT and offered to return the money or dedicate it to another campaign.[116]

In January 2013, Hartland signed and submitted a grant application to the Foundation for Deep Ecology, based on assurances by the SSCS development director that the grant would go to SSCS's general fund.[117]  The application referenced OZT, however, and the Foundation, which was headed by a veteran of the Southern Ocean campaigns, determined that it would award the money to SSAL instead.[118]

The "separation" strategy focused on cutting all financial ties to OZT. Between January 1 and January 16, 2013, SSCS incurred only $16,373 in OZT-related expenses.[119]  Almost all of these expenditures were credit card purchases

---

[115]  Ex. 640; Gaede 683:23-684:23.

[116]  Exs. 623-624; Zuckerman 419:4-16; Gaede 684:24-685:3, 687:12-18.

[117]  Hartland 253:4-19

[118]  Ex. 751; Hansen 1668:25-1670:3.

[119]  Exs. 782, 801, 802; McMaster 1245:5-20.

made by ship captains and managers before SSCS terminated the ship credit cards on January 8.[120]

Watson's attempts at separation were more difficult because he remained on one of the ships taking part in OZT. Watson testified that he remained on the *Steve Irwin* because he believed that he risked detention or extradition if he disembarked in Australia or New Zealand, the only two countries within 1000 miles of the *Steve Irwin*'s position.[121] Watson's fears were confirmed on January 4, 2013 when the *Steve Irwin* stopped in New Zealand to refuel, after first transferring Watson to the *Brigitte Bardot*. Immigration officials boarding the *Steve Irwin* announced to Chakravarty that they were searching the vessel specifically to look for Watson, on orders of the New Zealand Ministry of Foreign Affairs.[122] In addition, a helicopter hovered over the *Brigitte Bardot* and reported its position to the police.[123]

Watson believed he could remain on the *Steve Irwin* and still comply with the injunction because Chakravarty assured him that the *Steve Irwin* would not

---

[120] Ex. 190; McMaster 1257:1-1258:18.

[121] Watson 1806:23-1807:9.

[122] Chakravarty 1445:21-1448:5; Watson 1807:11-1808:12.

[123] Watson 1808:13-1809:13.

approach within 500 yards of the whaling vessels.[124]  Watson also believed that the

injunction did not prevent him from acting as an observer, reporting events, and

offering his opinion about those events.[125]  Watson considered himself an observer

and a chronicler, and he spent a good deal of his time writing.[126]

Watson testified that he exerted no control over the *Steve Irwin* or the other

ships after stepping down as captain and campaign leader.[127]  Chakravarty, who

had taken over command of the *Steve Irwin* from Watson, confirmed this

testimony, as did crew members.[128]  Watson was consulted on some logistical

questions, such as how to respond to operational difficulties experienced by the

*Brigitte Bardot.*[129]

Watson believed that his conduct did not violate the injunction, as is

evidenced by an email update he sent on January 28, 2013, which turned out to be

_____

[124]  Chakravarty 1439:7-1440:1; Watson 1786:1-11.

[125]  Watson 1794:18-1795:8, 1911:6-1912:11.

[126]  Watson 1801:24-1802:1, 1815:8-12.

[127]  Watson 1816:11-1817:6.

[128]  Hammarstedt 893:8-19; Lister 1018:20-1019:11, 1024:6-19; Chakravarty 1455:19-24, 1460:18-1462:18; Emko (stipulation) 1751:18-1753:18.

[129]  Exs. 164, 225, 238, 246; Watson 1822:4-20.

the eve of the first alleged incident of contempt.[130]  In his "update," Watson

observed that the Japanese whalers had not counted on "Sea Shepherd both

complying with the injunction and also continuing to legally intervene against

unlawful whaling activities in the Southern Ocean Whale Sanctuary."  In the

"update," Watson explained that, as a United States citizen, he had no intention of

violating the injunction and that SSCS had "withdrawn" from OZT.  According to

Watson, that left an Australian campaign made up of non-U.S. captains

commanding foreign-flagged and foreign-owned ships operating in international

waters that was beyond the authority of the Ninth Circuit.[131]

**H.  Alleged Incidents of Contempt and Defendants' Response**

On January 29, 2013, the *Brigitte Bardot* approached within 20.25 yards of

*Yushin Maru 3*.[132]  The same day, Plaintiffs' counsel protested this development in

a letter to SSCS's counsel, stating that it was a clear violation of the injunction

because the *Brigitte Bardot* "is under the control of defendants."[133]  Plaintiffs

---

[130]  Ex. 220.

[131]  Ex. 220.

[132]  PHO, Dkt. #245 at 14.

[133]  Ex. 226.

31

requested that the ship's captain be directed to comply with the injunction or risk

having SSCS revoke its grant of the vessel to SSAL and direct that it return to port.

     SSCS's counsel forwarded the letter from Plaintiffs' counsel to Watson and

to SSAL.[134]  Watson testified that because he was not in a position to order the

captain of the *Brigitte Bardot* not to do this again, he discussed the matter with Jeff

Hansen.[135]  Watson drafted an email that Hansen could send to SSCS's counsel

showing what the ship captains were being told by SSAL in the wake of the

January 29 incident.[136]  The email stated that SSAL has advised the captain of the

*Brigitte Bardot* to respect the safety perimeter, and that Captain Terlain has agreed

to do so "unless a whale's life is at stake," although he is "mystified" how the

injunction can apply to him.  The ghostwritten email also reported SSAL's

intention not to toss objects on the decks of the Japanese vessels and not to deploy

defensive lines on the understanding that the Japanese vessels will "not approach

within 450 metres and will not deploy fouling lines or fire objects at Sea Shepherd

vessels."[137]  Hansen testified that he sent the email to Mouré, but he regretted doing

---

    [134]  Ex. 643; Watson 1812:13-1813:6

    [135]  Hansen 1677:21-1678:17; Watson 1813:7-1814:8, 1858:8-24.

    [136]  Ex. 230; Watson 1814:9-20.

    [137]  Ex. 230.

so without consulting the SSAL board.[138]  Despite Watson's request, Hansen did

not speak to Captain Terlain.[139]

On February 2, 2013, McMullan replied to Plaintiffs' counsel that SSAL had

taken responsibility for running OZT, and it did not consider itself bound by the

injunction, especially in view of Plaintiffs' violation of the Australian injunction.[140]

In a February 7, 2013 letter to SSCS's counsel, Plaintiffs' counsel stated that he

had just learned, while deposing Gaede, that the January 29 letter from plaintiffs'

counsel protesting the incursion by the *Brigitte Bardot* had not been referred to the

SSCS board, and that the board was apparently not aware of the revocation

provisions of the vessel grants.[141]  Counsel also reiterated his belief that SSCS

remained in actual or constructive control of the assets deployed in OZT, and he

requested that the SSCS board be informed that they could be held individually

responsible for any violations of the injunction.  SSCS's counsel forwarded the

_____

[138]  Hansen 1679:17-1680:19.

[139]  Hansen 1681:2-10, 1699:16-21.  Watson testified that he assumed
Hansen had spoken to Terlain because there were no further incidents involving the
*Brigitte Bardot*.  Watson 1814:23-1815:6. The *Brigitte Bardot* became disabled
and headed to Hobart for repairs shortly after these exchanges took place.  Exs.
238, 241.

[140]  Ex. 644.

[141]  Ex. 240.

February 7 letter to Gaede, who in turn forwarded it to the rest of the SSCS board. Gaede was not aware of the January 29 incident until the morning of her February 4, 2013 deposition when she received a Google alert about it, and the rest of the board only learned of it when Gaede forwarded the February 7 letter.[142]

After receiving Plaintiffs' February 7, 2013 letter, Rieman resigned from the SSCS board on February 11. He resigned because he lacked control over the vessels, what was happening in the Southern Ocean, and statements made by SSCS staff in depositions taken in the underlying litigation that he felt were inaccurate or inappropriate.[143] Specifically, he objected to Hartland's casual reference to other Sea Shepherd entities as "chapters," and her statement that SSCS had no intention of revoking the grant of the *Brigitte Bardot*, when she had not consulted the board for its views on the matter.

Meanwhile, in view of the alleged event of contempt, Gaede determined it was time to write a letter to SSAL.[144] On or about February 8, 2013, Gaede consulted with SSCS's counsel about sending letters to the ship captains, SSAL,

---

[142] Ex 650; Gaede 690:25-691:16; Rieman 1324:2-22.

[143] Ex. 244; Rieman 1326:6-23.

[144] Gaede 602:11-603:1.

and SSNL.[145]  SSCS counsel Rebecca Millican drafted letters that urged the

captains and the organizations to do everything in their power to abide by the terms

of the injunction, and that warned that any further violations of the injunction

could be attributable to SSCS.[146]  The draft letters to the organizations tracked the

language used in the January 29 letter from Plaintiffs' counsel, warning that SSCS

might be forced to rescind the grant of the vessels and order them to return to

port.[147]  The draft letter to SSAL also pointed out that the helicopter aboard the

*Steve Irwin* was the only part of the campaign that remained a SSCS asset, and it

demanded that the helicopter not be used "in any manner that would constitute a

violation of the temporary injunction."[148]

SSCS counsel Mouré then edited the letters to remove references to the grant

agreements and the helicopter.[149]  Mouré explained that SSCS did not have any

legal authority to revoke the grant agreements as long as the ships were being used

---

[145]  Exs. 787, 789.

[146]  Exs. 789, 790; Gaede 698:17-699:4.

[147]  Exs. 789, 790.

[148]  Ex. 790.

[149]  Ex. 796.

in accordance with the conservation mission of SSCS.[150]  Mouré also advised
Gaede that "we should not be communicating directly with the captains" and
therefore the letters should go just to SSAL and SSNL.[151]  Gaede testified that she
relied on the advice of counsel in deciding not to send letters to the captains and in
deciding to omit the references to the helicopter and the vessel grants.[152]

On February 11, 2013, SSCS sent the final versions of Gaede's letters to
SSAL and SSNL.[153]  The letters referred to the alleged incursion of the *Brigitte
Bardot* and Plaintiffs' contempt motion and warned that "ICR's litigation could
greatly impact our financial future and jeopardize our ability to carry out our
mission of protecting the world's oceans."  The letters stated "We . . . request in
the strongest terms that your organization does not do anything that could give ICR
any basis for claiming any violation of the court's order."

---

[150]  Gaede 709:15-710:4.  It is unclear whether Mouré fully explained his
legal rationale at the time he edited Gaede's letter to SSAL, but she followed his
advice in any event.

[151]  Ex. 794; Gaede 695:4-15; 707:4-20.

[152]  Gaede 707:21-24; 708:13-709:3; 710:9-12.

[153]  Ex. 660.

SSAL responded on February 15, 2013 in an email from Brown and Hansen.[154] Brown and Hansen wrote that SSAL had four ships "protecting the global whale sanctuary in the Southern Ocean, from the illegal intent of the Japanese whaling fleet." The only reference to SSCS's legal difficulties was the statement: "We are mindful of the legal pursuit of your fine organisation in the court, as we undertake our priority task of Operation Zero Tolerance in the remaining weeks of this Antarctic summer." Brown testified that SSAL rejected Gaede's request because "[o]ur job at hand was to protect the whales, and it was a far more compelling task than what was happening here in the United States vis-à-vis the courts and the Sea Shepherd entity."[155]

Gaede wrote to SSAL again on February 19 and asked that it not use the helicopter during the current campaign.[156] "The helicopter is to stay on the vessel for the rest of this campaign and to not be used in any way." After the conclusion of OZT, in the summer of 2013, the SSCS board requested that the helicopter be

---

[154] Ex. 667.

[155] Brown 1556:4-17.

[156] Ex. 669.

removed from the ship and sold, and this was accomplished with the help of Chakravarty.[157]

Several additional alleged violations of the injunction occurred, on February 15, 17, 18, 19, 20, 24, 25, 27, and 28.  The majority of these alleged violations were based on incursions of the safety perimeter established by the injunction, but collisions occurred on February 20 and 25 in the course of efforts to prevent Plaintiffs' ships from refueling.[158]

Watson remained on the *Steve Irwin* for the duration of OZT.  Chakravarty had assured him that the *Steve Irwin* would not violate the injunction, and he and Watson had developed a contingency plan in the event of a close encounter with one of the whaling vessels: Chakravarty would transfer Watson to the *Brigitte Bardot*.[159]

Chakravarty abandoned the plan to respect the 500-yard safety perimeter in mid-February because he and the other captains decided to attempt a blockade that would prevent the *Nisshin Maru* from refueling from the *Sun Laurel*.[160]  Watson

---

[157]  Hartland 262:7-264:12; Gaede 594:14-596:9.

[158]  PHO, Dkt. #245 at 16-17.

[159]  Chakravarty 1440:2-24, 1441:17-1442:1.

[160]  Chakravarty 1455:19-1456:14, 1463:13-1464:24.

could not be transferred to the *Brigitte Bardot* because the *Brigitte Bardot* had developed engine trouble and was now 800-1000 miles away en route to Hobart.[161] Chakravarty declined to transfer Watson to a rigid inflatable boat because Watson lacked gear for prolonged exposure, and it was not clear how long it would be before Watson would be able to re-board the *Steve Irwin*.[162]

**I. Effect of Injunction on SSCS**

Over the past five years, the whale defense campaigns had become SSCS's highest profile activity, thanks to the *Whale Wars* program.[163] In large part due to that exposure, the organization's revenues had increased considerably.[164] Without any connection to OZT, revenues for SSCS showed a marked decline, decreasing by 66 percent – from $9.5 million to $3.2 million – between the first six months of 2012 and the first six months of 2013.[165]

---

[161] Chakravarty 1456:16-1457:9.

[162] Chakravarty 1457:12-1460:5.

[163] Zuckerman 540:18-541:4; Gaede 717:23-718:7.

[164] Gaede 650:1-16; Wintner 954:1-18.

[165] Ex. 803; McMaster 1262:11-25.

SSCS, Watson, the Volunteer Directors, Rieman and Hartland have had no involvement in planning or preparing for the 2013-2014 whale defense campaign, "Operation Relentless," which is being led by SSAL.[166]

## II
## Contempt Proceedings

On February 11, 2013, Plaintiffs filed a Motion to Appoint a Special Master to Conduct Contempt Proceedings and Motion for Contempt against SSCS. Dkt. #37. The motion was based on the first incident in which the *Brigitte Bardot* approached within 500 yards of Plaintiffs' vessels. On February 21, 2013, the court referred the contempt motion to the Appellate Commissioner. Dkt. #44.

Plaintiffs amended their motion for contempt on March 6, 2013, to allege additional violations of the injunction and to include defendant Watson, and seven non-parties: five current directors of SSCS, one former director, and SSCS's administrative director. Dkt. #54. On April 12, 2003, Plaintiffs filed a second amended motion for contempt alleging four more alleged violations of the injunction that had occurred before the first amended contempt motion was filed. Dkt. #105. Plaintiffs never sought to include SSAL directly in the contempt proceeding.

---

[166] Hartland 309:5-17; Gaede 718:12-719:9; Hammarstedt 898:1-25; Rieman 1327:16-18; Brown 1558:2-7; Watson 1826:24-1827:6.

In response to pre-hearing motions to compel by Plaintiffs, the Volunteer Directors proposed a limited waiver of attorney-client privilege under *Bittaker v. Woodford*, 331 F.3d 715 (9th Cir. 2003), so that they could present evidence of the attorney advice they relied upon without waiving privilege entirely. The hearing proceeded under such a limited waiver, and the content of certain attorney advice to the board was admitted. Watson, by contrast, did not present a defense based in any way on his reliance upon advice of counsel.

A hearing on Plaintiffs' contempt motion was held in Seattle from October 28, 2013 through November 6, 2013. Because the parties stipulated that actions had occurred at sea that would violate the injunction if performed by enjoined parties, testimony about these events was limited. Instead, the hearing focused on the response of SSCS, Watson and the other alleged contemnors to the injunction, and their relationship to the persons and entities directly responsible for the subsequent alleged events of contempt.

III

Legal Analysis and Conclusions of Law

In large part, the facts are uncontested, and the chief disputes relate to the inferences that should be drawn from the facts and how the law applies to those facts.  This is no simple task.  The law of contempt has developed in contexts vastly different from the one presented here.  Moreover, the law of contempt has largely arisen with respect to discrete acts that directly violate specific orders and decrees.  The inquiry here, by contrast, must assess a wide array of conduct by multiple parties whose relationship to one another is itself vigorously disputed.  In addition, the conduct at issue here must be assessed against the backdrop of rapidly unfolding events to determine whether that conduct was reasonable under the circumstances.

## A.  Legal Standards for Civil Contempt

Contempt proceedings may be civil or criminal.  If the purpose of the proceedings is to punish past defiance and to vindicate the court's judicial authority, the proceedings are criminal in nature, and require the full due process of a criminal proceeding.  Civil contempt proceedings, by contrast, are employed for two purposes: to coerce the defendant into compliance with the court's order, and

to compensate the complainant for losses sustained.  *See Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 517 (9th Cir. 1992).

Some of the alleged contemnors (hereafter referred to collectively as "Defendants") have argued at various points that the sanctions sought by Plaintiffs are sufficiently punitive to render these proceedings criminal in nature and therefore implicate the right to trial by jury and other procedures necessary in a criminal trial.  This argument fails because the Plaintiffs seek both coercive and compensatory relief.  Plaintiffs request a coercive sanction that will ensure that Defendants do not interfere with future whaling activities, as well as compensatory damages.  Plaintiffs chose not to present any evidence of any damages their vessels may have sustained as a result of the alleged acts of contempt, but the costs and fees incurred in enforcing the court's injunction through civil contempt proceedings are compensatory in nature and may be included in a civil contempt sanction.  *See Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc. v. Multistate Legal Studies, Inc.*, 26 F.3d 948, 953 (9th Cir. 1994).

Civil contempt consists of "a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply."  *Go-Video, Inc. v. Motion Picture Ass'n of America (In re Dual-Deck Video Cassette Recorder Antitrust Litig.)*, 10 F.3d 693, 695 (9th Cir. 1993) ("*Dual-*

*Deck*").  The contempt need not be willful, and there is no good faith exception to the requirement of obedience to a court order.  *Id.* (citing *In re Crystal Palace Gambling Hall, Inc.,* 817 F.2d 1361, 1365 (9th Cir.1987)).

At the same time, a party should not be held in contempt if its action "'appears to be based on a good faith and reasonable interpretation of the [court's order].'" *Id.* (citing *Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 889 (9th Cir.1982)).  "Substantial compliance" with the court order is a defense to civil contempt, and is not vitiated by "a few technical violations" where every reasonable effort has been made to comply.  *Id.* (citing *Vertex*, 689 F.2d at 891).  The party alleging civil contempt must demonstrate by clear and convincing evidence that the alleged contemnor violated the court's order.[167]  *Id.* (citing *Vertex,* 689 F.2d at 889).

---

[167] The burden of proof shifts if a contempt is established and the contemnor argues that it was impossible to comply with the court's order.  *See F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999).  Here, Defendants have not clearly invoked a defense of "impossibility," but they have come close to doing so in two contexts.  First, the Volunteer Directors argue that certain actions would have been futile, but this appears to be part of their claim that those actions did not constitute "reasonable steps within their power," an element of contempt that Plaintiffs must prove by clear and convincing evidence.  Second, Watson has argued that it was not possible for him to avoid his actual breach of the safety perimeter when Chakravarty ordered the *Steve Irwin* to assist in the blockade of the *Sun Laurel*.

44

Synthesizing these standards, the *Dual-Deck* court formulated the relevant inquiry as a determination whether the enjoined party "(1) . . . violated the court order, (2) beyond substantial compliance, (3) not based on a good faith and reasonable interpretation of the order, (4) by clear and convincing evidence." *Id.*

In addition to these elements, this case requires a determination of the reach of the injunction with respect to non-parties. Courts have construed the reach of injunctions broadly, usually in the context of Federal Rule of Civil Procedure 65(d)(2), which provides that, assuming actual notice, an injunction binds: "(A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)." The Supreme Court explained that the rule

> is derived from the commonlaw doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in "privity" with them, represented by them or subject to their control. In essence it is that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding.

*Regal Knitwear Co. v. N.L.R.B*, 324 U.S. 9, 14 (1945). The caselaw that descends from *Regal Knitwear*, however, is chiefly concerned with the liability of non-parties who violate an injunction, rather than the liability of parties for acts of non-

parties.[168]  As discussed below, Plaintiffs advance a variety of legal theories under which they assert that the acts of those participating in OZT may be attributed to SSCS.

## B. "All Reasonable Steps Within Their Power"

In many ways, the contempt issue boils down to a single question: did the court's injunction, framed in purely negative terms, require that the Defendants take a host of affirmative steps to insure that certain events did not occur.  If not, Defendants must prevail, because they substantially complied to the extent that they removed themselves from active participation in OZT.

Plaintiffs have adduced a wide range of affirmative steps that they claim SSCS should have taken in response to the injunction, including: stopping OZT altogether; remaining, or at least asking Watson to remain, in command of OZT so as to conduct the campaign in a way that complied with the injunction; asking or ordering the ships to remain at dock; issuing instructions to the ships' captains and

---

[168]  The question whether SSAL and the non-U.S. citizens participating in OZT are bound by the court's injunction is not directly presented by this contempt motion because they were not named as alleged contemnors.  The question whether SSAL and the ship captains violated the injunction is nonetheless relevant to the parties' positions because the claim that the alleged contemnors violated the injunction is ultimately based on the actions of SSAL and the ship captains. Defendants argue that they cannot have helped SSAL to break the law if SSAL was not bound by the law.  *See* Dkt. #301 at 54-56.

46

crews to comply with the injunction; and asking the ships' captains to stay more than 500 yards away from Plaintiffs' vessels and film Plaintiffs' activities from that distance.  *See* Dkt. #297 at 26-27.

Defendants respond that most of these steps were not in their power and therefore not reasonable.  To the extent that some of these steps were in their power, they contend that it would have been futile to ask SSAL and the ship captains to respect the terms of the injunction.  With the important but limited exception of Watson, all of the Defendants testified credibly that they believed they had no control over the ships and they could not order personnel committed to OZT to do anything.  Most Defendants had some first-hand knowledge of Sea Shepherd campaigns and the people who participate in them.  The captains and crew members who testified at the contempt hearing appeared to be steadfast and dedicated, above all else, to taking whatever measures were necessary to protect the whales.  With the qualified exception of Chakravarty, no OZT participant and no representative of SSAL testified that he would have been controlled or influenced by any order or request from the SSCS board, or Watson himself.[169]

_____

[169]  Chakravarty testified that he did not "really know" whether he would have removed the *Steve Irwin* from OZT if Watson had remained captain and ordered him to do so.  Chakravarty 1442:19-1444:12.  When a similar hypothetical was posed to Watson, he testified that Chakravarty was the only captain who

(continued...)

Plaintiffs argue that the injunction required SSCS to take affirmative steps to regulate the conduct of OZT because SSCS had already done so much to set OZT in motion, and OZT carried the threat of the enjoined conduct occurring. Plaintiffs cite *In re Transamerica Corp.*, 184 F.2d 319, 322 (9th Cir. 1950) (per curiam), in which banks and their executive officers were found in contempt for moving forward with a transfer of assets that was already underway when the court enjoined it as anti-competitive. The court held that its order reached the preparatory steps the banks had taken in advance of the transfer because "obedience to such an injunction necessarily requires that the prior orders be countermanded – that the agents be instructed not to do that which they had previously been told to do." The relevance of this case is limited, however, because in *Transamerica*, it was undisputed that the banks and their CEOs had the ability to direct entities that were indisputably their agents. That is not the case here.

Even in the absence of control, Plaintiffs argue, the Defendants could have, and should have, exerted their influence over the OZT participants to ensure that

---

[169](...continued)
would have followed his orders had he remained campaign leader, and he would have done so only in his capacity as Watson's first officer on the *Steve Irwin*, had Watson remained captain. Watson 1913:4-15.

no confrontations took place. Plaintiffs point to several out-of-circuit cases suggesting that parties subject to an injunction have an obligation to use their influence to prevent others from violating the injunction. *See* Dkt. #297 at 42-43. But, as Defendants note, in those cases the contemnors' failure to use their influence was one small part of a larger pattern of blatant recalcitrance. *See* Dkt. # 301 at 11-12. Even if there were some sort of obligation to use influence, there is no evidence that anyone other than Watson enjoyed such influence, and even his influence was questionable when advising a course of action at odds with what SSAL and the captains considered their mission.

Plaintiffs repeatedly point to the anguished email Watson wrote after first learning of the injunction and note that Hammarstedt replied, "Whatever you decide, you know that I have your back."[170] This is proof, Plaintiffs argue, that Watson could have turned OZT around. But is it? Hammarstedt is clearly pledging his support should Watson decide to *defy* the injunction; Watson would only need someone to "have his back" if he decided to violate the injunction. Hammarstedt testified credibly and forcefully that his reaction to the injunction was that it did not apply to him and that nothing was going to stop him from

---

[170] Ex. 358.

protecting the whales.[171]  The "I have your back" exchange with Watson did not signal a readiness to abandon the mission.

Similarly, Plaintiffs make much of the email Watson drafted for Hansen after the first alleged incident of contempt.[172]  Plaintiffs argue that, by acknowledging an exception to the safety perimeter when a whale's life at stake, the email is counseling defiance of the injunction, not compliance.  But Watson's ventriloquism here is more complicated and subtle.  The *Brigitte Bardot* had just engaged in a pointless violation of the safety perimeter.  Watson was not in a position to order the other captains to stand down, but he could craft an email to defuse the situation that would sound plausible coming from Hansen.  Watson testified, as did Hammarstedt and Chakravarty, that the "unless a whale is being taken" exception was the non-negotiable bottom line for the captains and SSAL.[173] The rest of the email, which Plaintiffs ignore, contained additional assurances that the injunction would be respected.  Hansen sent the email to Mouré, but he did not convey its substance to the captains.  It thus stands as some evidence that Watson attempted to use his influence, and that his influence was limited.

---

[171]  Hammarstedt 881:24-882:7, 920:6-22, 923:5-12.

[172]  Ex. 230.

[173]  Hammarstedt 893:8-895:8; Chakravarty 1484:25-1485:3, 1495:20-1496:10; Watson 1865:25-1867:8.

Plaintiffs argue that Defendants' deliberate failure to take "all reasonable steps" after the injunction issued is confirmed by their failure to take reasonable steps once the *Brigitte Bardot* violated the 500-yard safety perimeter on January 29. Plaintiffs point to the letter that Gaede sent to SSAL and SSNL after this first alleged incident of contempt and dismiss it as too little, too late. Worse, the drafting history of the letters shows that the SSCS board pulled the one punch it still had up its sleeve by not threatening to revoke the vessel grants.[174] Yet, Plaintiffs have not shown that revocation of any or all of the vessel grants was legally possible. The grants required the grantees to use the vessels to support SSCS's ongoing mission of global marine wildlife conservation and ending the slaughter of wildlife in the world's oceans. It remains uncertain whether SSAL or SSNL, outside the jurisdiction of the injunction, did anything that could be the basis of a revocation action. Certainly it was not a practical option for SSCS to institute some sort of complex legal proceeding in the waning weeks of the

_____

[174] Plaintiffs argue that, even before the January 29 incursion, the SSCS board should have used the vessel grants and SSCS's attenuated ownership interest in the *Steve Irwin* to influence the course of OZT. *See* Dkt. #296 at 6-7, #308 at 7.

whaling season, nor is there any reason to believe that the threat of such a proceeding would have deterred SSAL, SSNL, or the captains.[175]

The phrase "all reasonable steps" suggests an orderly sequence of actions designed to achieve a specific goal, but there were many variables at work here. First, it was unclear whether the Japanese fleet would even leave port. It may not have been the most realistic hope, but there is considerable evidence that that was indeed the hope of both the SSCS board and the OZT participants. Second, even when the Japanese fleet had sailed, it was not clear that encounters with Plaintiffs' vessels would necessarily be close encounters. Hammarstedt, Chakravarty, and Watson testified that they believed the Japanese might refrain from taking whales in the presence of the Sea Shepherd ships because, in the 2011-2012 campaign, the Japanese vessels had retreated when Sea Shepherd vessels appeared.[176] This may have been wishful thinking, because the injunction had altered the playing field, but it is difficult to know what "all reasonable steps" means in this context because the injunction prohibited close encounters, not OZT itself.

---

[175] As discussed below, the status of the vessel grants remains relevant to any future injunctive relief.

[176] Hammarstedt 884:12-885:7; Chakravarty 1436:20-1437:10; Watson 1786:1-11.

Plaintiffs implicitly concede the complexity of the situation Defendants faced in their list of the steps Defendants might have taken. Some of the proposed reasonable steps Plaintiffs assert Defendants failed to take assume that Defendants were in a position to "order" or "instruct" SSAL and the ship captains. Other steps proposed by Plaintiffs seem to recognize that Defendants could do no more than "ask." Some of the allegedly reasonable steps, like "stopping OZT" are at odds with other steps, like re-imagining OZT as an exercise in documentary filmmaking by filming the Japanese whalers in action but taking no further steps. The list itself suggests that there was no obvious way to comply with the injunction.

Notably, the injunction did not require Sea Shepherd to withdraw from OZT, nor did it outlaw OZT itself. Rather, it laid out a set of ground rules in the event that the opposing vessels encountered each other. Nevertheless, Plaintiffs argue that every step that Defendants took during its effort at "separation" that benefitted OZT necessarily aided and abetted the violation of the injunction.

Plaintiffs argue, and the evidence shows, that none of their proposed reasonable steps, with a few minor exceptions, were even discussed, let alone attempted. Any claim of futility is hollow, Plaintiffs maintain, in the absence of

any attempt to implement these other measures. Plaintiffs posit that the failure to take *any* of these steps shows that the steps they did take were a "sham."

Plaintiffs do not specify, however, which or how many of their proposed "reasonable" steps would have provided Defendants with a safe harbor with respect to the injunction. Plaintiffs imply that the "reasonable " steps could have, and should have, been tried *seriatim*, which itself suggests there may not have been a high probability of success. Rightly or wrongly, Defendants adopted their "separation" strategy to avoid the risk that they would be held accountable for failing to control the other participants in OZT.[177]

Defendants' attempt at compliance should not be seen and evaluated as a course of action that failed to include a few crucial steps. Instead, Defendants adopted a "separation" strategy and took reasonable steps to carry out that strategy in order to guarantee their own compliance with the injunction.

---

[177] The difference in approach to compliance is crystallized in this exchange between Plaintiffs' counsel and Gaede:

Q: And would you agree with me that you could take reasonable steps incrementally? In other words, try something and see if it works, and then if that doesn't work, try something else?

A: That isn't how we approached it. We had a plan, and I think we exercised the plan to the best of our ability.

Gaede 781:21-782:2.

**C. "Good Faith and Reasonable Interpretation of the Court's Order"**

The idea that a party should not be held in contempt if the party's actions were taken in good faith and based on a reasonable interpretation of the court's order is obviously in some tension with the idea that there is no good-faith exception for disobeying a court order. Both principles run throughout the caselaw. The rejection of the good faith defense is a corollary of the fact that intent is irrelevant to a finding of civil (as opposed to criminal) contempt. *See Stone v. City & County of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992) (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949)). The simultaneous recognition that a good faith and reasonable interpretation of the court's order forecloses a finding of contempt points in a different direction: the order itself.

The determination whether an alleged contemnor acted in good faith on the basis of a reasonable interpretation of the court's order necessarily addresses the clarity and complexity of the underlying order. In *Wolfard Glassblowing Co. v. Vanbragt*, 118 F.3d 1320, 1323 (9th Cir. 1997), for example, the court rejected a trademark infringer's argument that refraining from producing exact replicas of a lamp was a good faith and reasonable interpretation of an order prohibiting "colorable imitations." In *Vertex*, the court found no contempt because "Vertex failed to show by clear and convincing evidence that defendants' interpretation of

'includes' and 'incorporating' as allowing use of the single word 'Falcon' was unreasonable." 689 F.2d at 890. In both *Wolfard* and *Vertex*, the court held that the party seeking the citation of contempt had the burden of showing that the other party's interpretation of the court order was not reasonable.

The injunction here is straightforward in its prohibitions, but how it applied to the various parties in the Southern Ocean was not. Defendants testified consistently and credibly that they had many questions about the meaning and application of the injunction, particularly when the ships and the crews were thousands of miles away and under the direct command of the captains.[178] Plaintiffs dispute Defendants' claimed inability to control the other OZT participants, but all of the Volunteer Directors testified credibly that this was the concern that dictated the decision to comply with the injunction by "withdrawing" or "separating" from OZT. In their December 31, 2012 motion for reconsideration

---

[178] Watson and Hammarstedt also testified that the "approach" language in the injunction left it unclear whether the injunction would apply if Plaintiffs' vessels were responsible for coming within 500 yards of the ships participating in OZT. Hammarstedt 879:16-21; Watson 1785:8-20. Chakravarty testified that he did not understand the "acting in concert" language and that it was also unclear whether the term "Southern Ocean" included the Ross Sea, and whether Sea Shepherd vessels were required to stay 500 yards away from the *Sun Laurel*, the Korean tanker from which Plaintiffs' vessels refueled. Chakravarty 1409:9-1410:9. Notably, none of the parties had the benefit of the court's opinion, which was not filed until February 25, 2013.

of the injunction, SSCS and Watson asserted uncertainty concerning the

application of the injunction to "activities conducted by foreign owned and foreign

flagged vessels, manned by a mostly foreign crew, and mastered by foreign

captains." Dkt. #32 at 7-8. The motion for reconsideration was summarily denied

on January 7, 2013. Dkt. #34. Plaintiffs argue that the lack of control is an ex post

facto "cover" story, but the evidence does not support this view.[179]

Plaintiffs repeatedly refer to the "separation" strategy as a "sham," and argue

that the genesis of that strategy was Defendants' desire to preserve OZT while

shielding themselves from liability. With the exception of a few bombastic emails

from Watson, Plaintiffs offer no evidence that could be construed as evidence that

the SSCS board's overriding concern in adopting the "separation" strategy was

anything other than the discharge of its fiduciary duties and the preservation of the

---

[179] Plaintiffs argue, for instance, that counsel's advice not to ask SSAL to comply in the immediate aftermath of the injunction and the later advice not to communicate with the ship captains after the *Brigitte Bardot* crossed the safety perimeter on January 29 were motivated by a desire not to *appear* to have control, *see* Dkt. #308 at 10. Even if this were true, it is not evidence that Defendants in fact had control or believed they did. Defendants' worries about "control" were vindicated by the January 29 incursion. Zuckerman's notes, Rieman's resignation letter, and Watson's ghostwritten effort to reign in the ship captains after that event provide contemporaneous evidence that concerns about control were not concocted later as trial strategy.

organization.[180]  Plaintiffs cite considerable evidence that the individual

Defendants sympathized with the mission of OZT, both before and after the

injunction issued, but this is neither surprising nor contumacious.  Plaintiffs have

not produced persuasive, let alone clear and convincing evidence, that the SSCS

board did not believe it was complying in good faith with the injunction by

withdrawing from OZT.

Each of the Volunteer Directors testified at length that he or she relied on the

advice of SSCS's counsel in implementing the "separation" strategy.  Plaintiffs do

not dispute this fact so much as its relevance.  Because intent is irrelevant to a civil

contempt determination, advice of counsel is not available as a complete defense.

*See United States v. Asay*, 614 F.2d 655, 661 (9th Cir. 1980).  But reliance on

counsel's advice is clearly relevant to determining whether a particular

interpretation of the court's order, and the actions taken in accordance with that

interpretation, were reasonable and taken in good faith.  *See Chao v. Gotham*

*Registry, Inc.*, 514 F.3d 280, 293 (2d Cir. 2008) (holding that consultation with

---

[180]  The Volunteer Directors' consistent and credible testimony that
advancing OZT by other means was not their real priority is supported
by Zuckerman's detailed personal notes of the board's December 20 and December 30
meetings.  *See* Exs 785, 786; Zuckerman 433:23-424:16.

counsel was evidence of "diligent and energetic efforts to comply in a reasonable manner").

Plaintiffs argue that there is no evidence that Defendants' reliance on the advice of its counsel was reasonable because there is no evidence that SSCS's counsel was either competent or fully informed.  Defendants testified that they relied on Harris and Mouré on the basis of a long course of dealing, which included their recent victory in the district court.[181]  The "separation" strategy advised by counsel was neither inconsequential nor implausible, especially to a board whose members were not lawyers and had little experience with litigation.  Defendants' reliance on the advice of counsel was reasonable.

Even if the reliance was reasonable, the more important question, Plaintiffs emphasize, is whether the advice itself was reasonable.  In part, this is simply the "all reasonable steps" question in a different form.  If the advice missed "steps" that were clearly necessary to achieve compliance, Plaintiffs argue, it is difficult to see how it was reasonable.  Defendants argue, in turn, that the "separation" strategy was a reasonable set of steps that was a valid and realistic way to insure that SSCS complied with the injunction.

---

[181]  Zuckerman 384:8-12; Gaede 647:9-15; Talbot 1186:6-10.

Neither Plaintiffs nor Defendants offer a persuasive legal framework for deciding whether an interpretation of how to comply with an injunction is reasonable. Plaintiffs argue that the "separation" strategy cannot be reasonable because the very steps that the Defendants took in the name of compliance "worked to ensure the Injunction would be violated." Dkt.# 308 at 10. This argument is rhetorically powerful, but it rests on two assumptions: (1) that Defendants had sufficient control or influence to prevent the confrontations that occurred during OZT; and (2) that the injunction in fact bound the foreign participants.

Plaintiffs' argument is clearly based on the actual outcome of OZT; events that the injunction was designed to prevent did in fact occur. From Plaintiffs' perspective, the injunction obliged SSCS to guarantee that no confrontation occurred in the Southern Ocean, and the injunction did so because the parties that ultimately confronted the whaling vessels were acting in one or more ways "in concert" with SSCS, and the injunction bound SSCS, Watson, and those acting "in concert" with them.

Defendants' "separation" strategy, by contrast, did not equate compliance with becoming a surety for foreign OZT participants over whom they did not have control. Instead, they sought to guarantee that SSCS would not be directly

responsible for any future events that violated the injunction. When asked about the risk that the court might find the "separation" inadequate, Rieman replied it was a risk, but the alternative was for it to appear as if SSCS supported whatever happened in the course of OZT.[182] This version of compliance may be too literal, too narrow, or too naive, but the fact that it did not prevent confrontations in the Southern Ocean is not the measure of its validity as a "reasonable" interpretation of the court's order.

In *Wolfard*, the court rejected the infringer's interpretation of the injunction because, if accepted, "[t]he injunction's prohibition . . . would be of no effect." 118 F.3d at 1323-24. Here, it cannot be said that Defendants' interpretation of how to comply with the injunction led to the court's order having "no effect." SSCS severed all ties to the Southern Ocean whale defense campaigns, and its revenues have fallen drastically as a result. Presumably, revenues from the United States generally available to fund whale defense have also fallen, because U.S. citizen contributions to SSAL, unlike contributions to SSCS, are not tax-deductible. *See* 26 U.S.C. § 170(a)(2)(A). SSAL's ability to run future campaigns has no doubt been adversely affected by SSCS's decision to withdraw from those campaigns. This is not the "effect" Plaintiffs or the court envisioned when the injunction issued

---

[182] Rieman 1371:15-1372:9.

but, in the absence of clear and convincing evidence that Defendants sought to evade the injunction, the failure of the injunction to have its desired effect is not evidence that the injunction was violated.

### D. SSCS Liability for the Acts of Other Sea Shepherd Entities

The complex relationships among SSCS, the other Sea Shepherd entities, and the OZT participants are at the crux of the contempt inquiry. Plaintiffs suggest that the answer to that inquiry might actually be simple because the various Sea Shepherd entities acted as "one big venture to save ocean life" and therefore the acts of other entities that violated the injunction are attributable to Defendants. *See* Dkt. #296 at 12-15.

Plaintiffs' various theories of SSCS's liability for events in the Southern Ocean tend to run together, but some emphasize the entities' pre-injunction course of conduct while others emphasize the actions SSCS took after the injunction. Plaintiffs argue that there was an agency relationship between SSCS and SSAL, and that SSAL "acted 'in concert' with Defendants[;] that is, as an aider and abettor or co-conspirator." Dkt. #297 at 47. Given the extensive evidence that the various Sea Shepherd entities have worked as "one big joint venture," it would "work a fraud or injustice," Plaintiffs argue, to respect the entities' separate corporate existence. Dkt. #297 at 49-50.

Although Plaintiffs have attempted to connect any number of dots, they have not shown that all the Sea Shepherds are "one" in any sense that has relevance to the contempt inquiry. There was considerable testimony and evidence offered about the history and operation of SSAL and, to a lesser extent, the other Sea Shepherd entities. Both before and after the injunction issued, SSAL maintained an organizational and management structure separate from SSCS. Participation in the whale defense campaigns did not turn it into a subsidiary of SSCS. At times, Plaintiffs appear to concede this fact, and argue instead that the entities were not really separate because they acted in concert to evade the injunction.

Plaintiffs' evidence of the concerted effort to evade the injunction is largely negative and inferential: Defendants failed to prevent SSAL and the ship captains from taking actions SSCS could not itself pursue. Plaintiffs offer more direct evidence that SSCS functioned as an aider and abettor and/or co-conspirator in the form of the material aid SSCS offered OZT after the injunction. But this evidence does not prove a concerted effort to evade the injunction. First, aid to OZT was not forbidden by the injunction, and it was reasonable to continue with it while a plan of action was developed. Second, the continuing aid to OZT for a few weeks after the injunction issued is unsurprising, given that "separation" could not be achieved overnight. Third, the aid that OZT received in the two weeks following the

injunction was not necessary to its success.[183]  SSCS's expenditures between December 17 and December 31 are not sufficient to render SSCS an aider or abettor or co-conspirator in a scheme to violate the injunction.[184]

Plaintiffs also point to the January 2013 grant of the *Bob Barker* and certain equipment aboard the other ships as additional material support SSCS provided for violation of the injunction.  But these steps, taken on advice of counsel, merely formalized the de facto situation, and were undertaken as part of the "separation" strategy.[185]

---

[183]  Both Brown and Hansen testified that SSAL would have had no difficulty making up for any shortfall that would have occurred if SSCS had not made these final payments.  Brown 1552:18-1553:11; Hansen 1654:14-1655:1, 1670:4-20.  Plaintiffs concede that the campaign was "effectively ready to launch" when the injunction issued.  Dkt. #308 at 3.

[184]  As noted above, the most substantial expenditure in this period is the $106,830 fuel order for the *Steve Irwin*, which was paid on December 31, 2012, but not delivered until January 5.  In his deposition, Makhani testified that he paid the fuel invoice because he believed it had been approved by Chakravarty, a person who could authorize invoices on December 31.  Ex. 346 (Makhani dep. designations) 130:3-132:18.  Although the fuel facilitated the *Steve Irwin*'s participation in OZT, both Chakravarty and Watson had announced that the *Steve Irwin* would comply with the safety perimeter.

[185]  The emails exchanged between Mouré, Makhani, and Geert Vons, the head of SSNL show that SSNL already possessed an ownership interest in the Dutch-flagged *Bob Barker* when the injunction issued, and that SSCS wanted to get the vessel "off its books."  *See* Ex. 582.

In the absence of clear and convincing evidence establishing a concerted effort to evade the injunction, Plaintiffs invoke a variety of legal theories to establish Defendants' indirect liability for the actions of SSAL and the OZT participants. Plaintiffs do not develop any of these legal theories of indirect liability with reference to the record evidence, and Defendants argue persuasively that none would fit the facts of the case. *See* Dkt. #301 at 48-59. The various theories of indirect liability fail for different reasons, but most require a showing of control or consent that was not made. Even if an agency relationship could be found in previous whale defense campaigns, Plaintiffs would have to prove that the relationship survived SSCS's separation from OZT. SSCS's liability for acts committed by its putative agent, SSAL, requires a finding that SSAL's acts in the Southern Ocean were both within the scope of the agency relationship and for the benefit of SSCS and, after the injunction, those acts were not in the interest of SSCS. *See Scott v. Ross*, 140 F.3d 1275, 1280 (9th Cir. 1998) (applying Washington law) ("If the agent is not acting on the principal's behalf at the time of the act in question, then the principal is not liable for that act.").

IV
Recommendations

The key decision point here is whether the negative injunction required positive action and, if so, what positive action was necessary. The alleged contemnors – with the possible exception of Watson – adopted a "separation" strategy that would be legally sufficient if positive action were not required. There is no clearly controlling authority that answers this key decision point, however, and the panel that referred this matter must confront and resolve this question.

**A. Watson**

Plaintiffs' strongest case for contempt lies against Watson. Watson testified that his first reaction to the injunction was to call counsel, but, unlike the rest of the board, he is not asserting that his acts are defensible because they were based on counsel's advice. Watson played an active role in developing the "separation" strategy with Harris, Mouré, and Brown. As part of that strategy, Watson decided to resign from his command of OZT, his captaincy of the *Steve Irwin*, his executive director position with SSCS, and his board positions with SSCS and SSAL. If the panel concludes that the "separation" strategy was inadequate, he is directly responsible for that inadequacy.

Watson is in a different position from the rest of the SSCS board in another way.  He is the larger-than-life founder of SSCS, holding key positions in the global Sea Shepherd movement.  When the injunction issued, Watson was captain of the *Steve Irwin* and the commander of OZT, a role he had occupied for the previous eight whale defense campaigns.  If the panel concludes that it was incumbent on Defendants to attempt to use influence to persuade others to comply with the injunction, he is the Defendant to whom this view of compliance chiefly applies.

On the other hand, although Watson's colorful rhetoric suggests that he was "aiding and abetting" the violations of the injunction, the weight of the evidence suggests that the whale defense campaign would have proceeded in substantially the same manner no matter what Watson did.  The testimony of the other captains and crew and the documentary evidence show that the foreign participants in OZT were committed to going forward under the leadership of SSAL, and nothing Watson would have said would have deterred them.

It is also clear that SSAL would have taken charge of OZT regardless of any action by Watson or anyone else with SSCS.  There was strong public and legal support for whale defense in Australia and, once the SSAL board received a legal opinion that this court's injunction did not bind SSAL, it was inevitable that SSAL

would take over. Watson could not have prevented that from occurring. Ultimately, the responsibility for the incursions of the safety perimeter and any other violation of the injunction lies with SSAL and the captains who reported to SSAL, but plaintiffs have not sought a remedy in this court over SSAL or those captains, and it is doubtful that jurisdiction exists to do so.

In light of the inevitability of OZT proceeding as it did regardless of any act or plea by Watson, I conclude that Watson did not fail to take all reasonable steps *within his power* to comply with the injunction. If Watson lacked the power to stop the injunction from being violated, then he should not be held liable for failing to take acts that would not have mattered.

There is no other persuasive reason for holding Watson in contempt. He should not be punished for resigning from his positions. The injunction did not compel him to remain in charge to police the ongoing events in OZT, and he was entitled to remove himself from direct command – and responsibility – when he reasonably concluded that he ultimately could not prevent violations of the injunction by others.

Nor should Watson be held in contempt for personally violating the injunction when the *Steve Irwin* – with Watson on board – penetrated the safety

perimeter. He had no control over the ship at that point, and he had no way of disembarking.

Finally, Watson's expression of support for the campaign and his actions in observing, chronicling, and reporting on the events in the Southern Ocean do not provide a basis for liability. The injunction cannot be read to forbid him from following the campaign and expressing his opinions about it.

## B. SSCS

The determination of SSCS's liability for contempt requires a similar analytic framework. Watson and SSCS's counsel formulated the "separation" strategy and, if that strategy constitutes contempt, SSCS may be liable. Because Plaintiffs failed to prove that SSCS attempted to ignore or evade the injunction, contempt liability should depend on Plaintiffs showing by clear and convincing evidence that SSCS had a duty to take additional steps to comply with the injunction.

Plaintiffs identify three main steps that SSCS could have taken in response to the injunction: (1) influence or direct SSAL to comply with the injunction; (2) cease all funding immediately after the injunction issued; and (3) threaten to revoke the ship grants if the injunction were violated. Even if SSCS had a duty to

take these steps, there is little likelihood that these steps would have changed anything.

SSAL had logistical control of the campaign when the injunction issued and soon thereafter received legal advice that it was not bound by the injunction. Plaintiffs assert, without clear or convincing evidence, that SSCS had leverage over SSAL and the OZT participants, but it remains unproven that anything the staff or board of SSCS might have done would have made any difference to events in the Southern Ocean. Indeed, when SSCS did issue a plea to SSAL to stand down because of the fear of dire legal consequences for SSCS, the response was a polite refusal.

Plaintiffs have invited the court to view the steps SSCS actually took as an attempt to shield SSCS from liability while providing financial assistance for a few weeks after the injunction issued, thus ensuring that OZT continued. But the injunction did not outlaw OZT, only certain ways in which OZT could operate, and the funding for OZT was largely in place by December 17, 2012.

Finally, Plaintiffs suggest that SSCS's "beneficial ownership" interest in the *Steve Irwin* and its revocation rights under the other three vessel grants provided legal leverage that SSCS should have at least threatened to use. But Plaintiffs have not established what that "beneficial ownership" was and have not shown that

those ownership or revocation rights would be triggered by acts SSAL took simply

because they were acts that the injunction prohibited SSCS from taking.[186]  Given

SSAL's curt refusal when urged by SSCS to abide by the injunction, it seems

highly unlikely that a threat to seek revocation of the vessel grants would have

stopped SSAL or SSNL from continuing with the whale defense mission, which

had only a few weeks left to go.  Although Gaede's letter to SSAL did not threaten

revocation of the grants, SSAL had already been forwarded the January 29 letter

from Plaintiffs' counsel raising the specter of revocation.  SSAL was on notice of

the possibility of revocation and that possibility did not affect SSAL's response to

SSCS's request.

Plaintiffs also have suggested that SSCS should have required Watson to

stay in command and run OZT in a manner that complied with the injunction, but

SSCS had no legal or practical ability to control Watson in this manner.  The

Volunteer Directors saw the fate of the organization as separate from Watson's.

The board believed that Watson would comply with the injunction, but they had no

---

[186]  In their post-hearing reply brief, Plaintiffs mount a belated tax law argument contending that SSCS must have retained control of its transferred assets to retain favorable tax treatment.  *See* Dkt. #308 at 7-9. This argument was not raised previously and therefore should not be addressed.  It appears, however, that the argument is not persuasive; among other things, the tax authorities cited by Plaintiffs apply to control over "funds" that a domestic charitable organization funnels to a foreign entity, not property.

basis for concluding that he could guarantee that the terms of the injunction would be honored by the other OZT participants.

## C. Volunteer Directors

Whether or not the court finds SSCS or Watson in contempt, it should not find the Volunteer Directors personally liable for any damages. Even if "advice of counsel" does not provide a defense to civil contempt, it is generally recognized to be a factor in mitigation. *See Eustace v. Lynch*, 80 F.2d 652 (9th Cir. 1935); *see also TWM Mfg. Co. v. Dura Corp.*, 722 F.2d 1261, 1273 (1st Cir. 1981); S.E.C. *v. First Fin. Group of Texas, Inc.*, 659 F.2d 660, 670 (5th Cir. 1981).

Here the mitigation – assuming a finding of contempt – should be complete. The Volunteer Directors suddenly found themselves in uncharted seas, reliant on counsel's advice in a very complicated situation. The "separation" strategy may have been developed among Watson, Hansen, Brown, and SSCS's counsel, but the Volunteer Directors agreed to it based on representations made by SSCS's counsel at the December 20 board meeting. There is no question that every subsequent step they took was guided by advice of counsel.

Counsel may not have always kept the Volunteer Directors adequately informed; the delay in informing them of the first alleged event of contempt remains unexplained. But that is not a basis for holding them personally liable for

implementing a plan that made sense to them. The Volunteer Directors are impressive people, but they are not attorneys. Each testified why their own experience with Sea Shepherd led them to believe the "separation" strategy was their only viable option, given their fiduciary duty to preserve the organization. Their decision to follow the steps proposed by counsel was reasonable – subjectively and objectively.

In addition, the Volunteer Directors may be protected by the Volunteer Protection Act (VPA). The VPA provides that a volunteer serving with a nonprofit organization is not "liable for harm caused by an act or omission of the volunteer . . . [who] was acting within the scope of the volunteer's responsibilities . . . at the time of the act of omission." 42 U.S.C. § 14503(a)(1). Plaintiffs contend that the VPA is designed to protect volunteers from state law negligence claims, and may not even apply to federal claims, let alone contempt citations. *See* Dkt. #297 at 51- 52. Plaintiffs also note that, by its own terms, the VPA does not apply to actions marked by gross negligence, recklessness, or a "conscious, flagrant indifference to the rights or safety of the individual harmed by the volunteer." 42 U.S.C. § 14503(a)(3). Defendants counter that the Volunteer Directors were not acting outside the scope of their responsibilities, and the VPA immunizes volunteers for a

broad array of "harms" that should include those claimed by Plaintiffs in this case. *See* Dkt. #301 at 39-40.

There is very little law construing the VPA, although at least one court has held that it preempts federal as well as state claims. *See Armendarez v. Glendale Youth Center, Inc.*, 265 F. Supp. 2d 1136, 1139-41 (D. Ariz. 2003); *but cf. American Produce, LLC v. Harvest Sharing, Inc.*, 2013 WL 1164403, at *3-4 (D. Colo. Mar. 20, 2013). The legislative history of the statute shows that it was intended to apply to "any claim for harm caused by an act or omission of a volunteer," but no court has considered the statute in relation to an application for relief from contempt. *See* 42 U.S.C. § 14501 Hist. and Stat. Notes (b). In any event, the Defendants rightly call the court's attention to the broader legislative purpose behind the VPA, documented in the statute itself. *See* 42 U.S.C. § 14501(a)(1) ("the willingness of volunteers to offer their services is deterred by the potential for liability actions against them.").

## D. Rieman

Rieman should not be found individually liable for the same reasons that apply to the other Volunteer Directors. Rieman has argued in multiple motions that he should be dismissed from the contempt proceedings because his February 11, 2013 resignation from the SSCS board meant that he was no longer in a

position to comply with the court's injunction. Even if that is true, Plaintiffs allege that he played a role in SSCS's decision to "separate" from OZT, and that the "separation" decision constituted contempt. If SSCS's actions (and inactions) put it in contempt, then he is as liable as the other Volunteer Directors. For the reasons stated above, like the other Volunteer Directors, he should not be found personally liable.

**E. Hartland**

Plaintiffs assert that Hartland is personally liable for contempt because she "willingly participated in these failures to take reasonable steps." Dkt. #297 at 42. Even if participation in a failure to act were legally cognizable as an act of contempt, it would be a particularly weak basis for assigning liability to Hartland. There is no evidence that Hartland took any action in response to the injunction that was not authorized by the SSCS board, which was itself relying on advice of counsel. Hartland's job put her at the center of many administrative matters, and her signature appears on some important documents, such as the grant of the *Bob Barker*, but her actions were at the behest of others. She should not be found personally liable.

**F. Damages/Attorney Fees**

If the court finds contempt, the compensatory remedy of attorney fees becomes available. This court has explained that it is not necessary to find that the contempt was willful in order to award costs and attorney fees because "the cost of bringing the violation to the attention of the court is part of the damages suffered by the prevailing party." *Perry v. O'Donnell*, 759 F.2d 702, 705 (9th Cir. 1985) (quoting *Cook v. Ochsner Found. Hosp.*, 559 F.2d 270, 272 (5th Cir. 1977)).

The award of fees and costs remains discretionary, *see Harcourt*, 26 F.3d at 953, and based on a case-specific inquiry, *see Perry*, 759 F.2d at 705. Defendants maintain that, should there be a finding of contempt, it would be inequitable to award Plaintiffs their full fees and costs because Plaintiffs multiplied the proceedings unnecessarily by adding non-parties, and because those added parties were volunteers and an employee carrying out the directives of the volunteer board. *See* Dkt. #301 at 75-76.

It is premature to address the issue of attorney fees. If the court is inclined to award fees, it should call for additional briefing, and the parties should be directed to comply with the requirements of Ninth Circuit Rule 39-1.

**G.  Continuing Injunctive Relief**

In addition to a request for their attorney's fees, Plaintiffs offer suggestions about sanctions designed to make sure the injunction is not violated in the future. They propose a $2 million bond,  based on the current net worth of SSCS, and offer some specifics:

> It is not the Court's job, nor Plaintiffs', to point out what reasonable steps these Defendants can take, but one is to make a good faith, sincere effort to persuade SSAL and any other participating Sea Shepherd entity to not conduct any Southern Ocean campaign until such time as the Injunction is lifted, unless SSCS can devise a way to be in the Southern Ocean with Plaintiffs such that the Injunction is not in fact violated.  Watson can use his leadership role to make a good faith, sincere effort to persuade SSAL and his followers not to participate in the campaign unless, again, a way can be devised to do that such that the Injunction is not in fact violated.  And SSCS and the Directors can use whatever means they have to persuade Watson to do that.

Dkt. #296 at 18-19.

Plaintiffs' proposal is remarkable for several reasons.  First, the admission here (and elsewhere in their post-hearing papers) that it is not the job of Plaintiffs or the court to specify the reasonable steps Defendants should take going forward severely undercuts the case for continuing sanctions.  The ability of this court to find Defendants in contempt depends on its ability to specify what "reasonable steps" should have been taken or should be taken going forward.

Second, the specific steps that Plaintiffs set forth reiterate the steps that Plaintiffs argue should have taken in response to the original injunction. These steps are based on a view of the organization of the Sea Shepherd entities that Plaintiffs failed to prove, and a view of Defendants' control and influence that Plaintiffs failed to prove. If Plaintiffs failed to prove that these "reasonable steps" were available last year, it appears unlikely that Defendants can be held accountable for accomplishing them now. Plaintiffs' proposal for continuing sanctions shows no awareness that SSCS has gone out of the whale protection business. Although Plaintiffs' counsel conceded at the hearing that none of the Defendants appears to be involved in any way with Operation Relentless, Plaintiffs want Defendants to act as surety for persons and entities beyond Plaintiffs' reach and Defendants' control.

Plaintiffs' proposal includes one additional item: that Defendants revoke the grant agreements for the four ships (and related property), or at least make a good faith, reasonable effort to obtain their return. Throughout the contempt proceedings, the possibility of such an action was asserted by Plaintiffs with no substantial legal support, and just as blithely rejected by Defendants. Defendants might be able to lodge an action against SSAL or SSNL for return of the ships, but Plaintiffs offer no reason to believe such an action would be successful. It is also

hard to see how the court could monitor the litigation, or determine whether any effort to obtain the ships' return was reasonable and in good faith.

It is well-settled that "an action for an injunction does not become moot merely because the conduct complained of was terminated, if there is a possibility of recurrence, since otherwise the defendant[s'] would be free to return to [their] old ways." *Affordable Media*, 179 F.3d at 1237. The existing injunction should therefore continue in place to make sure that Defendants do not engage in the conduct prohibited by the injunction. But beyond that, it is difficult to express in legally cognizable terms the content of an injunction to address the current situation in the Southern Ocean.