**No. 12-35266**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

THE INSTITUTE OF CETACEAN RESEARCH, a Japanese research foundation; KYODO SENPAKU KAISHA, LTD., a Japanese corporation; TOMOYUKI OGAWA, an individual; and TOSHIYUKI MIURA, an individual,

*Plaintiffs-Appellants,*

v.

SEA SHEPHERD CONSERVATION SOCIETY, an Oregon nonprofit corporation, and PAUL WATSON, an individual,

*Defendants-Appellees.*

SEA SHEPHERD CONSERVATION SOCIETY, an Oregon nonprofit corporation,

*Counter-plaintiff,*

v.

THE INSTITUTE OF CETACEAN RESEARCH, a Japanese research foundation; KYODO SENPAKU KAISHA, LTD., a Japanese corporation; and HIROYUKI KOMURA, an individual,

*Counter-defendants.*

Appeal from District Court Case No. 2:11-cv-02043-RAJ
Western District of Washington, Seattle (Hon. Richard A. Jones)

**DEFENDANTS-APPELLEES SEA SHEPHERD CONSERVATION SOCIETY AND PAUL WATSON AND NON-PARTIES LANI BLAZIER, MARNIE GAEDE, SUSAN HARTLAND, PETER RIEMAN, BOB TALBOT, ROBERT WINTNER, AND BEN ZUCKERMAN'S OBJECTIONS AND RESPONSE TO PLAINTIFFS-APPELLANTS' OBJECTIONS TO THE APPELLATE COMMISSIONER'S REPORT AND RECOMMENDATION**

By:/s/ *David F. Taylor*
David F. Taylor
DFTaylor@perkinscoie.com
Kathleen M. O'Sullivan
KOSullivan@perkinscoie.com
Zachary P. Jones
ZJones@perkinscoie.com
Perkins Coie
1201 Third Avenue, Ste. 4900
Seattle, WA 98101

Attorneys for Non-Parties Lani
Blazier, Marnie Gaede, Bob Talbot,
Robert Wintner, and Ben Zuckerman

By: /s/ *Daniel P. Harris*
Daniel P. Harris
dan@harrismoure.com
Charles P. Moure
Charles@harrismoure.com
Rebecca Millican
rebecca@harrismoure.com
Harris & Moure, PLLC
600 Stewart Street, Ste. 1200
Seattle, WA 98101

Attorneys for Defendant-Appellee Sea
Shepherd Conservation Society

By: /s/ *Timothy G. Leyh*
Timothy G. Leyh
timl@calfoharrigan.com
Michelle Buhler
michelleb@calfoharrigan.com
Charles S. Jordan
chipj@calfoharrigan.com
Calfo Harrigan Leyh & Eakes, LLP
999 Third Avenue, Ste. 4400
Seattle, Washington 98104
Attorneys for Defendant-Appellee
Paul Watson


By: /s/ *Claire Loebs Davis*
Claire Loebs Davis
davisc@lanepowell.com
Katie Smith Matison
matisonk@lanepowell.com
Lane Powell PC
1420 Fifth Avenue, Ste. 4200
Seattle, Washington 98101
Attorneys for Non-Party Susan
Hartland


By: /s/ *Kristina S. Bennard*
Kristina S. Bennard
kbennard@yarmuth.com
Julia D. Woog
jwoog@yarmuth.com
Yarmuth Wilsdon PLLC
818 Stewart Street, Ste. 1400
Seattle, Washington 98101
Attorneys for Non-Party Peter
Rieman

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...............................................................................1

II.  PROCEDURAL HISTORY ............................................................5

III.  LEGAL STANDARDS ....................................................................6

    A.  Standard of Review ...............................................................6

    B.  Standard for Proving Civil Contempt .................................11

IV.  RESPONSE TO PLAINTIFFS' OBJECTIONS ..........................12

    A.  The Commissioner Correctly Determined that Defendants and the Non-Parties Lacked the Power to Control Third Parties and Separated From OZT to Comply With the Injunction ......................13

        1.  SSCS, Watson, and the Non-Parties did not have the power to control OZT's participants, and did not "turn it over" to SSAL .........................................................13

        2.  The Commissioner correctly determined that Defendants and the Non-Parties separated from OZT to comply with the Injunction, not to evade it ...................................................22

    B.  Defendants and the Non-Parties Took All Reasonable Steps Within Their Power to Comply With the Injunction Based on a Reasonable and Good Faith Interpretation of the Order ....................31

        1.  SSCS, Watson, Hartland, and the Volunteer Directors took all reasonable steps within their power to ensure that SSCS complied .........................................................32

        2.  Plaintiffs have not identified any reasonable steps within Defendants and the Non-Parties' power that would have ensured compliance ................................................34

            a.  "Not turning OZT over" ...............................35

            b.  Expenditure cut-off .......................................35

            c.  Seizing the ships ...........................................36

# TABLE OF CONTENTS
## (continued)

**Page**

    d.    Persuading others ........................................................... 39

    3.    Separation from the campaign was a good faith and reasonable interpretation of the Injunction ............................. 43

        a.    Separation from the campaign was reasonable ............ 43

        b.    Separation from the campaign was in good faith .......... 45

C.    The Commissioner Correctly Concluded that Defendants and the Non-Parties Were Not Indirectly Liable for Actions of SSAL or the Ship Captains and Crew ................................................ 46

    1.    No legal identity ................................................................ 49

    2.    No aiding and abetting .......................................................... 51

    3.    No control ...................................................................... 53

D.    The Commissioner Correctly Determined That Watson's Presence Aboard the *Steve Irwin* Within the 500-yard Perimeter Is Not a Basis for Contempt ...................................................... 56

E.    The Commissioner Properly Admitted Evidence Concerning the Volunteer Directors' Reliance on the Advice of Counsel ............ 61

F.    The Volunteer Protection Act Precludes a Contempt Judgment Against the Volunteer Directors ...................................................... 66

G.    Plaintiffs Are Not Entitled to Sanctions or Fees ............................... 69

    1.    The requested sanctions are punitive, not compensatory or coercive ...................................................................... 69

    2.    Attorneys' fees and costs are unwarranted ............................. 73

V.    DEFENDANTS AND THE NON-PARTIES' OBJECTIONS ................... 74

A.    It is Unnecessary to Determine Whether the Injunction Required "Positive Action." ................................................ 74

B.    Rieman's Resignation is Relevant ...................................................... 76

**TABLE OF CONTENTS**
**(continued)**

**Page**

    C.    The Invalidity of the Injunction Precludes a Contempt Sanction ......76

VI.    CONCLUSION...............................................................................77

LEGAL28625608.50

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Am. Produce, LLC v. Harvest Sharing, Inc.*,
No. 11–cv–00241–PAB–KLM, 2013 WL 1164403 (D. Colo. Mar. 20, 2013) ................................................................................68

*Anderson v. City of Bessemer City*,
470 U.S. 564 (1985)......................................................................10

*Armendarez v. Glendale Youth Ctr., Inc.*,
265 F. Supp. 2d 1136 (D. Ariz. 2003) ..............................................67

*B.K.B. v. Maui Police Dep't*,
276 F.3d 1091 (9th Cir. 2002) ........................................................67

*Balla v. Idaho State Bd. of Corrections*,
869 F.2d 461 (9th Cir. 1989) ..........................................................34

*Bittaker v. Woodford*,
331 F.3d 715 (9th Cir. 2003) (en banc) ......................................64, 65

*Buschmeier v. G & G Investments, Inc.*,
No. 02:03mc00506, 2009 WL 90400 (W.D. Pa. Jan. 14, 2009) ........62

*Carbo v. United States*,
314 F.2d 718 (9th Cir. 1963) ..........................................................10

*Chao v. Gotham Registry, Inc.*,
514 F.3d 280 (2d Cir. 2008) ......................................................46, 62

*Falstaff Brewing Corp. v. Miller Brewing Co.*,
702 F.2d 770 (9th Cir. 1983) ......................................................71, 73

*Gibbs v. Pierce Cnty. Law Enforcement Support Agency*,
785 F.2d 1396 (9th Cir. 1986) ..........................................................9

LEGAL28625608.50

**TABLE OF AUTHORITIES**
(continued)

Page

*Girardi v. Dow Chem. Co.*,
    528 F.3d 1131 (9th Cir. 2008) ............................................................. 7

*Goya Foods, Inc. v. Wallack Mgmt. Co.*,
    290 F.3d 63 (1st Cir. 2002) ................................................................ 52

*Harris v. City of Phila.*,
    47 F.3d 1342 (3d Cir. 1995) ............................................................... 44

*Hicks ex rel. Feiock v. Feiock*,
    485 U.S. 624 (1988) .................................................................... 69, 71

*Humane Soc'y Int'l, Inc. v. Kyodo Senpaku Kaisha Ltd.*
    [2008] FCA 3 (Austl.) ....................................................................... 43

*Illinois v. Milwaukee*,
    406 U.S. 91 (1972) ............................................................................. 8

*In re Battaglia*,
    653 F.2d 419 (9th Cir. 1981) ............................................................. 31

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,
    10 F.3d 693 (9th Cir. 1993) ........................................................ passim

*In re EchoStar Comm'ns Corp.*,
    448 F.3d 1294 (Fed. Cir. 2006) ......................................................... 64

*In re Establishment Inspection of Hern Iron Works, Inc.*,
    881 F.2d 722 (9th Cir. 1989) ............................................................. 76

*In re Holland Furnace Co.*,
    341 F.2d 548 (7th Cir. 1965) ............................................................. 22

*In re SkyPort Global Commc'ns, Inc.*,
    08-36737-H4-11, 2013 WL 4046397 (Bankr. S.D. Tex. Aug. 7, 2013) ...... 53, 54

LEGAL28625608.50

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*In re Transamerica Corp.*,
   184 F.2d 319 (9th Cir. 1950) ....................................................41, 42

*Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n*,
   389 U.S. 64 (1967).....................................................................11, 34

*Int'l Rectifier Corp. v. Samsung Electronics Co.*,
   361 F.3d 1355 (Fed. Cir. 2004) ............................................40, 49, 52

*Kiobel v. Royal Dutch Petroleum Co.*,
   133 S. Ct. 1659 (2013)......................................................................77

*Labor/Cmty. Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth.*,
   564 F.3d 1115 (9th Cir. 2009) ..............................................31, 44, 45

*Lynch v. Rank*,
   639 F. Supp. 69 (N. D. Cal. 1985)......................................................42

*Max's Seafood Cafe v. Quinteros*,
   176 F.3d 669 (3d Cir. 1999) ..........................................................41, 50

*Miller v. City of Los Angeles*,
   661 F.3d 1024 (9th Cir. 2011) ...........................................................70

*NAACP v. Claiborne Hardware Co.*,
   458 U.S. 886 (1982)...........................................................................30

*Nat'l Org. for Women v. Operation Rescue*,
   37 F.3d 646 (D.C. Cir. 1994)..............................................................30

*Nat'l Org. for Women v. Scheidler*,
   267 F.3d 687 (7th Cir. 2001) .........................................................49, 53

LEGAL28625608.50

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Nat'l Spiritual Assembly of Baha'is of U.S. Under Hereditary Guardianship*
  *v. Nat'l Spiritual Assembly of Baha'is of U.S.*,
  628 F.3d 837 (7th Cir. 2010) ............................................................50

*NBA Props., Inc. v. Gold*,
  895 F.2d 30 (1st Cir. 1990).............................................12, 41, 44

*Newman v. Graddick*,
  740 F.2d 1513 (11th Cir. 1984) .........................................41

*NLRB v. Arcade-Sunshine Co.*,
  132 F.2d 8 (D.C. Cir. 1942) (per curiam)............................7

*NLRB v. Deena Artware, Inc.*,
  361 U.S. 398 (1960)...........................................................22

*NLRB v. FMG Indus.*,
  820 F.2d 289 (9th Cir. 1987) .............................................7

*NLRB v. Interstate Material Corp.*,
  930 F.2d 4 (7th Cir. 1991) .................................................8

*NLRB v. Laborers' Int'l Union*,
  882 F.2d 949 (5th Cir. 1989) ...........................................22

*NLRB v. Local 3, Int'l Bhd. of Elec. Workers*,
  471 F.3d 399 (2d Cir. 2006) ...............................................8

*NLRB v. Sequoia Dist. Council of Carpenters*,
  568 F.2d 628 (9th Cir. 1977) .............................................7

*Nunez v. Duncan*,
  No. Civ. 03-1359-AA, 2004 WL 1274402 (D. Or. June 9, 2004).................67

LEGAL28625608.50

**TABLE OF AUTHORITIES**
(continued)

Page

*Oil, Chem. & Atomic Workers Int'l Union v. NLRB*,
547 F.2d 575 (D.C. Cir. 1976) .......................................................................... 7, 10

*Palm Beach Metro Transp., LLC v. NLRB*,
No. 08-13447, 2011 U.S. App. LEXIS 23073 (5th Cir. Aug. 16, 2011)
(per curiam) ................................................................................................................. 8

*Perry v. O'Donnell*,
759 F.2d 702 (9th Cir. 1985) ..................................................................................... 74

*Peterson v. Highland Music, Inc.*,
140 F.3d 1313 (9th Cir. 1998) ................................................................................... 49

*Portland Feminist Women's Health Ctr. v. Advocates for Life, Inc.*,
877 F.2d 787 (9th Cir. 1989) ..................................................................................... 70

*Regal Knitwear Co. v. NLRB*,
324 U.S. 9 (1945) ................................................................................................ 48, 50

*Robin Woods Inc. v. Woods*,
28 F.3d 396 (3d Cir. 1994) ........................................................................................ 62

*Roe v. Operation Rescue*,
919 F.2d 857 (3d Cir. 1990) ...................................................................................... 55

*Rogers v. Webster*,
776 F.2d 607 (6th Cir. 1985) (per curiam) ............................................................... 64

*Schenck v. Pro-Choice Network of W. N.Y.*,
519 U.S. 357 (1997) ................................................................................................... 77

*SEC v. First Fin. Grp. of Texas*,
659 F.2d 660 (5th Cir. 1981) ..................................................................................... 64

LEGAL28625608.50

**TABLE OF AUTHORITIES**
(continued)

Page

*Sierra Club v. Dep't of Interior,*
  424 F. Supp. 172 (N.D. Cal. 1976) ....................................................32

*Spallone v. United States,*
  493 U.S. 265 (1990) ........................................................................70

*St. Joseph Stock Yards Co. v. United States,*
  298 U.S. 38 (1936)...........................................................................10

*Stone v. City & Cnty. of S.F.,*
  968 F.2d 850 (9th Cir. 1992) ...........................................................11

*Tegal Corp. v. Tokyo Electron Co.,*
  248 F.3d 1376 (Fed. Cir. 2001) ..................................................40, 49

*United Mine Workers v. Bagwell,*
  512 U.S. 821 (1994).........................................................................69

*United Pharmacal Corp. v. United States,*
  306 F.2d 515 (1st Cir. 1962)............................................................55

*United States v. 60.22 Acres of Land,*
  638 F.2d 1176 (9th Cir. 1980) .........................................................42

*United States v. Alcan Elec. & Eng'g, Inc.,*
  197 F.3d 1014 (9th Cir. 1999) .........................................................66

*United States v. Asay,*
  614 F.2d 655 (9th Cir. 1980) ...........................................................62

*United States v. Graf,*
  610 F.3d 1148 (9th Cir. 2010) ...........................................................7

*United States v. Int'l Bhd. of Teamsters,*
  899 F.2d 143 (2d Cir. 1990) ............................................................43

LEGAL28625608.50

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*United States v. McKie,*
 951 F.2d 399 (D.C. Cir. 1991) (per curiam) ...................................... 29

*United States v. Prof'l Air Traffic Controllers Org., Local 504,*
 703 F.2d 443 (10th Cir. 1983) ........................................................... 45

*United States v. Rylander,*
 460 U.S. 752 (1983) ........................................................................... 73

*United States v. Saccoccia,*
 433 F.3d 19 (1st Cir. 2005) ........................................................... 11, 35

*Washington Metro. Area Transit Auth. v. Amalgamated Transit Union,*
 531 F.2d 617 (D.C. Cir. 1976) ........................................................... 64

*Weil v. Investment/Indicators, Research & Mgmt., Inc.,*
 647 F.2d 18 (9th Cir. 1981) ............................................................... 65

*Whittaker Corp. v. Execuair Corp.,*
 953 F.2d 510 (9th Cir. 1992) ............................................................. 70

*Wolfard Glassblowing Co. v. Vanbragt,*
 118 F.3d 1320 (9th Cir. 1997) ........................................................... 31

*Zino Davidoff SA v. CVS Corp.,*
 No. 06 Civ. 15332(RJS), 2008 WL 1775410 (S.D.N.Y. Apr. 17, 2008) .......... 62

**STATUTES**

26 U.S.C. § 170(c) .............................................................................. 39

28 U.S.C. §§ 631-639 ........................................................................... 8

Volunteer Protection Act 42 U.S.C. §§ 14501-14505 ................ 66, 67, 68

LEGAL28625608.50

**TABLE OF AUTHORITIES**
(continued)

Page

OTHER AUTHORITIES

Fed. R. App. P. 8 ...................................................................................... 77

Fed. R. App. P. 48 ........................................................................... 5, 6, 7, 8

Fed. R. Civ. P. 52 ...................................................................................... 9

Fed. R. Civ. P. 53 .................................................................................. 7, 8

Fed. R. Civ. P. 65 .................................................................................... 49

Fed. R. Civ. P. 72 ...................................................................................... 8

Fed. R. Civ. P. 73 ...................................................................................... 8

IRS Gen. Couns. Mem. 35319, 1973 WL 34333 (Apr. 27, 1973) ........................... 39

IRS Rev. Rul. 66-79, 1966-1 C.B. 48, 1966 WL 15142 (1966) ............................. 39

LEGAL28625608.50

# I.    INTRODUCTION

After six months of discovery, eight days of trial at which all the alleged contemnors appeared and testified, and hundreds of pages of post-trial briefing, Appellate Commissioner Shaw found that Plaintiffs failed to prove contempt.  In a 79-page Report and Recommendation ("Report")[1] that includes detailed findings of fact and conclusions of law, the Commissioner rejected Plaintiffs' claims and found that Defendants Sea Shepherd Conservation Society ("SSCS") and Paul Watson, and the Non-Parties (six SSCS Volunteer Directors and SSCS's administrative director) took all reasonable steps within their power to comply with this Court's December 17, 2012 injunction (the "Injunction").[2]

Plaintiffs do not object to any of the Commissioner's factual findings. Disparaging his conclusions as "naïve," "inexplicabl[e]," or "completely wrong," Plaintiffs instead argue that the Commissioner should have drawn different "inferences" from these undisputed facts.[3]  According to Plaintiffs, what the Commissioner found to be good faith compliance with the Injunction was an elaborate scheme of "evasion."  As a result, Plaintiffs assert that SSCS, Watson, and the Non-Parties should be held in contempt for the actions taken by

---

[1] Appellate Docket Entry ("Dkt.") #314.
[2] Dkt. #31.
[3] Plaintiffs-Appellants' Objections to Appellate Commissioner's Report and Recommendation, Dkt. #335 ("Plf. Obj."), at 3, 15, 42.

LEGAL28625608.50

independent third parties.

Plaintiffs offer no persuasive factual or legal support for their attack on the Commissioner's well-reasoned and legally sound Report. Rather, Plaintiffs challenge the Report with cherry-picked quotes from a few documents, while almost completely ignoring the evidence presented at trial, disregarding the Commissioner's factual findings based on that evidence, and failing to articulate how their interpretation of the evidence matches up with the legal standards governing their claims. By contrast, the Commissioner based his factual findings on the evidence as a whole, pointing out that most of the facts were "uncontested,"[4] and supported his legal conclusions by applying the governing legal standards to those facts. After this careful analysis, the Commissioner arrived at a number of well-founded conclusions, based on facts that Plaintiffs do not contest, that are fatal to Plaintiffs' claims.

*First*, Operation Zero Tolerance ("OZT") had always been a joint effort among independent Sea Shepherd organizations from around the world.[5] While SSCS provided administrative support for the campaign, Sea Shepherd Australia Limited ("SSAL") provided the primary logistical support.[6] SSAL was an

---

[4] Report 42.
[5] Report 3, 6-7.
[6] Report 7-8, 70.

independent entity with its own board of directors, staff, operations, and network of supporters that included 16 chapters and hundreds of volunteers from around Australia.[7]

**Second**, when the Injunction issued, Watson, SSCS, and the Non-Parties did not control OZT and had no power to stop the campaign or ensure that it was conducted in compliance with the Injunction.[8] By December 17, 2012, the OZT ships were largely provisioned, were captained and crewed by activists wholly dedicated to stopping the killing of whales, and were already in or near Australia and New Zealand waiting for the whaling vessels to leave Japan.[9] When SSAL concluded that it was not bound by the Injunction and decided to proceed with OZT regardless of SSCS's involvement, Defendants and the Non-Parties had no power to stop OZT nor control its conduct.[10] Indeed, when the SSCS board and Watson asked SSAL to respect the terms of the Injunction, SSAL refused.[11]

**Third**, Watson, SSCS, and the Non-Parties responded to the Injunction in good faith and took all reasonable steps within their power to comply.[12] Lacking control over OZT, they decided to comply with the Injunction by severing all ties

---

[7] Report 3-4, 7-8, 67-68.
[8] Report 67-68, 70.
[9] Report 9-10, 47.
[10] Report 21, 33-34, 67-68, 70.
[11] Report 32-37, 50, 70.
[12] Report 54, 68-71.

-3-

with OZT.[13]  Within one month of the Injunction and more than two weeks before

the first alleged event of contempt, SSCS had completely separated from OZT:

SSCS terminated all administrative and financial support for OZT and made

wrenching changes to its operations that, among other things, reduced its revenues

by 66%, reordered its leadership, and resulted in the loss of the *Whale Wars*

television show that provided SSCS with a worldwide platform for its conservation

message.[14]  Effectively precluded from disembarking the *Steve Irwin*, Watson took

all reasonable steps within his power to comply with the Injunction by resigning all

his positions with SSCS and SSAL, relinquishing his leadership role in OZT, and

giving up command of the *Steve Irwin*.[15]  The alleged events of contempt were the

acts of independent third parties, not of Defendants and the Non-Parties.[16]

    The party moving for contempt must prove by "clear and convincing

evidence" that an enjoined party failed to take "all reasonable steps within its

power" to comply "based on a good faith and reasonable interpretation of the

order."  *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693,

695 (9th Cir. 1993).  Plaintiffs did not carry their burden at trial.  Now, they fail to

show how any of the Commissioner's factual findings or legal conclusions are

_____

[13] Report 18-19.
[14] Report 23-28, 39-40.
[15] Report 22-23, 29-31.
[16] Report 2, 70.

LEGAL28625608.50

wrong. Defendants and the Non-Parties respectfully request that the Court adopt the Report and deny Plaintiffs' motion for contempt.

## II. PROCEDURAL HISTORY

In February 2013, Plaintiffs moved under Federal Rule of Appellate Procedure ("FRAP") 48 to appoint a special master to conduct contempt proceedings against SSCS.[17] The Court granted the motion and appointed Commissioner Shaw to "determine the issues of fact and law raised by the parties."[18] Although the Order of Reference instructed that the inquiry be kept "within reasonable bounds,"[19] Plaintiffs subsequently amended their motion (without leave) to add eight additional alleged "contemnors," seven of whom were not parties.[20] Plaintiffs also increased the number of alleged violations from 1 to 25.[21]

Through six months of discovery, Plaintiffs received over 100,000 pages of documents, including emails, SSCS financial records, photographs, handwritten board meeting notes, and hundreds of hours of video footage. Plaintiffs took 21 depositions, some by videoconference with witnesses as distant as Sweden, India,

---

[17] Dkt. #37.
[18] Dkt. #44 at 2.
[19] Dkt. #44 at 3.
[20] Dkt. #105 at 7-12.
[21] Dkt. #105 at 3-7.

and Australia.

Trial began in late October. The Commissioner heard eight days of testimony and argument. Fifteen witnesses testified, including all the alleged contemnors: six Volunteer Directors (Ben Zuckerman, Marnie Gaede, Lani Blazier, Robert Wintner, Peter Rieman, and Bob Talbot), SSCS's administrative director Susan Hartland, and SSCS founder Paul Watson. Also testifying were *Bob Barker* captain Peter Hammarstedt, *Steve Irwin* captain Siddharth Chakravarty and crewmember Eleanor Lister, SSCS accountant Nancy McMaster, SSAL Managing Director Jeff Hansen, and SSAL board members John McMullan and former Australian Senator Bob Brown. The Commissioner questioned 14 of the 15 witnesses, often extensively, and received 500 exhibits into evidence.

The Commissioner issued his Report on January 31, 2014. The Report included detailed Findings of Fact, totaling 38 pages with 166 footnotes citing to the record.

## III. LEGAL STANDARDS

### A. Standard of Review

Plaintiffs moved for contempt pursuant to FRAP 48. While FRAP 48 does not set forth a specific standard of review, this Court should review the Commissioner's findings of fact for clear error. "A finding is clearly erroneous if

it is illogical, implausible, or without support in the record." *United States v. Graf*, 610 F.3d 1148, 1157 (9th Cir. 2010).

Here, the standard of review this Court applies may not matter because factual findings not specifically objected to are taken as verities. *See Girardi v. Dow Chem. Co.*, 528 F.3d 1131, 1132 (9th Cir. 2008). Because Plaintiffs make no objections to specific factual findings, the Court should accept the Commissioner's findings.

Circuit courts reviewing special masters' reports have historically reviewed factual findings for clear error. *See, e.g.*, *NLRB v. FMG Indus.*, 820 F.2d 289, 291 (9th Cir. 1987); *NLRB v. Sequoia Dist. Council of Carpenters*, 568 F.2d 628, 631 (9th Cir. 1977); *NLRB v. Arcade-Sunshine Co.*, 132 F.2d 8, 8 (D.C. Cir. 1942) (per curiam). By analogy, some courts looked to Federal Rule of Civil Procedure ("FRCP") 53, the district court rule governing referral to special masters. *See, e.g.*, *Oil, Chem. & Atomic Workers Int'l Union v. NLRB*, 547 F.2d 575, 580 (D.C. Cir. 1976). This Court has adopted the "clear error" standard in the special master context. *See FMG Indus.*, 820 F.2d at 291; *Sequoia*, 568 F.2d at 631.

Clear error review was the case law rule when the Supreme Court promulgated FRAP 48. The Advisory Committee Note states that "[t]he courts of appeals have long used masters in contempt proceedings." Fed. R. App. P. 48

advisory committee's note (1994) (citing cases applying clear error standard for review of fact findings).

In the district courts, too, clear error review was the practice at the time FRAP 48 was adopted. *See* Fed R. Civ. P. 53(e)(2) (eff. Dec. 1, 1993 to Dec. 1, 2003) ("In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous."). Although FRCP 53 was amended in 2003 to require district courts to review special masters' findings de novo, the Supreme Court has not amended FRAP 48, and thus circuit courts continue to review special masters' factual findings for clear error. *See, e.g.*, *Palm Beach Metro Transp., LLC v. NLRB*, No. 08-13447, 2011 U.S. App. LEXIS 23073, at *2 (5th Cir. Aug. 16, 2011) (per curiam); *NLRB v. Local 3, Int'l Bhd. of Elec. Workers*, 471 F.3d 399, 403 (2d Cir. 2006).

FRAP 48—not FRCP 53—applies here. *See* Fed. R. Civ. P. 53 advisory committee's note (2003) ("Special masters are appointed in many circumstances outside the Civil Rules. [FRCP] 53 applies only to proceedings that [FRCP] 1 brings within its reach."); *NLRB v. Interstate Material Corp.*, 930 F.2d 4, 6 (7th Cir. 1991) ("the Federal Rules of Civil Procedure do not apply to cases in the court

LEGAL28625608.50

of appeals").[22]

Not only is the clearly erroneous standard consistent with circuit court practice, it also is the standard that would have applied had this Court referred or remanded this contempt proceeding to a district court judge. *See* Fed. R. Civ. P. 52(a)(6) ("Findings of fact . . . must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."). The purpose of the clear error standard is to avoid "undermin[ing] the legitimacy of the [fact-finders] in the eyes of litigants," "multiply[ing] appeals by encouraging appellate retrial of some factual issues," and "needlessly reallocate[ing] judicial authority." Fed. R. Civ. P. 52 advisory committee's note (1985).

Credibility determinations are especially appropriate for review under a clear

_____

[22] Plaintiffs' contention that the de novo standard for review of a magistrate judge's findings should apply is misplaced. FRCP 72 and FRCP 73 apply only to magistrates appointed by district courts under 28 U.S.C. §§ 631-639. *See* Fed. R. Civ. P. 72(b) advisory committee's note (1983); Fed. R. Civ. P. 73(a). Moreover, FRCP 72(b)(3) concerns pre-trial matters. If this Court applies the FRCP by analogy, it should use FRCP 73's clear error standard of review for trials by consent of the parties. Here, there was a full-blown trial, and Plaintiffs consented to the Commissioner by specifically requesting that the court "appoint a Special Master to conduct contempt proceedings." Dkt. #37 at 2. Plaintiffs also say the rules concerning Supreme Court special masters in original jurisdiction cases should apply, Plf. Obj. 4, but the Supreme Court's original jurisdiction is "invoked sparingly," *Illinois v. Milwaukee*, 406 U.S. 91, 93 (1972), making Supreme Court special masters almost sui generis.

error standard: "In cases of conflicting testimony where credibility is necessarily at issue, we must be especially reluctant to set aside the findings of the trial court." *Gibbs v. Pierce Cnty. Law Enforcement Support Agency*, 785 F.2d 1396, 1402 (9th Cir. 1986) (quotation marks and citation omitted). "Credibility involves more than demeanor. It apprehends the over-all evaluation of testimony in light of its rationality or internal consistency and the manner in which it hangs together with other evidence." *Carbo v. United States*, 314 F.2d 718, 749 (9th Cir. 1963). The Commissioner's assessment of how the evidence "hangs together" should be given substantial weight, especially in light of the sizeable record, thousands of pages of transcript, and many hours of testimony he heard and considered. Deference is owed not just to the factual findings but also to the inferences drawn from those facts. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985) (clear error standard applies even where "findings do not rest on credibility determinations, but are based instead on . . . inferences from other facts"); *Oil, Chem. & Atomic Workers*, 547 F.2d at 580 (same, in special master context).

But even under a de novo standard, the Commissioner's factual analysis merits deference. *See generally St. Joseph Stock Yards Co. v. United States*, 298 U.S. 38, 53 (1936) (the "judicial duty to exercise an independent judgment . . . may be greatly facilitated by the assembling and analysis of the facts, . . . informed and

-10-

aided by the sifting procedure" already done).  The Commissioner's report is the product of his review of the evidence in a unique role as factfinder and questioner of witnesses with the ability to judge the credibility and demeanor of witnesses. The Commissioner's assessment of the evidence therefore should be accorded substantial weight.

**B.      Standard for Proving Civil Contempt**

Civil contempt is "disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply."  *Dual-Deck*, 10 F.3d at 695.  Plaintiffs bear the burden of proving "(1) that [the alleged contemnors] violated the court order, (2) beyond substantial compliance, (3) not based on a good faith and reasonable interpretation of the order, (4) by clear and convincing evidence."  *Id.*

To support a finding of civil contempt, the underlying order must "state in 'specific terms' . . . what the court intends to require and what it means to forbid."  *Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967).  The party moving for contempt thus "has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court."  *Stone v. City & Cnty. of S.F.*, 968 F.2d 850, 856 n.9 (9th Cir. 1992).  "The question is not whether the order is clearly worded as a

general matter," but whether "the words of the court's order have clearly and unambiguously forbidden the *precise conduct on which the contempt allegation is based*." *United States v. Saccoccia*, 433 F.3d 19, 28 (1st Cir. 2005). In adjudicating a contempt motion, a court "must read any ambiguities or omissions in [the underlying] order as redounding to the benefit of the person charged with contempt." *NBA Props., Inc. v. Gold*, 895 F.2d 30, 32 (1st Cir. 1990) (quotation marks, citation, and alterations omitted).

As the second and third *Dual-Deck* factors show, "[s]ubstantial compliance with the court order is a defense to civil contempt." 10 F.3d at 695 (quotation marks omitted). Although "there is no good faith exception to the requirement of obedience to a court order," "a person should not be held in contempt if his action appears to be based on a good faith and reasonable interpretation of the court's order." *Id.* (quotation marks and alterations omitted).

## IV.    RESPONSE TO PLAINTIFFS' OBJECTIONS

The Commissioner determined that all the alleged acts of contempt were committed by independent third parties, namely, SSAL and the ship captains.[23] Plaintiffs argue that the Court should find Watson, SSCS, and the Non-Parties

---

[23] Report 2, 63.

liable for the acts of these independent third parties on a variety of theories. The Commissioner properly rejected Plaintiffs' arguments.

### A. The Commissioner Correctly Determined that Defendants and the Non-Parties Lacked the Power to Control Third Parties and Separated From OZT to Comply With the Injunction.

The Commissioner found that "Plaintiffs have not produced persuasive, let alone clear and convincing evidence, that the SSCS board did not believe it was complying in good faith with the injunction by withdrawing from OZT."[24] Plaintiffs' first objection challenges that determination. They contend that "the evidence was clear and convincing that Defendants 'turned over' leadership of OZT to SSAL with the intent that SSAL would conduct the campaign without regard to the Injunction."[25] Plaintiffs rely on isolated snippets of the record that supposedly show the "turnover" was done intentionally to evade the objection.[26] Their argument ignores the Commissioner's factual findings and contradicts the weight of the evidence.

### 1. SSCS, Watson, and the Non-Parties did not have the power to control OZT's participants, and did not "turn it over" to SSAL.

Plaintiffs' "turnover" theory rests on the false premise that Defendants and

---

[24] Report 58.
[25] Plf. Obj. 4.
[26] Plf. Obj. 7.

LEGAL28625608.50

the Non-Parties had the power to control the campaign. They did not. The evidence was undisputed that SSCS separated from OZT because the board believed that it could not control the actions of the captains or their crews.[27] The board also adopted the separation strategy because it "believed this was the only option available to it that would fulfill its fiduciary responsibility of protecting the organization from the consequences of others violating the injunction."[28]

The board's assessment was supported by the facts. SSAL and the ship captains did not need SSCS to "turn over" anything in order to proceed with OZT. At the time of the Injunction, SSAL already had logistical control over OZT.[29] SSAL had provided the primary operational support for OZT from the beginning, including long-term berths for the ships, a ship operations base, and approximately half of the volunteer crew members.[30] By the time the Injunction issued, OZT had been largely funded, and preparations for departure were almost complete.[31] The four OZT vessels were in Australia or New Zealand, or at sea, and under the command of their respective captains—waiting to depart when they heard that the

---

[27] Report 18-19.
[28] Report 18-19.
[29] Report 70.
[30] Report 8.
[31] Report 7, 9-11; Exs. 778, 779, 782, 800, 801; McMaster 1238:17-1245:9.

whaling vessels had left Japan.[32] As Captain Hammarstedt testified, "I had a full crew, I had all of my fuel, I had all of my oils, I had all of my critical repairs undertaken, and the ship was ready to leave on [the] campaign."[33]

Not only were SSAL and the ship captains already in control of OZT, they were intent on moving forward with OZT regardless of anything done by Watson, SSCS, or the Non-Parties.[34] As SSAL Managing Director Hansen testified, the "ships [were] ready to go, the captains were ready to go," and "we didn't really need [SSCS's] permission."[35] SSAL had compelling reasons to carry on with OZT, including the strong public and legal support for whale defense in Australia.[36] And once SSAL's attorneys advised that the Injunction did not bind SSAL, it was "inevitable" that SSAL would proceed with OZT.[37]

Just days after the Injunction, Senator Brown visited the *Sam Simon* in port to "reassure the crew there that I was right behind them," and that the Injunction "would not be impeding" SSAL's "ability to uphold Australian law to prevent

---

[32] Hammarstedt 874:16-19, 875:9-17, 878:10-13, 878:25-879:4; Watson 1784:4-18, 19-21; Exs. 567-69.
[33] Hammarstedt 875:9-17.
[34] Report 67.
[35] Hansen 1666:21-1667:1.
[36] Report 67.
[37] Report 21, 67-68, 70.

LEGAL28625608.50

illegal whaling."[38]  Bolstered by their belief in the mission and the support of the Australian public, SSAL's leaders made clear that neither Watson nor anyone at SSCS had the power to dissuade them from pursing their "priority task" of defending the whales.[39]  As Brown testified, if Watson had told him to stand down: "I would have said to Paul Watson, 'You're wrong.  We are proceeding.  This is our task . . . . I respect your point of view, but I reject it."[40]

The ship captains and crew were equally committed to moving forward with OZT.  As Hammarstedt testified, "nothing was going to stop me from going down to the Southern Ocean Whale Sanctuary,"[41] and he was pressing forward, "regardless of what Paul [Watson] could have or would have said."[42]  As was his crew:  "I have no doubt that every single one of my crew members would have accompanied me down to the Southern Ocean Whale Sanctuary."[43]  Asked what effect a directive from the SSCS board to stay in port would have had, Hammarstedt replied, "None whatsoever."[44]  Based on extensive testimony, the Commissioner found that the captains and crew were "steadfast and dedicated,

---

[38] Brown 1537:20-1538:14.
[39] Report 37 (quoting Ex. 667).
[40] Brown 1552:3-11.
[41] Hammarstedt 914:25-915:2.
[42] Hammarstedt 886:13-14.
[43] Hammarstedt 886:21-23.
[44] Hammarstedt 899:16-900:4.

LEGAL28625608.50

above all else, to taking whatever measures were necessary to protect the whales."[45]

The testimony of the captains and SSAL leadership is corroborated by how they responded to requests from the SSCS board and Watson to stand down—by ignoring them. When Watson asked Hansen to instruct *Brigitte Bardot* Captain Jean-Yves Terlain to respect the 500-yard perimeter established by the Injunction, Hansen disregarded his request.[46] When SSCS board president Gaede wrote SSAL entreating it "in the strongest terms . . . [to] not do anything that could give ICR any basis for claiming any violation of the court's order," SSAL refused.[47] As the Commissioner put it, "when the board of "SSCS did issue a plea to SSAL to stand down because of the fear of dire legal consequences for SSCS, the response was a polite refusal."[48]

On the strength of this evidence and more, the Commissioner concluded that SSCS, Watson, Hartland, and the Volunteer Directors did not control OZT and had no power to prevent it from going forward, or to compel SSAL, the captains or crews to abide by the terms of the Injunction: "Plaintiffs assert, without clear or convincing evidence, that SSCS had leverage over SSAL and the OZT participants,

---

[45] Report 47.
[46] Report 32-33; Hansen 1679:17-1680:19.
[47] Report 36 (quoting Ex. 660).
[48] Report 70.

but it remains unproven that anything the staff or board of SSCS might have done would have made any difference to events in the Southern Ocean."[49]  Likewise, Watson lacked the power to control how OZT proceeded:  "the weight of the evidence suggests that the whale defense campaign would have proceeded in substantially the same manner no matter what Watson did."[50]

Ignoring the exhaustive evidence supporting the Commissioner's findings, Plaintiffs cherry-pick a few parts of the record they say show SSCS had the power to control OZT at the time of the Injunction, but "turned over" that control to SSAL."[51]  Even the bits of the record Plaintiffs cite do not support their claim.

First, Plaintiffs point out that Watson was the leader of the campaign until he resigned that position after the Injunction.[52]  But they ignore the extensive evidence of Watson's inability to control the other vessel captains or to dictate how the independent Sea Shepherd organizations would operate—and the fact that SSAL had "logistical control of the campaign when the injunction issued" and

---

[49] Report 70.
[50] Report 67-68. Hansen and Brown testified that if Watson had opposed SSAL conducting OZT, they would have overruled him.  Hansen 1663:4-13, 1665:19-1666:16; Brown 1551:21-1552:17.
[51] Plf. Obj. 23.
[52] Plf. Obj. 23.

LEGAL28625608.50

intended to move forward regardless of Watson's actions.[53]

Second, Plaintiffs invoke SSCS's administrative involvement with OZT *before* the Injunction.[54] They claim that "Gaede, President of SSCS testified the primary objective of SSCS's staff was to support OZT," and also point to the funds SSCS raised for the campaign.[55] But Gaede's testimony referred to SSCS's support for the campaign *prior to the Injunction*.[56] As for OZT funding, Plaintiffs' assertion that SSCS supplied "[a]ll the funds for OZT" is wrong.[57] Significant sums were contributed "from Sea Shepherd organizations around the world to fund OZT," including $700,000 from SSAL.[58] More important, almost all the money (approximately 95%) had been spent or incurred before the Injunction issued, and SSAL had the resources and resolve to carry on with OZT without further support

---

[53] Report 7-10, 30, 32-33, 47, 49-50, 57 n.179, 67-68; *see, e.g.*, Chakravarty, 1398:17-24 ("Paul Watson obviously is looked upon as a figurehead or a spiritual leader for Sea Shepherd Conservation Society . . . . But in no way does that influence the decision that each captain makes on the high seas or during the campaigns.").

[54] Plaintiffs cite two emails from Hartland describing a "handover" to SSAL, but fail to acknowledge that Hartland could only "hand over" what she had—*i.e.*, responsibility for paperwork and other administrative matters, but no authority or control. Report 26-27.

[55] Plf. Obj. 23.

[56] Gaede 661:18-20.

[57] Plf. Obj. 23.

[58] Report 6-7; Hansen 1702:5-10.

LEGAL28625608.50

from SSCS.[59]  Funding provided *before* the Injunction gave SSCS no power to control OZT *after* the Injunction.

Finally, Plaintiffs repeatedly assert that SSCS "owned" the *Bob Barker* when the Injunction was issued, and retained "economic" or "beneficial" ownership of the *Steve Irwin*.  Regarding the *Steve Irwin*, the Commissioner determined that "Plaintiffs have not established what that 'beneficial ownership' was" or how it might have enabled SSCS to seize control of the *Steve Irwin* during OZT.[60]  As for the *Bob Barker*, Plaintiffs ignore the evidence that "SSNL already possessed an ownership interest in the Dutch-flagged *Bob Barker* when the injunction issued,"[61] and that SSNL was listed as the vessel owner in the ship's certificate of registry.[62] Plaintiffs never explain how legal ownership of the *Bob Barker* would have enabled SSCS to exercise control over Captain Hammarstedt and his crew. Hammarstedt testified that his "loyalty is to my crew" and to the whales, not to the *Bob Barker*'s purported owners, and not to Watson.[63]

Plaintiffs discount the importance of legal ownership when it suits their position, describing Watson as "Master and Commander" of the ships, and

---

[59] Report 10, 64 n.183; *see* Ex. 801; Hansen 1670:8-17.
[60] Report 70.
[61] Report 64 n.185.
[62] Ex. 582.
[63] Hammarstedt 900:22-901:22.

LEGAL28625608.50

asserting that this means that he "had control over the vessels despite who may have been in title on them."[64] This conclusory assertion ignores the undisputed testimony, and the Commissioner's findings, that SSAL's leadership and at least three of the four vessel captains were determined to move forward with OZT and do whatever was necessary to protect the whales—regardless of what Watson told them to do.[65] Watson's literary title of "Master and Commander" did not enable him to control events in OZT, since, as he explained, "[t]he captains are in charge of their ships."[66] The evidence was that the captains had a high degree of autonomy and independence in their operational decisions during campaigns, and while Watson had been campaign leader before the Injunction, he never had control over the captains' actions.[67]

By December 17, 2012, the ships were already under the command and control of SSAL, the ship captains, and their crews. SSCS had nothing to "turn over." It was precisely because of SSCS's inability to control the various entities

---

[64] Plf. Obj. 7.

[65] Report 47; Brown 1551:13-20, 1552:12-17; McMullan 1099:11-16, 1100:13-20; Watson 1811:4-18; Hammarstedt 875:5-17, 886:4-887:10, 914:18-915:2. The fourth captain, Chakravarty, who replaced Watson as *Steve Irwin* captain, testified that he did not "really know" what he would have done if Watson had remained captain and ordered him to stand down. Report 47.

[66] Watson 1857:7-8; *see also* Chakravarty 1398:11-24, 1442:2-11.

[67] Chakravarty 1398:11-16, 1472:11-1474:4; Watson 1856:16-1857:13; 1864:6-16.

LEGAL28625608.50

and individuals involved in OZT that the SSCS board decided that it needed to separate from the campaign to comply with the Injunction. The Injunction did not forbid OZT from going forward and, as the Commissioner emphasized, SSAL did not need SSCS's permission to proceed with the campaign. That decision was "inevitable," and would have been made "regardless of any action by Watson or anyone else with SSCS."[68] This was not, as Plaintiffs intone, a "turnover," let alone a turnover of a "loaded gun."[69]

### 2. The Commissioner correctly determined that Defendants and the Non-Parties separated from OZT to comply with the Injunction, not to evade it.

Not only do Plaintiffs mischaracterize *what* Defendants and the Non-Parties did to comply with the Injunction, they also devise a conspiracy theory to explain *why* they did it, repeating that the "turnover" of OZT was "intentionally" done to "evade" the Injunction.[70] Yet, as the Commissioner found, "Plaintiffs failed to prove that SSCS attempted to ignore or evade the injunction."[71] To the contrary, Plaintiffs' "intentional evasion" theory directly contradicts the Commissioner's findings and the evidence that SSCS, Watson, and the Non-Parties separated from

---

[68] Report 67-68.
[69] Plf. Obj. 5.
[70] Plf. Obj. 7; *see also id.* 14, 15, 20, 21.
[71] Report 69.

LEGAL28625608.50

the campaign in a good faith effort to comply with the Injunction.[72]

The Commissioner reached this conclusion after evaluating the actions by Defendants and the Non-Parties in response to the Injunction. The SSCS board met within three days of the Injunction being entered, and heard SSCS counsel explain the severe consequences of any violation.[73] The board, including Watson, unanimously agreed that SSCS had to comply with the Injunction, and sought advice from counsel regarding how to do so.[74] As Volunteer Director Talbot put it, the board was in "complete agreement . . . that we should absolutely comply with the injunction, because it was too much risk to the organization and our future

---

[72] Report 57-58. In support of their evasion theory, Plaintiffs string together citations for the unremarkable propositions that (1) where a party acts "solely" to evade an injunction, he has not complied; and (2) mere "apparent" or "paper" compliance is insufficient. Plf. Obj. 19-20. All these cases involved blatant recalcitrance by the alleged contemnor or contumacy by its successor entity or subsidiary, or both. Neither is present here. *See, e.g.*, *NLRB v. Deena Artware, Inc.*, 361 U.S. 398, 401, 404 (1960) (stating that subsidiaries could be liable where they allegedly acted as "single enterprise" with parent company, which "siphoned off" assets "for the purpose of evading" NLRB back pay order and remanding for discovery and consideration of that "alternative theory of liability"); *NLRB v. Laborers' Int'l Union*, 882 F.2d 949, 950-51 (5th Cir. 1989) (new local union set up solely in response to bankruptcy filing was successor in interest to union subject to back pay order); *In re Holland Furnace Co.*, 341 F.2d 548, 551-552 (7th Cir. 1965) ("abundant evidence" that alleged contemnor "made no bona fide attempt to comply," but "pursued a course of conduct designed to construct . . . a façade behind which to continue the condemned sales practices").

[73] Ex. 785; Blazier 796:14-17.

[74] Report 17-18; Ex. 785; Blazier 796:15-20; Wintner 948:4-12; Talbot 1177:20-1178:4; Watson 1793:6-20; Rieman (video dep.) 1052:6-12, 1307:11-13.

LEGAL28625608.50

mission."[75]  The Volunteer Directors all testified that they were committed to complying with the Injunction.[76]  Their testimony was uncontroverted and the Commissioner found them all credible.[77]

The Volunteer Directors' testimony was also corroborated by handwritten notes from the board meetings:  they all "believed they had no control over the ships and they could not order personnel committed to OZT to do anything."[78]  Each Volunteer Director testified that their individual experiences with SSCS led them to believe that separating from OZT was their only viable option, given their fiduciary duty to preserve the organization.[79]  The Southern Ocean was not the only part of the world SSCS sought to protect; the SSCS board wanted to preserve the organization's ability to continue its mission beyond OZT.[80]  The board

---

[75] Talbot 1178:14-22.  *See also* Zuckerman 541:24-542:3; Gaede 719:15-19; Blazier 827:1-3; Wintner 960:4-6; Talbot 1211:23-25; Rieman (video dep.) 1057:1-13.

[76] Zuckerman 541:24-542:3; Gaede 719:15-19; Blazier 827:1-3; Wintner 960:4-6; Talbot 1211:23-25; Rieman (video dep.) 1057:1-13.

[77] Report 56.

[78] Report 47; Ex. 785.

[79] Report 73; *see, e.g.*, Zuckerman 423:7-12 ("It's inconceivable to me that these 20-year-old volunteers or the captains like Peter Hammarstedt, who was so dedicated to saving the oceans, . . . would change their minds and just hold all these ships in port. . . . Maybe in some other parallel universe, but not in my mind."); Blazier 820:8-14, 821:6-12 ("I have been around Sea Shepherd volunteers my entire life . . . and I have never met more dedicated, strong-willed individuals. If we're not there to physically stop those ships, . . . [t]hey will go.").

[80] *See* Hartland 184:5-15; Gaede 782:25-783:8; Talbot 1178:19-22.

LEGAL28625608.50

directed SSCS to take difficult steps to separate from OZT and ensure it complied with the Injunction.[81]

Once the SSCS board decided upon the separation strategy, the Commissioner found that SSCS's board and staff made a good faith effort to implement the separation.[82] In particular, Plaintiffs adduced no evidence that Hartland sought to defy the Court's order, and the evidence showed that all her actions were authorized by the SSCS board, which had in turn relied upon the advice of counsel.[83] While Hartland had "no role in the choice of strategy," she worked diligently and in good faith to "implement the 'separation' strategy adopted by the board."[84]

Finally, Watson indicated from the beginning that his intent was to comply with the Injunction, and explored different ways to ensure his compliance.[85] The testimony of trial witnesses and Watson's correspondence was consistent: Watson made clear at all times that he intended to abide by the Injunction.[86] There was no

_____

[81] *See* Report 39 (describing effects of separation on SSCS); *supra* IV.B.1, at 32-34.
[82] Report 27.
[83] Report 75.
[84] Report 26, 27.
[85] Report 12, 13.
[86] *See* Hartland 193:20-194:7, 195:2-14 (discussing Watson's proposal to comply); Gaede 724:13-19 (everyone at SSCS, including Watson, wanted to comply); Blazier 850:24-851:25 (she believed Watson's statements that he

LEGAL28625608.50

contrary testimony. Upon learning of the Injunction, Watson called a meeting of the *Steve Irwin* crew, and informed them of the Injunction and the need to comply.[87] Watson also sent a proposal to the board of SSCS stating that he "will not violate the injunction."[88]

Watson initially believed OZT could be conducted in compliance with the Injunction, and he looked for an approach that would eliminate the risk of any violation.[89] For example, he proposed that Sea Shepherd vessels could prevent the transfer of killed whales and comply with the Injunction by surrounding the *Nisshin Maru* (the whaling fleet's processing ship) at a 500-yard distance and cabling themselves together.[90] But eventually, Watson realized that despite his role as the figurehead leader of the "Sea Shepherd" movement, he could not

---

intended to comply); Wintner 966:22-967:8 (Watson consistently stated he would comply and had no intention of violating the Injunction); Talbot 1205:20-1206:17 (Watson made it very clear "that we were going to comply," and everyone understood that); Zuckerman 543:8-544:20 (SSCS's plans for compliance originated as, and closely tracked, a proposal by Watson); Ex. 139 at 2 ("Paul Watson will not violate the injunction"); Ex. 145 (Watson's proposal to resign positions in SSCS and OZT in order to comply); *see also* McMullan 1089:11-21, 1090:7-17; Chakravarty 1407:8-1408:11, 1414:16-1415:5; Hammarstedt 882:8-23; Watson 1786:12-25, 1787:11-1789:21, 1790:12-1794:17, 1805:22-1806:19, 1827:7-16.

[87] Report 12; Chakravarty 1407:8-1408:11; Watson 1786:12-1787:9.

[88] Ex. 139.

[89] *See* Watson 1786:12-25, 1791:24-1792:21.

[90] Plf. Obj. 8; *see* Report 13; Ex. 132. Hammarstedt rejected the plan as unworkable. Report 13 n.43; Watson 1917:2-24.

-26-

control the actions of the captains and crews who were committed to their mission.[91]  As a result, he concluded that he had to withdraw from his leadership roles in SSCS, SSAL, and the campaign to ensure he personally complied.[92]

Despite the Commissioner's factual findings to the contrary,[93] Plaintiffs accuse Defendants and the Non-Parties of "trying to *evade* the Injunction."[94]  Yet their only evidence to support their allegation of "evasion" is scattered, out-of-context snippets of emails—most of which show a commitment to *compliance*. For example, Plaintiffs cite an early *draft* press release that declared that SSCS would respond to the Injunction by continuing to defend whales non-violently "and *legally*,"[95] and claim that Watson showed an intent to evade when he wrote in an email that the whalers had not counted on Sea Shepherd "both complying with the injunction and also continuing to legally intervene against" illegal whaling.[96]  But as the Commissioner found, such statements do not indicate "evasion."  They are evidence that "Watson believed that his conduct did not violate the injunction."[97]

Likewise, it was not "evasion" when Watson "expressed dismay" upon

---

[91] Watson 1863:16-23, 1864:6-16; *see* Hammarstedt 899:16-25; Chakravarty 1442:20-1444:12.

[92] *See* Watson 1790:12-1792:14, 1793:22-1794:9, 1794:14-17.

[93] *E.g.*, Report 63-64.

[94] Plf. Obj. 16.

[95] Plf. Obj. 7-8; Ex. 125 at 3; *see* Report 12-13 n.42.

[96] Plf. Obj. 13; Ex. 220 at 1.

[97] Report 30-31.

LEGAL28625608.50

learning of the Injunction, or when he lamented in a December 18 email, "The question is how do we stop them now?  If we back down to the 9th District Court [sic], the whales will die."[98]  As Watson testified on cross-examination, that email was an "emotional reaction to the injunction," and he soon realized he and SSCS *would* have to back down:

> Q.    Well, one of the things that you're known for is not backing down, isn't it?
>
> A.    But I did back down.
>
> Q.    You did back down?
>
> A.    I complied with the injunction.
>
> Q.    Well, did you consider what you did to be backing down?
>
> A.    Unfortunately, yes.
>
> Q.    Okay.
>        How so?
>
> A.    I withdrew from the campaign.[99]

Finally, it is not evidence of evasion that Watson wrote in a December 27, 2012, email that "[i]t appears that the hunt is on and we intend to hunt whalers."[100]  As the testimony demonstrated, Watson and the vessel captains believed that they

---

[98] Plf. Obj. 7 (quoting Ex. 124 at 1); *see* Report 12-13.
[99] Watson 1906:6-18.
[100] Plf. Obj. 12; Ex. 154 at 1.

LEGAL28625608.50

could "hunt" (i.e. pursue) the whalers and still comply with the Injunction.[101]  In the two preceding Southern Ocean campaigns, the whaling vessels had ceased whaling and fled as soon as the Sea Shepherd vessels found them, with Sea Shepherd pursuing at a distance.[102]  During the 2010-2011 campaign, Sea Shepherd vessels chased the *Nisshin Maru* halfway around the globe, without ever getting close to it.[103]  Watson had good reason to believe that Sea Shepherd could "hunt" whalers without coming close to them, or violating the Injunction.[104] Whether Defendants and the Non-Parties intended to comply in good faith is a "quintessentially factual question."  *See United States v. McKie*, 951 F.2d 399, 423 (D.C. Cir. 1991) (per curiam).  The Commissioner correctly rejected Plaintiffs' attempts to attribute sinister motives to Defendants and the Non-Parties based on nothing more than "a few bombastic emails from Watson."[105] Other than these isolated emails, the Commissioner correctly found that "Plaintiffs offer no evidence . . . that the SSCS board's overriding concern in adopting the 'separation' strategy was anything other than the discharge of its fiduciary duties and the

---

[101] Hammarstedt 879:5-12; 879:22-880:18; Chakravarty 1436:20-1437:16; 1439:7-12; Watson 1809:20-1810:6.

[102] *See* Hammarstedt 879:5-880:12, 884:12-885:7, Chakravarty 1399:17-1400:8, 1436:20-1437:16, 1438:12-1439:12; Watson 1779:6-23, 1809:20-1810:6; Hansen 1655:16-23.

[103] Hammarstedt 884:12-885:7; Watson 1786:1-11.

[104] Watson 1786:1-11, 1911:1-5.

[105] Report 57.

preservation of the organization."[106]

At most, Plaintiffs succeed in showing that Watson and the Non-Parties "sympathized with the mission of OZT"—that is, saving whales.[107] But as the Commissioner found, that is "neither surprising nor contumacious."[108] Watson, SSCS, and the Non-Parties may not be held in contempt simply for voicing support for the campaign, or sympathizing with its objectives. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 910-12 (1982); *Nat'l Org. for Women v. Operation Rescue*, 37 F.3d 646, 656-58 (D.C. Cir. 1994). Plaintiffs' rhetoric about a "turnover" and "evasion" does not rebut the Commissioner's findings. Indeed, this rhetoric is really a roundabout way to allege that the Defendants and Non-Parties should be held in contempt based on the actions of SSAL and the vessel captains. But, as the Commissioner correctly found, Plaintiffs have failed to make the required showing to establish this indirect liability.[109]

---

[106] Report 57-58.

[107] Report 58. Rieman's deposition testimony—particularly when read in its *full* context, not the snippet cited by Plaintiffs—confirms that the board believed it had no ability to stop the dedicated captains and volunteers from carrying out OZT. Rieman 1037:19-1060:12.

[108] Report 58.

[109] *See infra* sections IV.B, at 39-43, and IV.C, at 46-56.

LEGAL28625608.50

**B.      Defendants and the Non-Parties Took All Reasonable Steps Within Their Power to Comply With the Injunction Based on a Reasonable and Good Faith Interpretation of the Order.**

Plaintiffs' second objection contends that the "Report seems to have difficulty applying the *Dual-Deck* 'reasonable steps' standard," and lists various steps Plaintiffs say Defendants and the Non-Parties should have attempted.[110]  But the Commissioner correctly concluded that Defendants and the Non-Parties took all reasonable steps within their power to comply with the Injunction, and rejected each of Plaintiffs' supposedly reasonable steps because they failed to show that any was reasonable or feasible.

A basic legal error infects Plaintiffs' second objection:  they insist that the Commissioner's reasoning was a "subversion of the 'reasonable steps' requirement" because he placed the burden on Plaintiffs to prove that their proposed steps were necessary for compliance.[111]  But the party moving for contempt "at all times" has the burden to prove non-compliance.  *In re Battaglia*, 653 F.2d 419, 424 (9th Cir. 1981).  Although a party asserting the affirmative defense of "impossibility" has the burden to prove he *cannot* comply, the party moving for contempt must prove that the alleged contemnor *did not* comply.  *See Wolfard Glassblowing Co. v. Vanbragt*, 118 F.3d 1320, 1322 (9th Cir. 1997); *see*

---

[110] Plf. Obj. 22.
[111] Plf. Obj. 31.

-31-

*also Labor/Cmty. Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth.*, 564 F.3d 1115, 1119 (9th Cir. 2009) (affirming district court's conclusion "that contempt sanctions were inappropriate" because party moving for contempt "had failed to satisfy its burden of establishing, by clear and convincing evidence, that [defendant] either failed to substantially comply with the Final Order or failed to take all reasonable steps to insure compliance with the Final Order").

> **1.  SSCS, Watson, Hartland, and the Volunteer Directors took all reasonable steps within their power to ensure that SSCS complied.**

The civil contempt standard requires a party to take all "reasonable" steps "within the party's power to comply," not all conceivable steps. *Dual-Deck*, 10 F.3d at 695. The law does not require taking steps that are futile or beyond a party's power. *Id.*; *Sierra Club v. Dep't of Interior*, 424 F. Supp. 172, 175 (N.D. Cal. 1976). Defendants and the Non-Parties decided to separate from the campaign to comply with the Injunction. To implement this course of compliance, Watson resigned from all of his positions with SSCS and SSAL, relinquished his leadership role in OZT, and surrendered command of the *Steve Irwin*. And SSCS's board and staff took numerous steps to separate the organization from OZT.

LEGAL28625608.50

***First***, SSCS severed its relationships with employees and contractors who remained with the ships.[112]

***Second***, SSCS ceased soliciting or accepting donations for the Southern Ocean campaigns. This led to a dramatic decline in total revenue and donations for SSCS—from $9.5 million to $3.2 million between the first six months of 2012 and the same period in 2013.[113]

***Third***, SSCS stopped further expenditures for OZT.[114] Between December 18 and December 31, SSCS incurred just $163,405 in OZT-related expenses, most of which was a single fuel invoice.[115] Between January 1 and January 16, SSCS incurred just $16,373 in OZT-related expenses, less than 1% of the total spent.

***Fourth***, SSCS separated its website and social media from OZT and SSAL, and removed references that could lead to donations intended for OZT.[116]

***Fifth***, SSCS cut its ties with *Whale Wars*, the promotional vehicle that had helped it disseminate its message to a worldwide audience.[117]

***Sixth***, the board divested the organization of assets being used in OZT, including the *Bob Barker*, and equipment on the *Steve Irwin* and the *Brigitte*

---

[112] Report 23-24, 27.
[113] Report 24-25, 27, 39.
[114] Report 70.
[115] Report 64 n.184; Ex. 801; McMaster 1245:10-13, 1253:16-1254:20.
[116] Report 25, 27.
[117] Hansen 1675:16-1676:5; Hartland 311:18-20, 338:17-24; Ex. 712.

LEGAL28625608.50

*Bardot.* As the Commissioner found, these grants were "undertaken as part of the 'separation' strategy"[118] and on the advice of counsel.[119]

### 2. Plaintiffs have not identified any reasonable steps within Defendants and the Non-Parties' power that would have ensured compliance.

Plaintiffs conjured a "wide range of affirmative steps that they claim SSCS should have taken in response to the injunction."[120] Their list of proposed steps has been a moving target.[121] And none of Plaintiffs' proposed steps represents a "reasonable step[] within [the alleged contemnors'] power to insure compliance." *See Balla v. Idaho State Bd. of Corrections*, 869 F.2d 461, 466 (9th Cir. 1989) (quoting *Sekaquaptewa v. MacDonald*, 544 F.2d 396, 406 (9th Cir. 1976)). Instead, the list consists of steps that SSCS and its board had no power to take; steps that would have been futile; and steps the Injunction did not require. *See, e.g.*, *Int'l Longshoremen's Ass'n*, 389 U.S. at 76 (party may only be held in contempt for violating an order that "state[d] 'in specific . . . terms' the acts that it required or prohibited"); *Dual-Deck*, 10 F.3d at 695 (steps are not required if futile or beyond a party's power).

---

[118] Report 64.
[119] Report 25, 64.
[120] Report 46.
[121] *Compare* Dkt. #255 at 10, *with* Dkt. #296 at 6, *with* Plf. Obj. at 28.

LEGAL28625608.50

### a.     *"Not* turning OZT over"

Plaintiffs' first proposed "reasonable" step is framed as a negative: "*not* turning OZT over to" SSAL. This is just another way of re-arguing their first objection, which fails for the reasons above.

### b.     Expenditure cut-off

Next, Plaintiffs contend that SSCS should have "immediately ceas[ed] funding of OZT, including not providing needed fuel for the OZT vessels."[122] SSCS did cut off funding for OZT by January 16, 2013, two weeks before the first alleged event of contempt. Plaintiffs complain about the relatively small amount of funds spent between December 17 and January 8, but the Commissioner properly found that these were permitted by the Injunction, reasonable under the circumstances, and of no consequence.

First, "aid to OZT was not forbidden by the injunction, and it was reasonable to continue with it while a plan of action was developed."[123] Courts issue freeze orders when that is their objective. *See, e.g.*, *Saccoccia*, 433 F.3d at 29-31 (reversing contempt judgment because asset freeze order did not specify assets to be restrained). The Injunction did not direct SSCS to cut off funding for OZT, let alone do so by a particular date.

---

[122] Plf. Obj. 28.
[123] Report 63.

Second, January 16 was a reasonable cut-off date, because it was the earliest feasible date for completing the separation process.[124] As the Commissioner explained, that multifaceted process "could not be achieved overnight."[125] In asserting that SSCS should have "immediately" frozen all campaign-related expenditures, Plaintiffs seek to punish SSCS for failing to go fast enough in completing something the Injunction itself did not require.

Third, "immediately" cutting off campaign funding would have been futile because funding for OZT was largely in place by December 17, 2012, and SSAL and the other Sea Shepherd organizations were willing and able to pay any additional costs necessary for OZT.[126] The Commissioner correctly determined that SSCS's post-Injunction expenditures were "not sufficient to render SSCS" liable for the independent acts of SSAL and the other participants in OZT.[127]

### c. Seizing the ships

Plaintiffs also argue that Defendants and the Non-Parties should have "retain[ed] ownership" of the *Bob Barker* and various ancillary equipment on the other ships, and exercised their purported authority to take back the other vessels

---

[124] Report 25-26.
[125] Report 63.
[126] Report 70; Hansen 1670:4-20.
[127] Report 64.

LEGAL28625608.50

being used in the campaign.[128]  The Commissioner found this suggestion utterly

impractical:  all four ships were already at sea or in Australia or New Zealand, in

the hands of captains and crew committed to carrying out OZT, and under the

logistical control of SSAL.  As the Commissioner explained, "Certainly it was not

a practical option for SSCS to institute some sort of complex legal proceeding in

the waning weeks of the whaling season, nor is there any reason to believe that the

threat of such a proceeding would have deterred SSAL, SSNL, or the captains."[129]

In addition, as the Commissioner found, SSNL already had an ownership

interest in the *Bob Barker* when the Injunction issued.[130]  Granting the *Bob Barker*,

"on advice of counsel, merely formalized the de facto situation, and [was]

undertaken as part of the 'separation' strategy."[131]

Plaintiffs misread the grant agreements by arguing that SSCS could have

revoked them after the Injunction.  The grant agreements for the *Brigitte Bardot*

and *Sam Simon* permit revocation only for a violation of the purpose expressed in

the grants, which is "to support SSCS's ongoing mission of global marine wildlife

---

[128] Plf. Obj.  28.

[129] Report 51-52; *see also* Report 71 ("Given SSAL's curt refusal when
urged by SSCS to abide by the injunction, it seems highly unlikely that a threat to
seek revocation of the vessel grants would have stopped SSAL or SSNL from
continuing with the whale defense mission, which had only a few weeks left to
go.").

[130] Report 64 n.185.

[131] Report 64.

LEGAL28625608.50

conservation" by using "innovative direct-action tactics."[132]  Using the vessels in

the Southern Ocean whale defense campaigns undoubtedly supported that mission.

The *Steve Irwin*'s grant agreement contains *no* revocation clause, vesting in

SSNL a right of ownership that was "unconditional," and "not subject to any

qualitative . . . obligations," "limited . . . rights," or "other encumbrance or

restriction based on an agreement."[133]  Plaintiffs insist that the grant allowed SSCS

to retain "economic ownership" of the *Steve Irwin*, but they never explain what

such "economic ownership" was, or how it might have allowed SSCS to take

control of the ship during the campaign.  Plaintiffs concede that they have

presented no "authority" explaining "what 'economic ownership' means in this

context."[134] The Commissioner thus correctly found that "Plaintiffs have not

shown that revocation of any or all of the vessel grants was legally possible."[135]

Plaintiffs belatedly contend that U.S. tax law required SSCS to maintain

control over the vessels, and that all the grants incorporated that purported rule.[136]

---

[132] Exs. 519, 521.

[133] Ex. 539.

[134] Plf. Obj. 24.

[135] Report 51.

[136] The Commissioner correctly found that Plaintiffs waived this argument by raising it for the first time in their post-hearing reply brief.  Report 71 n.186.  In response, Plaintiffs claim that "[t]he tax issue was addressed" in their Proposed Findings of Fact and Conclusions of Law.  Plf. Obj. 26 n.56 (citing Dkt. #297 at 50-51).  But the pages to which Plaintiffs direct the Court's attention contain

Plaintiffs' tax argument not only is waived and relies on improper authority, it misstates federal tax law.[137] Plaintiffs invoke Section 170(c)(2) of the Internal Revenue Code, which concerns the *deductibility* of contributions to tax-exempt 501(c) organizations. 26 U.S.C. § 170(c)(2). Because a tax-deductible contribution must be "used within the United States" for the nonprofit's charitable purposes, § 170(c)(2)(D), the nonprofit organization must have "control and discretion" over tax-deductible funds before granting them to a foreign organization. Rev. Rul. 66-79, 1966-1 C.B. 48, 1966 WL 15142, at *3 (1966). But neither Section 170 nor the IRS rulings Plaintiffs cite suggest that a nonprofit must exercise *perpetual* control over its overseas grants, which would make little sense in the context of fungible "funds"—the subject to which the revenue rulings are mainly directed.[138]

### d. Persuading others

Finally, Plaintiffs claim that Defendants and the Non-Parties should have tried "to persuade SSAL, the Captains, crew and volunteers to respect the

---

nothing of the sort. There is no hint of Plaintiffs' "tax issue" argument anywhere in that filing.

[137] Plaintiffs cite a memorandum from the IRS General Counsel's office, but that memorandum expressly notes that it "is not to be relied upon or otherwise cited as precedent by taxpayers." IRS Gen. Couns. Mem. 35319, 1973 WL 34333, at *9 (Apr. 27, 1973).

[138] Report 71 n.186.

Injunction," and that the SSCS board should have asked "Watson to remain in his leadership position . . . so as to better influence" OZT's participants.[139]  This argument overlooks the overwhelming evidence that SSAL and the ship captains were wholly committed to carrying out OZT regardless of anything said by Watson, SSCS, or the Non-Parties.  Plaintiffs' control theory is, as the Commissioner put it, "based on a view of the organization of the Sea Shepherd entities that Plaintiffs failed to prove, and a view of Defendants' control and influence that Plaintiffs failed to prove."[140]

As an initial matter, it is clear that any additional attempts to "persuade" SSAL and the vessel captains to comply with the Injunction would have been futile.  When SSCS and Watson did make such attempts, SSAL declined to take any action in response.[141]  Given the failure of these requests, the Commissioner found it "highly unlikely" that additional efforts would have yielded a different result.[142]

More fundamentally, Defendants and the Non-Parties may not be held in contempt for the failure to police the compliance of third parties who are beyond their control.  *See Int'l Rectifier Corp. v. Samsung Electronics Co.*, 361 F.3d 1355,

---

[139] Plf. Obj. 28.
[140] Report 78.
[141] Report 32-33, 35-38, 70.
[142] Report 71.

LEGAL28625608.50

1361-62 (Fed. Cir. 2004) (reversing contempt finding); *Tegal Corp. v. Tokyo Electron Co.*, 248 F.3d 1376, 1379-80 (Fed. Cir. 2001) (same); *NBA Props.*, 895 F.2d at 33 (same); *Max's Seafood Cafe v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (same); *Newman v. Graddick*, 740 F.2d 1513, 1528-29 (11th Cir. 1984) (same). To read an "affirmative obligation" to "police" third parties' compliance into the negatively worded Injunction "would turn a 'prohibitory' injunction into a 'mandatory' injunction," without any legal basis for doing so. *NBA Props.*, 895 F.2d at 33.

Plaintiffs cite *In re Transamerica Corp.*, 184 F.2d 319 (9th Cir. 1950), for the proposition that SSCS had the responsibility "to act to *try* to prevent what they had set in motion."[143] But *Transamerica* does not support that argument. First, the acts that the *Transamerica* defendants had "set in motion" were direct violations of the injunction—unlike here, where Plaintiffs accuse SSCS of "setting in motion" OZT, which was not forbidden by the Injunction. *Id.* at 320-21. Second, as the Commissioner found, in "*Transamerica*, it was undisputed that the banks and their CEOs had the ability to direct entities that were indisputably their agents."[144] SSCS, Watson, and the Non-Parties had no such power to command compliance with the Injunction by third parties, nor did the Injunction instruct them to do so.

---

[143] Plf. Obj. 30.
[144] Report 48.

LEGAL28625608.50

Finally, neither *Transamerica* nor any other precedent requires an individual to remain in his or her position to procure the enjoined corporation's compliance.

Plaintiffs evince great frustration that they did not achieve what they had hoped through the Injunction. But, as the Commissioner pointed out, "the failure of the injunction to have its desired effect is not evidence that the injunction was violated."[145] Rather, a party is confined to the "structural limitations of the injunction they secured," *Lynch v. Rank*, 639 F. Supp. 69, 76 (N. D. Cal. 1985), even if that means the injunction does not achieve the desired objective. *See, e.g.*, *United States v. 60.22 Acres of Land*, 638 F.2d 1176, 1178 (9th Cir. 1980) ("It is [the court's] responsibility to construe a judgment so as to give effect to the intention of the court, not to that of the parties.").

Here, Plaintiffs had notice since at least February 2, 2013 that SSAL had taken charge of OZT,[146] and knew long beforehand that SSAL provided primary logistical support for the Southern Ocean campaigns, which launch from Australian ports, to protect "Australian whales" in Australian waters.[147] But Plaintiffs did not seek an injunction against SSAL—likely because their whale hunting activities violate a 2008 injunction entered by the Australian Federal

---

[145] Report 62.
[146] Report 33 & n.140 (citing Ex. 644).
[147] Report 7-8.

LEGAL28625608.50

Court. *Humane Soc'y Int'l, Inc. v. Kyodo Senpaku Kaisha Ltd.* [2008] FCA 3 (Austl.).[148] If plaintiffs want to control the actions of SSAL, they must take action against SSAL. As the Commissioner found, it is improper to use Defendants and the Non-Parties as a "surety for persons and entities beyond Plaintiffs' reach and Defendants' control."[149] *See United States v. Int'l Bhd. of Teamsters*, 899 F.2d 143, 147 (2d Cir. 1990) (improper to hold alleged contemnor as "hostage" to "put pressure on third parties interested in his release form contempt").

### 3. Separation from the campaign was a good faith and reasonable interpretation of the Injunction.

Plaintiffs also failed to meet their burden to show that Defendants and the Non-Parties' decision to separate from the campaign was not based on a good faith and reasonable interpretation of the Injunction.

### a. Separation from the campaign was reasonable.

The Injunction is just three sentences long, and entirely prohibitory: it prohibited enjoined parties from approaching, attacking, or navigating dangerously around Plaintiffs' whaling ships. But it did not say how to comply with these prohibitions under the circumstances faced by SSCS, Watson, and the Non-Parties—namely, that (1) OZT was a joint effort with foreign organizations that

---

[148] Report 21, 68.
[149] Report 78.

LEGAL28625608.50

believed they were not bound by the Injunction and were intent on leading the campaign, regardless of what SSCS, Watson, and Non-Parties said or did; and (2) OZT was already under way, and Defendants and the Non-Parties had no means to stop or control the campaign. Confronted with that situation, Defendants and the Non-Parties decided to separate from the campaign to comply. As the Commissioner explained, "they sought to guarantee that SSCS would not be directly responsible for any future events that violated the injunction."[150]

In determining what a court order requires or prohibits, "any 'ambiguities' or 'omissions' . . . 'redound[] to the benefit of the person charged with contempt.' " *NBA Props.*, 895 F.2d at 32 (citation omitted). Thus, a person cannot be held in contempt for adopting a course of compliance that is "a plausible one from the language" of an injunction. *Harris v. City of Phila.*, 47 F.3d 1342, 1352 (3d Cir. 1995); *see also Labor/Cmty. Strategy Ctr.*, 564 F.3d at 1124 (even if alleged contemnor's interpretation of court order is "ultimately deemed incorrect," he should not be held in contempt if interpretation of order was "not unreasonable" and he was not "acting in bad faith"). The SSCS board reasonably understood that separating SSCS from the campaign was its "only viable option" to ensure that

---

[150] Report 60-61.

SSCS would not be held responsible for any close encounters with Plaintiffs' vessels.[151] That interpretation was reasonable.

### b. Separation from the campaign was in good faith.

Not only was that interpretation reasonable, it was made in good faith.

First, Defendants and the Non-Parties took far-reaching steps to comply with the Injunction that had "gut wrenching" effects on SSCS and Watson, providing powerful evidence that separation was a good faith effort to comply.[152] An enjoined party's diligent efforts to comply provide evidence of its good faith. *See Labor/Cmty. Strategy Ctr.*, 564 F.3d at 1122-24.

Second, Watson, the Volunteer Directors, and Hartland all testified that they did not believe they had power to coerce those participating in the campaign to abide by the Injunction.[153] Their uncontroverted testimony provides further evidence of their good faith. *See, e.g.*, *United States v. Prof'l Air Traffic Controllers Org., Local 504*, 703 F.2d 443, 445 (10th Cir. 1983) (vacating civil contempt sanction because government did not "produce[] clear and convincing proof that the defendants *knew* they had the power to comply with the court's order") (emphasis added).

---

[151] Report 73.
[152] Zuckerman 540:16; Gaede 650:1-4; Blazier 794:21-795:7, 828:20-22.
[153] Report 47, 56.

LEGAL28625608.50

Third, the Volunteer Directors sought, received, relied on, and followed advice from legal counsel concerning compliance with the Injunction, which is further evidence of their good faith. *See, e.g.*, *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 291-93 (2d Cir. 2008) (defendant not in civil contempt where consultations with counsel provided "evidence of [its] diligent and energetic efforts to comply in a reasonable manner").[154] Here, the SSCS board relied on the advice of counsel in adopting the decision to separate SSCS from the campaign and in implementing that decision.[155] By following counsel's advice, the board acted in good faith to comply with the Injunction. And its "decision to follow the steps proposed by counsel was reasonable—subjectively and objectively."[156]

## C. The Commissioner Correctly Concluded that Defendants and the Non-Parties Were Not Indirectly Liable for Actions of SSAL or the Ship Captains and Crew.

As the Commissioner determined, SSCS had separated from OZT long before the first alleged act of contempt, and none of Defendants or the Non-Parties controlled OZT after the separation.[157] The alleged acts of contempt were

---

[154] Defendants and the Non-Parties address Plaintiffs' objection as to the admissibility of SSCS counsel's advice below. *See infra* Section IV.E.

[155] *See infra* Section IV.E, at 61.

[156] Report 73.

[157] Report 46, 48-49, 67-70.

LEGAL28625608.50

committed by third parties, including SSAL and the vessel captains.[158]  That fact forecloses Plaintiffs' theories of indirect liability, each of which requires them to show that Defendants and the Non-Parties exercised control over the third parties who allegedly violated the terms of the Injunction.

Having failed to establish their primary claims that Watson, SSCS, and the Non-Parties violated the Injunction, Plaintiffs grasp for some alternative basis to support a contempt sanction.  In their post-hearing briefing to the Commissioner, Plaintiffs invoked a hodgepodge of theories of indirect liability, including agency, aiding and abetting, conspiracy, and joint venture, but failed to "develop any of these legal theories of indirect liability with reference to the record evidence."[159] Plaintiffs do not explicitly revive any of these indirect liability theories in their objections, and do not challenge the Commissioner's conclusion that *all* of their "various theories of indirect liability fail for different reasons, but most require a showing of control or consent that was not made."[160]

---

[158] Report 68.

[159] Report 65.

[160] Report 65.  Plaintiffs seem to assert that the Commissioner's rejection of indirect liability was based on a finding that SSAL was not bound by the Injunction.  Plf. Obj. 16.  While SSAL likely is not subject to the jurisdiction of the United States courts, the real problem, as the Commissioner found, was that Plaintiffs failed to establish any of the elements necessary to show indirect liability.

Plaintiffs do not directly contest the Commissioner's conclusion.[161]

Nevertheless, Plaintiffs' "turnover" and "evasion" theories are really just an

attempt to revive their indirect liability claims. Plaintiffs argue broadly that

"Defendants sought to evade the Injunction by accomplishing through SSAL what

they could not do directly because they were enjoined," and that as a result, "[t]his

makes Defendants liable in contempt for the enjoined acts physically committed by

others."[162] But Plaintiffs still fail to articulate any coherent theory of indirect

liability. Instead, they mash together a variety of disparate concepts, to generally

assert that SSCS is liable for SSAL's actions either because (1) SSCS and SSAL

had a close relationship; or (2) SSCS and SSAL "conspired" or "acted in concert"

with one another to evade the Injunction.

Meanwhile, Plaintiffs avoid any discussion of the legal standards that they

must meet to prove either of these theories because those standards pose

insurmountable burdens in light of the evidence.[163] First, Plaintiffs must show that

---

[161] Plaintiffs even seem to disclaim these theories: "although they believe contempt should have been found on Plaintiffs' other theories of relief, Plaintiffs have focused their Objections on a few key areas." Plf. Obj. 4 n.10.

[162] Plf. Obj. 15.

[163] Plaintiffs criticize the Commissioner for failing to apply *Regal Knitwear Co. v. NLRB*, 324 U.S. 9 (1945), but the Commissioner performed a thorough analysis of the requirements for indirect liability under that line of cases. Report 45-46. Meanwhile, Plaintiffs use *Regal Knitwear* as a soundbite, but ignore the legal standards that follow from the case. Plf. Obj. 16.

LEGAL28625608.50

either: (1) SSAL and the vessel captains were "legally identified" (or in privity) with SSCS; or (2) SSAL or the vessel captains "aided and abetted" SSCS and Watson, or were in "active concert" with them in committing specific acts of contempt. *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1323 (9th Cir. 1998); *see* Fed. R. Civ. P. 65(d)(2) (injunction binds parties' officers, agents, servants, employees, and attorneys, as well as those "in active concert or participation with them").[164] To show that the Defendants or Non-Parties are liable for a third party's actions, Plaintiffs must then take the *additional* step of presenting clear and convincing proof that Defendants or the Non-Parties incited, or controlled these alleged acts of contempt. *See Nat'l Org. for Women v. Scheidler*, 267 F.3d 687, 706 (7th Cir. 2001), *rev'd on other grounds*, 537 U.S. 393 (2003); *Tegal Corp.*, 248 F.3d at 1379. Plaintiffs' argument fails at each stage.

### 1. No legal identity

First, as the Commissioner found, Plaintiffs presented no evidence that SSCS and SSAL are so closely associated that they should be considered as a

---

[164]As the Commissioner observes, most of the case law on indirect liability focuses on the potential liability of non-parties. Report 45-46 & n.168. However, the case law also establishes that in order to show that a principal is liable for the actions of a third party, Plaintiffs must first go through this analysis to show that a third party "violated" the injunction, and then must demonstrate that the principal incited, directed, or controlled that violation. *See, e.g.*, *Int'l Rectifier Corp.*, 361 F.3d at 1361.

LEGAL28625608.50

single entity for the purposes of the Injunction.[165] A third party is "legally identified" with an enjoined party if there is a "very close identity of interest and such significant control over the organization *and* the underlying litigation that it is fair to say that the nonparty had his day in court when the injunction was issued." *Nat'l Spiritual Assembly of Baha'is of U.S. Under Hereditary Guardianship v. Nat'l Spiritual Assembly of Baha'is of U.S.*, 628 F.3d 837, 853 (7th Cir. 2010); *see also Regal Knitwear*, 324 U.S. at 14 (injunction binds parties "identified with [defendants] in interest, in 'privity' with them, represented by them or subject to their control"). Much more is required to establish legal identification based on a mere business relationship, or even a legal affiliation. *See, e.g.*, *Max's Seafood Cafe*, 176 F.3d at 673-74 (mere business association insufficient to hold one party in contempt for acts of another).

In their objections, Plaintiffs assert that SSCS is responsible for SSAL's actions largely by insinuation, casually referring to SSAL as "SSCS's Australian affiliate," suggesting that SSAL is an "instrumentality" of SSCS as described in *Regal Knitwear*, and indicating that SSCS and SSAL are united by a "common interest."[166] The Commissioner rejected all such theories, however, finding that although "Plaintiffs have attempted to connect any number of dots, they have not

---

[165] Report 63.
[166] Plf. Obj. 2, 17-18.

shown that all of the Sea Shepherds are 'one' in any sense that has relevance to the contempt inquiry."[167] Although the Commissioner observed that the "various Sea Shepherd entities consider themselves to be part of a loosely organized conservation movement," he found that "considerable testimony and evidence offered about the history and operation of SSAL" confirmed that SSAL was a separate corporate entity that functioned independently, that "[b]oth before and after the injunction issued, SSAL maintained an organizational and management structure separate from SSCS,"[168] and that "[p]articipation in the whale defense campaigns did not turn it into a subsidiary of SSCS."[169]

### 2. No aiding and abetting

Second, the Commissioner was correct that Plaintiffs did not present evidence that Defendants and the Non-Parties were "conspiring" or "acting in concert" with SSAL to violate the Injunction.[170] As shown above, Watson, SSCS, and the Non-Parties did not "turn over" OZT to SSAL to evade the Injunction; rather, they cut ties with an operation they could neither stop nor control.

---

[167] Report 63.
[168] Report 3, 63.
[169] Report 63 (noting "Plaintiffs appear to concede this fact").
[170] Report 63 (evidence "does not prove a concerted effort to evade the injunction").

Plaintiffs' indirect theories collapse for this lack of proof.[171]

Nor did Plaintiffs prove the other elements of their indirect liability theories. For example, the question of whether parties were "acting in concert" is another way of asking whether one party aided and abetted the other. *See, e.g., Int'l Rectifier Corp.*, 361 F.3d at 1362. Here, Plaintiffs do not even attempt to establish any of the elements of aider and abettor liability, such as how the actions that allegedly violated the Injunction were "for the benefit of, or to assist" SSCS. *Goya Foods, Inc. v. Wallack Mgmt. Co.*, 290 F.3d 63, 75 (1st Cir. 2002). As the Commissioner found, the opposite was true—SSAL and the vessel captains acted independently and in pursuit of their own interests, and when SSCS asked SSAL to comply with the Injunction, SSAL *refused*.[172] Most importantly, Plaintiffs *concede* that SSCS and SSAL were not "acting in concert" at the time of the alleged violations, when the OZT vessels actually approached Plaintiffs' vessels.[173] Rather, their entire theory of aiding and abetting liability is based on the incorrect

_____

[171] Plf. Obj. 18 (claiming that "[t]he 'conspiring' or 'acting in concert' SSCS and SSAL did was the turnover itself").

[172] Report 33, 37, 70; *see also* Report 65 ("SSCS's liability for acts committed by its putative agent, SSAL, requires a finding that SSAL's acts in the Southern Ocean were both within the scope of the agency relationship and for the benefit of SSCS and, after the injunction, those acts were not in the interest of SSCS.").

[173] Plf. Obj. 18 ("The fact that SSCS may not have been 'acting in concert' with SSAL at the precise times the enjoined acts were committed is irrelevant.").

LEGAL28625608.50

factual assertion that "SSCS clearly turned OZT over to SSAL."[174]

### 3. No control

Finally, the Commissioner correctly found that Plaintiffs failed to present evidence of control that is essential to any theory of indirect liability.[175]  To show that Defendants and the Non-Parties are responsible for the alleged violations of the Injunction committed by a third party, Plaintiffs must, but do not, present clear and convincing evidence that Defendants and the Non-Parties directed, incited, or controlled the alleged acts of contempt.  *See Scheidler*, 267 F.3d at 707 ("Nothing in the order purports to hold the defendants liable for actions they do not direct, incite, or control."); *In re SkyPort Global Commc'ns, Inc.*, 08-36737-H4-11, 2013 WL 4046397, at *54 (Bankr. S.D. Tex. Aug. 7, 2013) ("a court must consider whether the enjoined party violated the injunction *through* the abettor in accordance with a common plan.").

The Commissioner correctly found that SSAL and the vessel captains acted independently of SSCS in conducting OZT.[176]  Specifically, the Commissioner found that "the responsibility for the incursions of the safety perimeter and any other violation of the injunction lies with SSAL and the captains who reported to

---

[174] Plf. Obj. 18.
[175] Report 65.
[176] Report 63-64.

SSAL."[177]  Plaintiffs do not object to these findings.  Indeed, Plaintiffs seem only

to assert that Watson and SSCS were "instigators" of OZT.[178]  That is irrelevant to

the question of contempt.  As the Commissioner observed, most of the preparations

for OZT were already in place by the time the Injunction was entered, and the

Injunction did not forbid OZT from going forward.[179]

And Plaintiffs provide no support for their assertion that an enjoined party

has a duty to *maintain* control over a legal activity (*i.e.*, OZT) to prevent potential

future violations of an injunction by independent third parties.[180]  The very cases

on which Plaintiffs rely undercut their arguments.[181]  *Skyport*, for example,

describes a "blatant and frequent" conspiracy to evade an injunction, which

includes extensive evidence that a party *directly instructed* his agent to engage in

enjoined behavior.  *SkyPort*, 2013 WL 4046397 at *66.  And *Skyport* makes clear

that a party is *only* liable if he "in active concert" with the aider and abettor in

regard to the act of contempt.  *Id.* at *61-62 & n.101 (reviewing cases and

_____

[177] Report 67-68.
[178] Plf. Obj. 19.
[179] Report 9-11, 21.
[180] *See* Plf. Obj. 28.
[181] Plaintiffs assert that the Commissioner "*never mentions*" Plaintiffs' authority.  Plf. Obj. 17.  However, the Commissioner correctly explained that in the "out-of-circuit" cases on which Plaintiffs rely, "the contemnors' failure to use their influence was one small part of a larger pattern of blatant recalcitrance" that does not exist here.  Report 49.

concluding that "[i]n each of these cases, the facts clearly demonstrated that the alleged aider/abettor's actions were not performed independently, but in conjunction with the enjoined party").

Likewise, plaintiffs cite *Roe v. Operation Rescue*, 919 F.2d 857 (3d Cir. 1990) for the proposition that a defendant cannot "instigate" contemptuous conduct, and then avoid liability by leaving the performance of the prohibited act to another.[182] In *Roe*, the court held the leader of an anti-abortion movement in contempt for violating an injunction that forbade him from blocking the entrances to abortion clinics, when the leader had: (1) led demonstrations, the express purpose of which was to block clinic access, and which did, in fact, block clinic access; and (2) personally attended and controlled those demonstrations, giving instructions to the demonstrators through a headset. *Id.* at 871.

The most that can be said here is that SSCS provided support to OZT before the Injunction. But that does nothing to prove Plaintiffs' indirect theories because (1) OZT itself was not enjoined, and (2) those activities occurred before the Injunction when they were entirely lawful. *United Pharmacal Corp. v. United States*, 306 F.2d 515, 517 (1st Cir. 1962) ("It may very well be, although we do not need to decide, that prior to the preliminary injunction Metabolic and United had

---

[182] Plf. Obj. 19.

LEGAL28625608.50

been actively collaborating in pushing the drug on the market. But the question is not what Metabolic and United had been doing. Their past contractual relationship is not controlling. The question is whether United and its officers aided and abetted Metabolic in violating the preliminary injunction . . . ."). Plaintiffs present no evidence that SSCS, Watson, or the Non-Parties either instigated or controlled the alleged violations of the Injunction, and the Commissioner found none. All Plaintiffs have is that Defendants and the Non-Parties "sympathized with the mission of OZT."[183] But as the Commissioner found, this is "neither surprising or contumacious."[184] Sympathy falls well short of showing indirect liability.

**D.** **The Commissioner Correctly Determined That Watson's Presence Aboard the *Steve Irwin* Within the 500-yard Perimeter Is Not a Basis for Contempt.**

Plaintiffs argue that (1) Watson should have remained in control of the *Steve Irwin* to ensure that that vessel at least did not participate in OZT, thereby ensuring his personal compliance with the safety perimeter and (2) the Commissioner's finding that Watson acted reasonably by remaining on the vessel was "naïve."[185] Both assertions are unfounded.

---

[183] Report 58.
[184] Report 58.
[185] Plf. Obj. 42-44.

LEGAL28625608.50

To understand Watson's actions in response to the Injunction, it is necessary to understand that the timing of the Injunction left Watson with limited options for compliance. When Watson learned of the Injunction, OZT was under way and he was at sea aboard the *Steve Irwin*.[186] The Commissioner found that, because Watson was subject to an Interpol Red Notice, he reasonably believed he could not disembark without risking detention and extradition to Japan.[187] His fears were confirmed on January 4, 2013, when the *Steve Irwin* stopped in New Zealand to refuel (after transferring Watson to the *Brigitte Bardot*)[188] and immigration officials searched the vessel for Watson on orders of the New Zealand Foreign Office.[189]

The Commissioner found that Watson reasonably believed he could remain on the *Steve Irwin* and comply with the Injunction.[190] This was based on Chakravarty's assurance that it would not be necessary to approach within 500 yards of the Japanese vessels since in recent campaigns the whaling vessels fled

---

[186] Watson 1784:4-14.
[187] *See* Report 29; Watson 1806:23-1807:9, 1824:5-1825:18; Chakravarty 1435:8-16, 1436:1-19.
[188] Report 29.
[189] Report 29; Chakravarty 1445:21-1448:5; Watson 1807:11-1808:12.
[190] Report 29.

LEGAL28625608.50

when the Sea Shepherd ships appeared.[191]  Chakravarty and Watson agreed that, if a close encounter appeared likely, Chakravarty would transfer Watson to the *Brigitte Bardot*.[192]

At the same time, Watson recognized that if he remained in his leadership positions in OZT, he might still be found in contempt based on the actions of others beyond his control.[193]  Therefore, to ensure his personal compliance with the Injunction, he resigned all leadership positions in OZT and on the *Steve Irwin* and, thereafter, acted only as an observer and chronicler of the campaign.[194]  Watson, the captains and crew members all uniformly testified that Watson exerted no control over the *Steve Irwin* or other vessels after stepping down as captain and campaign leader, and the Commissioner so found.[195]  Watson gave no order or

---

[191] Report 29-30; Watson 1786:1-11, Hammarstedt 879:6-880:18, 884:20-885:7; Chakravarty 1436:20-1439:12.

[192] Chakravarty 1410:13-19, 1440:2-24, 1441:17-1442:1; Watson 1810:7-1811:2.

[193] Watson 1856:16-1857:13

[194] Report 30 (citing Watson 1794:18-1795:8, 1801:24-1802:1, 1815:8-12; 1911:6-1912:11).  The Commissioner concluded: Watson's "actions in observing, chronicling, and reporting on the events in the Southern Ocean do not provide a basis for liability."  Report 69.

[195] Report 30 (citing Hammarstedt 893:8-19; Lister 1018:20-1019:11, 1024:6-19; Chakravarty 1455:19-24, 1460:18-1462:18; Emko (stipulation) 1751:18-1753:18).

LEGAL28625608.50

command to any captain or crew,[196] was not involved in campaign strategy, and did not direct any ship's movements.[197] By relinquishing leadership of OZT and the *Steve Irwin*, "Watson did not fail to take all reasonable steps *within his power* to comply with the injunction" and that is all the law required of him.[198]

Plaintiffs assert that Watson should have remained in command of the *Steve Irwin* to ensure that that vessel did not participate in OZT.[199] However, the Injunction did not prohibit the *Steve Irwin* from participating in OZT and, furthermore, as the Commissioner correctly found, "[t]he injunction did not compel [Watson] . . . to police the ongoing events in OZT, and he was entitled to remove himself from direct command—and responsibility—when he reasonably concluded that he ultimately could not prevent violations of the injunction by others."[200]

Having taken reasonable steps to comply with the Injunction in good faith, the facts that the *Steve Irwin* ultimately penetrated the safety perimeter, and the contingency plan to transfer Watson to the *Brigitte Bardot* proved unfeasible, do

---

[196] *See* Chakravarty 1461:8-10, 1461:18-20; 1455:19-24; 1460:18-1462:18; Lister 1016:20-24, 1019:7-11; Emko (stipulation) 1752:1-6; Watson 1816:11-14, 1816: 23-1817:6, 1822:21-1823:10.
[197] Watson 1816:15-22, 1823:11-1824:1.
[198] Report 68 (emphasis by the Commissioner); *see Dual-Deck*, 10 F.3d at 695.
[199] Plf. Obj. 43.
[200] Report 68.

LEGAL28625608.50

not render Watson in contempt when those events were beyond his control. On February 19, 20 and 25, Chakravarty decided to maneuver the *Steve Irwin* within 500 yards of the *Sun Laurel* to block the *Nisshin Maru* from refueling.[201] Watson was not in command and took no part in that decision.[202] Watson could not transfer to the *Brigitte Bardot* as previously planned, because it was 800 to 1,000 miles away heading to Australia for engine repairs.[203] Chakravarty decided it was unsafe to transfer Watson into one of the *Steve Irwin's* small inflatable boats, since Watson lacked the training, fitness, and specialized clothing required to survive in subzero temperatures for what might be seven hours or longer.[204] Plaintiffs offered no evidence to the contrary. The Commissioner correctly found that when the *Steve Irwin* penetrated the safety perimeter Watson "had no control over the ship at that point and he had no way of disembarking" and therefore should not "be held in contempt for personally violating the injunction."[205]

---

[201] Chakravarty 1454:10-17, 1455:19-22. Chakravarty was unsure whether the Injunction covered the Korean vessel *Sun Laurel*. Chakravarty 1454:18-24, 1455:7-10.

[202] Chakravarty 1455:23-24, 1456:10-14, 1464:7-24.

[203] Chakravarty 1456:16-1457:9; Watson 1821:20-1822:3, 1875:20-1876:9. In addition, Watson could not have risked entering Australian waters. Watson 1877:3-8.

[204] Chakravarty 1457:12-1460:5; 1482:24-1486:4; 1501:23-1507:21.

[205] Report 68-69.

LEGAL28625608.50

**E.  The Commissioner Properly Admitted Evidence Concerning the Volunteer Directors' Reliance on the Advice of Counsel.**

Defendants and the Non-Parties interpreted the Injunction to mean that SSCS should separate from the campaign.  To demonstrate that they reached this determination in good faith, the Volunteer Directors presented evidence that they consulted with and followed the advice of counsel in determining how to comply with the Injunction, and "every subsequent step they took was guided by advice of counsel."[206]  Counsel specifically recommended: (1) the overall decision to cut ties with the OZT;[207] (2) waiting until the whaling fleet left port before adopting a formal resolution to separate from the campaign;[208] (3) granting the *Bob Barker* to SSNL;[209] (4) separating SSCS's web site and other media from OZT and SSAL;[210] (5) sending Gaede's letters to SSAL and SSNL, but not to the vessel captains, as well as the specific language in the letters;[211] and (6) not attempting to revoke the vessel grants, based on counsel's interpretation of the terms of the grant agreements.[212]

---

[206] Report 72.
[207] Report 17.
[208] Report 19-20.
[209] Report 25, 64 & n.185.
[210] Report 25, 27; Ex. 620; Gaede 677:23-678:19.
[211] Report 34-36.
[212] Report 35-36.

LEGAL28625608.50

The Commissioner correctly ruled that "reliance on counsel's advice is clearly relevant to determining whether a particular interpretation of the court's order, and the actions taken in accordance with that interpretation, were reasonable and taken in good faith."[213]  Although a client cannot rely in good faith on legal advice to *violate* a court order, *see, e.g., United States v. Asay*, 614 F.2d 655, 661 (9th Cir. 1980), the SSCS board relied on counsel's legal advice as to how to *comply* with the Injunction.  That reliance provides evidence of their good faith in interpreting and responding to the Injunction.  *See, e.g.*, *Gotham Registry*, 514 F.3d at 293 (holding that defendant was not in contempt where it "sought the advice of counsel before adopting its overtime policy" in response to court order and such consultation provided "evidence of [its] diligent and energetic efforts to comply in a reasonable manner.").[214]

Plaintiffs try to distinguish *Gotham Registry* on the ground that the order in that case "was ambiguous as to what acts the decree forbade," while "[t]here is no

---

[213] Report 58.

[214] Other courts have held that reliance on advice of counsel is relevant to whether a party accused of civil contempt has taken reasonable steps in good faith to comply with the court's order.  *See, e.g.*, *Buschmeier v. G & G Investments, Inc.*, No. 02:03mc00506, 2009 WL 90400, at *13 (W.D. Pa. Jan. 14, 2009); *Zino Davidoff SA v. CVS Corp.*, No. 06 Civ. 15332(RJS), 2008 WL 1775410, at *13 (S.D.N.Y. Apr. 17, 2008); *see also Robin Woods Inc. v. Woods*, 28 F.3d 396, 399 (3d Cir. 1994) (holding that alleged contemnors "acted in good faith and on the advice of counsel" but affirming contempt sanction because they "consciously chose" to violate injunction).

ambiguity here."[215] The Commissioner correctly concluded to the contrary, "The injunction here is straightforward in its prohibitions, but how it applied to the various parties in the Southern Ocean was not."[216] Counsel's advice to separate from OZT was therefore "neither inconsequential nor implausible, especially to a board whose members were not lawyers and had little experience with litigation."[217]

Plaintiffs question counsel's "competency," their knowledge of the case, and their "objectivity,"[218] claiming that "no evidence was offered (and the Report cites to none) that the advice of counsel (Moure and Harris) was competent and unbiased or that counsel was fully informed of all relevant facts."[219] Those assertions are untrue: Harris & Moure is an experienced maritime law firm that represented SSCS in all aspects of the litigation, and the Volunteer Directors specifically relied on Harris & Moure on the basis of a long course of dealing, including their recent victory in the district court.[220]

---

[215] Plf. Obj. 35.
[216] Report 56.
[217] Report 59.
[218] Plf. Obj. 35.
[219] Plf. Obj. 34.
[220] Report 59 & n.181 (citing Zuckerman 384:8-12; Gaede 647:9-15; Talbot 1186:6-10).

LEGAL28625608.50

The Volunteer Directors' good faith was also admissible as evidence in mitigation. Plaintiffs claim that " '[a]dvice of counsel' . . . is not an accepted mitigating factor."[221] But the weight of authority refutes Plaintiffs' position. *See, e.g.*, *Rogers v. Webster*, 776 F.2d 607, 612 (6th Cir. 1985) (per curiam) (in civil contempt, reliance on advice of counsel is relevant in mitigation of any penalty); *SEC v. First Fin. Grp. of Texas*, 659 F.2d 660, 670 (5th Cir. 1981) (same); *see generally Washington Metro. Area Transit Auth. v. Amalgamated Transit Union*, 531 F.2d 617, 621 (D.C. Cir. 1976) (same) (good faith is relevant in mitigation).[222]

Plaintiffs' last argument is that, even if advice of counsel *were* relevant, the Commissioner improperly admitted it because he "deprived Plaintiffs of access to documents bearing on the merits of the defense."[223] But a limited waiver does not give the opposing party "unfettered discretion to rummage through all of their files." *In re EchoStar Comm'ns Corp.*, 448 F.3d 1294, 1303 (Fed. Cir. 2006). The waiver must be "no broader than needed to ensure the fairness of the proceedings." *Bittaker v. Woodford*, 331 F.3d 715, 720-21 (9th Cir. 2003) (en banc). By offering

---

[221] Plf. Obj. 45 (citing *Eustace v. Lynch*, 80 F.2d 652, 656 (9th Cir. 1935)).

[222] The Volunteer Directors' good faith is also relevant to their statutory immunity based on the Volunteer Protection Act, 42 U.S.C. § 14503(a), which precludes liability except where a nonprofit organization's volunteer causes harm willfully, recklessly, with gross negligence, or similar heightened scienter. *See infra* section IV.F, at 66-68.

[223] Plf. Obj. 46.

evidence of their communications with counsel regarding the Injunction and SSCS's response, the Volunteer Directors waived the attorney-client privilege only as to the same subject matter. *See, e.g.*, *Weil v. Investment/Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 25 (9th Cir. 1981) (waiver of attorney-client privilege applies "only as to communications about the matter actually disclosed"). In receiving those materials, Plaintiffs "implicitly agree[d] to the conditions of the waiver"—if Plaintiffs did "not wish to be bound, [they] were free to reject the materials and litigate without them." *Bittaker*, 331 F.3d at 721. Plaintiffs neglect to mention *Bittaker*, let alone reconcile it with their objection.

Here, the Commissioner carefully considered the proper scope of the waiver, both before and during the trial.[224] Pursuant to the Commissioner's pre-trial order the Volunteer Directors produced 81 privileged documents, which the Commissioner confirmed—after his in camera review—constituted all the documents within the scope of the waiver.[225] The Volunteer Directors produced documents within the waiver's parameters, Plaintiffs accepted and relied on those documents at trial, and the Commissioner properly enforced the boundaries of the Volunteer Directors' waiver.

---

[224]Dkt. #276 (pre-trial order); Tr. 486:11-24, 488:15-489:10.
[225] Dkt. 282; Tr. 738:7-21; Tr. 1428:22-1429:4.

LEGAL28625608.50

**F.      The Volunteer Protection Act Precludes a Contempt Judgment Against the Volunteer Directors.**

The Volunteer Protection Act ("VPA") immunizes volunteers of nonprofit organizations from liability for harm caused by actions taken within the scope of their volunteer responsibilities.  42 U.S.C. § 14503(a)(1).  As the Commissioner recognized, it may apply here.[226]  Plaintiffs bury a perfunctory objection to the Commissioner's finding in a footnote, saying they intend to "address this issue to the extent needed in their Reply."[227]  That is not appropriate.  If Plaintiffs had an objection to the Report's conclusion that the Volunteer Directors may be protected by the VPA, Plaintiffs had to make that argument in their opening brief.  *E.g.*, *United States v. Alcan Elec. & Eng'g, Inc.*, 197 F.3d 1014, 1020 (9th Cir. 1999).  Because they did not, Plaintiffs have waived any VPA argument.

In any case, the text, legislative history, and case law interpreting the VPA show that it precludes finding the Volunteer Directors in contempt.  The VPA immunizes a volunteer of a nonprofit organization for liability for a "harm caused" where "the volunteer was acting within the scope of the volunteer's responsibilities," except in narrow circumstances where the volunteer acted willfully, criminally, recklessly, with gross negligence, or with "a conscious,

_____

[226] Report 73-74.
[227] Plf. Obj. 45 n.88.

LEGAL28625608.50

flagrant indifference to the rights or safety of the individual harmed by the volunteer." § 14503(a)(1), (3). SSCS is a "nonprofit organization," § 14505(4),[228] and the Volunteer Directors are "volunteers," within the meaning of the VPA, § 14505(6).[229] The Volunteer Directors also acted within the scope of their responsibilities, in good faith and reasonably, when they met and made decisions regarding SSCS's response to the injunction.

This case also fits the VPA's broad definition of "harm." § 14505(2). Plaintiffs seek to recover "their attorney fees and other expenses incurred in pursuing the contempt violation."[230] This Court has described attorneys' fees incurred in pursuing a civil contempt sanction as a type of "harm." *See, e.g.*, *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1109 (9th Cir. 2002). And Plaintiffs have described their request for attorneys' fees as "compensation," *i.e.*, their pecuniary loss.[231]

The VPA's "limitations on the liability of a volunteer . . . include *both* state and federal laws." *Armendarez v. Glendale Youth Ctr., Inc.*, 265 F. Supp. 2d 1136, 1140 (D. Ariz. 2003) (emphasis in original); *see Nunez v. Duncan*, No. Civ. 03-1359-AA, 2004 WL 1274402, at *1 (D. Or. June 9, 2004) (applying VPA to

---

[228] Dkt. #245-1, Admitted Facts ¶ 1.
[229] Dkt. #245-1, Admitted Facts ¶¶ 3-8.
[230] Dkt. #296 at 16.
[231] Plf. Obj. 46.

dismiss *Bivens* claim); *but see Am. Produce, LLC v. Harvest Sharing, Inc.*, No. 11–cv–00241–PAB–KLM, 2013 WL 1164403, at *3 (D. Colo. Mar. 20, 2013) (finding no exemption from "federal liability"). The legislative history, which the Commissioner recognized, confirms that the VPA "applies to *any* claim for harm caused by an act or omission of a volunteer." § 14501 Hist. and Stat. Notes (b) (emphasis added).[232]

Applying the VPA in this case also comports with the statute's legislative purpose of encouraging volunteerism. Congress found that the "potential for liability actions against" volunteers of nonprofits had caused the "withdrawal of volunteers from boards of directors and service in other capacities." § 14501(1), (2). A contempt action can chill board service as much as an ordinary claim for negligence. In fact, three of SSCS's volunteer board members have already resigned because of Plaintiffs' contempt motion, and others might well be deterred from joining the board without the VPA's protections.[233]

---

[232] *See* Report 74.
[233] Report 34 (Rieman); Dkt. #245-1, Admitted Facts ¶ 7 (Zuckerman); Rieman 1327:6-15 (Persia White).

LEGAL28625608.50

**G.      Plaintiffs Are Not Entitled to Sanctions or Fees.**

>   **1.      The requested sanctions are punitive, not compensatory or coercive.**

Plaintiffs request sanctions of $2 million to coerce compliance with the Injunction, but say that SSCS, Watson, and the current directors "may purge themselves of contempt by seeking in good faith to recover the OZT vessels pursuant to the grant agreements."[234]

Civil contempt sanctions must be "nonpunitive and avoidable."  *United Mine Workers v. Bagwell*, 512 U.S. 821, 831 (1994).  A sanction "is considered civil and remedial if it either coerces the defendant into compliance with the court's order or compensates the complainant for losses sustained" from noncompliance.  *Id.* at 829 (quotations omitted).  "Where a fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge" the sanction through compliance. *Id.*  Punitive sanctions may not be awarded in a civil contempt proceeding.  *Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 632-33 (1988).

Plaintiffs do not contend that a $2 million sanction reflects any actual loss. It is not compensatory.

Nor does Plaintiffs' proposed sanction represent a genuine coercive remedy. Plaintiffs offer no evidence or argument that $2 million is "the minimum sanction

---

[234] Plf. Obj. 46.

LEGAL28625608.50

necessary to obtain compliance" with the Injunction. *See Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 517 (9th Cir. 1992). Plaintiffs offer no rationale for a sanction of $2 million at all. And there is no basis to find that a staggering $2 million fine is necessary to coerce SSCS to comply with the Injunction (if further compliance were even possible), much less secure compliance by Watson and the Non-Parties. *See Miller v. City of Los Angeles*, 661 F.3d 1024, 1030 (9th Cir. 2011) ("$63,687.50 is an extraordinary amount for such non-compensatory sanctions."). Sanctions against the individuals would be even more extraordinary. Any sanction would have to be imposed "first against the [party entity] alone" and "[o]nly if that approach failed to produce compliance within a reasonable time should the question of imposing contempt sanctions against [non-party individuals] even [be] considered." *Spallone v. United States*, 493 U.S. 265, 280 (1990).

Furthermore, if a sanction's purpose is "to coerce future compliance with the court's order," the court must allow "the defendant [to] avoid paying the fine by performing the act required by the court's order." *Portland Feminist Women's Health Ctr. v. Advocates for Life, Inc.*, 877 F.2d 787, 790 (9th Cir. 1989). "[S]anctions imposed in civil contempt proceedings must always give the alleged contemnor the opportunity to bring himself into compliance . . . ." *Whittaker Corp.*, 953 F.2d at 518 (quotations omitted).

Plaintiffs' proposed sanctions do not provide Defendants and the Non-Parties an "unequivocal opportunity to purge." *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 780 (9th Cir. 1983). Plaintiffs' motion for contempt proposed that Defendants could purge a sanction by complying with the Injunction.[235] Plaintiffs now suggest that "SSCS, Watson, and the remaining Directors may purge themselves of contempt by seeking in good faith to recover the OZT vessels pursuant to the grant agreements."[236]

But conditioning a sanction on revocation of the grant agreements is not keyed to compliance with the Injunction, and would be an entirely new obligation. "The critical feature that determines whether the remedy is civil or criminal in nature is . . . whether the contemnor can avoid the sentence imposed on him, or purge himself of it, by *complying with the terms of the original order*." *Feiock*, 485 U.S. at 635 n.7 (emphasis added). Here, the "original order" is the Injunction. It related to specific conduct in the Southern Ocean. It did not require SSCS to attempt to revoke the grants.

Moreover, Plaintiffs' proposed "good faith" efforts provide no objective yardstick by which to measure compliance. It is unclear what such efforts would entail or whether some sort of continuing supervision would be required. The

---

[235] Dkt. #37 at 3.
[236] Plf. Obj. 46.

LEGAL28625608.50

grant instruments provide for revocation only under limited circumstances not applicable here, and as the Commissioner correctly determined, "Plaintiffs have not shown that revocation of any or all of the vessel grants was legally possible."[237] Plaintiffs' proposed purge provision thus fails to provide clear notice of what is necessary to avoid the sanction and would require ongoing judicial resources.

Plaintiffs' proposal deprives especially Hartland and former directors Rieman and Zuckerman of an ability to purge the sanction because it applies only to SSCS, Watson, and "the remaining Directors."[238] Indeed, Plaintiffs have acknowledged that, as former directors, Rieman and Zuckerman "have no ability to police compliance with the Injunction."[239] And the same is true for Watson, who also resigned his positions with SSCS and thus could not conceivably revoke the grants. Without the ability to purge, any sanction imposed on Hartland and the former directors is punitive and cannot be imposed in civil contempt proceedings.[240]

---

[237] Report 51.

[238] Plf. Obj. 46.

[239] Dkt. #296 at 18. Rieman resigned on February 11, 2013, in part because he felt he lacked control over the ships and events in the Southern Ocean. Report 34; Exs. 244, 657.

[240] With respect to Rieman, any request for coercive sanctions would also be barred by judicial estoppel. In its successful opposition to Rieman's motion to dismiss, Plaintiffs disavowed any intent to seek coercive sanctions against Rieman. *See* Dkt. #301 at 77-81.

LEGAL28625608.50

Finally, "[t]he power to impose coercive sanctions to compel obedience . . . is limited by the individual's ability to comply with the court's order." *Falstaff Brewing*, 702 F.2d at 781; *accord United States v. Rylander*, 460 U.S. 752, 757 (1983). The present inability to comply with a court order—here, the Injunction— is "a complete defense to a charge of coercive civil contempt." *Falstaff Brewing*, 702 F.2d at 782 n.7. Plaintiffs focus on the past and what they think Defendants and the Non-Parties should have done differently to comply with the Injunction. In the present, however, Defendants and the Non-Parties do not control SSAL or the ships' captains (that is especially true for Rieman, Zuckerman, and Watson) and can do no more than personally stay 500 yards away from Plaintiffs' vessels.[241]

## 2. Attorneys' fees and costs are unwarranted.

Plaintiffs request their attorneys' fees.[242] The Commissioner correctly recognized that an award of fees and costs is discretionary and based on a case-specific inquiry, and that, "if the court is inclined to award fees, it should call for additional briefing."[243] The Court has "the discretion to analyze each contempt

---

[241] Defendants and the Non-Parties raised the "impossibility" defense in their post-hearing submission (Dkt. #301 at 34-37), and Rieman also raised it in his pre-hearing brief (Dkt. #256 at 30-32).

[242] Plf. Obj. 46.

[243] Report 76.

case individually and decide whether an award of fees and expenses is appropriate as a remedial measure." *Perry v. O'Donnell*, 759 F.2d 702, 705 (9th Cir. 1985).

The unique circumstances of this case militate against an award of fees, and certainly against a joint and several award. Plaintiffs have expanded this action beyond reasonable bounds. Having named SSCS as a contemnor in its initial motion for contempt, Plaintiffs had no need to expand the proceedings. Plaintiffs' "damages" in the form of its attorneys' fees resulted from their *own* "self-inflicted . . . spare-no-expense punitive expedition" against individual Non-Parties. *Dual-Deck*, 10 F.3d at 696. It would be especially inequitable and excessive to award any fees against the Volunteer Directors, all of whom are unpaid volunteers, or against Hartland, a staff member who simply carried out the board's directives.

## V. DEFENDANTS AND THE NON-PARTIES' OBJECTIONS

### A. It is Unnecessary to Determine Whether the Injunction Required "Positive Action."

In his Report, the Commissioner made detailed factual findings establishing that Defendants and the Non-Parties did not have the control or ability to prevent SSAL, the other international Sea Shepherd organizations, or the vessel captains and crew, from engaging in conduct prohibited by the Injunction. The Commissioner further concluded that Defendants and the Non-Parties took all reasonable steps within their power to comply with the Injunction and, therefore,

did not violate the Injunction. The Court should adopt the Commissioner's findings and conclusions in their entirety. If the Court adopts those findings and conclusions, it need not consider this objection.

In his Report, the Commissioner states that "[t]he key decision point here is whether the negative injunction required positive action and, if so, what positive action was necessary . . . and the panel that referred this matter must confront and resolve this question."[244] To the extent that comment suggests that resolution of this question is necessary to determine Defendants and the Non-Parties' liability for contempt, Defendants and the Non-Parties object to the Report in this limited respect. The Commissioner's fact findings and conclusions noted above make it unnecessary for the Court to decide in the abstract whether the Injunction's "negative" terms purported to impose a duty to take "positive action" to prevent third parties from engaging in the prohibited conduct. That question is moot, because the Commissioners' fact findings comprehensively establish that any such positive action would have been futile.[245]

---

[244] Report 66.
[245] Defendants and the Non-Parties incorporate by reference sections IV.A-C above, which show that Defendants and the Non-Parties took all reasonable steps within their power to comply with the Injunction based on a good faith and reasonable interpretation.

**B.      Rieman's Resignation is Relevant.**

Rieman objected to the Commissioner's Report to the extent it suggests his resignation from the board on February 11, 2013, was not relevant to the contempt proceedings and possible sanctions.[246]  The grounds for that objection are briefed in section IV.G on sanctions.  But if the Court adopts the Commissioner's findings and recommendations regarding the Volunteer Directors, it need not consider this objection.

**C.      The Invalidity of the Injunction Precludes a Contempt Sanction.**

Finally, Defendants and the Non-Parties object to the Report because the Commissioner declined to address their arguments that the Injunction itself is invalid.[247]

First, the Injunction's 500-yard perimeter violates the First Amendment because it prevents Defendants and the Non-Parties from engaging in core expressive activities—publicizing and protesting Plaintiffs' lethal whaling

---

[246] Dkt. #318.

[247] "The invalidity of the underlying order is always a defense to a civil contempt charge."  *In re Establishment Inspection of Hern Iron Works, Inc.*, 881 F.2d 722, 726 n.11 (9th Cir. 1989).  The Commissioner advised Defendants and the Non-Parties they had preserved their challenges to the validity of the Injunction and he would reserve those issues for the Panel.  Dkt. #265, 1-3; Tr. 1934:21-1935:2

LEGAL28625608.50

operations.[248] The Injunction's chilling effects are substantial: SSCS was forced to abandon its advocacy in the Southern Ocean to avoid a contempt sanction. The Injunction's 500-yard buffer burdens "more speech than necessary" to serve the government's interest in maritime safety. *See Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 371 (1997).

Second, the Injunction was issued sua sponte and without notice to any enjoined party, contravening the requirements of Federal Rule of Appellate Procedure 8 and basic notions of due process.

Third, the Injunction reaches purely extraterritorial conduct that does not violate specific and universal international-law norms, in violation of *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013).[249]

## VI.   CONCLUSION

The Commissioner's Report should be adopted, and Plaintiffs' request to hold Defendants and the Non-Parties in contempt should be denied.

---

[248] Talbot 1183:11-1184:21, 1184:23-1185:8, 1199:8-20, 1211:10-16; Watson 1763:6-14.

[249] In support of these objections, Defendants and the Non-Parties incorporate and renew these arguments as developed in their earlier filings to this Court. *See, e.g.*, Dkt. ##32, 99, 127, 128, 143, 144, 164.

DATED March 28, 2014.

By:/s/ *David F. Taylor*
David F. Taylor
DFTaylor@perkinscoie.com
Kathleen M. O'Sullivan
KOSullivan@perkinscoie.com
Zachary Jones
ZJones@perkinscoie.com
Perkins Coie LLP
1201 Third Avenue, Ste. 4900
Seattle, WA 98101

Attorneys for Non-Parties Lani
Blazier, Marnie Gaede, Bob Talbot,
Robert Wintner, and Ben Zuckerman

By: /s/ *Daniel P. Harris*
Daniel P. Harris
dan@harrismoure.com
Charles P. Moure
Charles@harrismoure.com
Rebecca Millican
rebecca@harrismoure.com
Harris & Moure, PLLC
600 Stewart Street, Ste. 1200
Seattle, WA 98101

Attorneys for Defendant-Appellee Sea
Shepherd Conservation Society

By: /s/ *Timothy G. Leyh*
Timothy G. Leyh
timl@calfoharrigan.com
Michelle Buhler
michelleb@calfoharrigan.com
Charles S. Jordan
chipj@calfoharrigan.com
Calfo Harrigan Leyh & Eakes, LLP
999 Third Avenue, Ste. 4400
Seattle, Washington 98104

Attorneys for Defendant-Appellee
Paul Watson

By: /s/ *Claire Loebs Davis*
Claire Loebs Davis
davisc@lanepowell.com
Katie Smith Matison
matisonk@lanepowell.com
Lane Powell PC
1420 Fifth Avenue, Ste. 4200
Seattle, Washington 98101

Attorneys for Non-Party Susan
Hartland

By: /s/ *Kristina S. Bennard*
Kristina S. Bennard
kbennard@yarmuth.com
Julia D. Woog
jwoog@yarmuth.com
Yarmuth Wilsdon PLLC
818 Stewart Street, Ste. 1400
Seattle, Washington 98101

Attorneys for Non-Party Peter
Rieman

LEGAL28625608.50

**CERTIFICATION OF COMPLIANCE
PURSUANT TO FED. R. APP. 32(A)(7)(C) AND
CIRCUIT RULE 32-1 FOR CASE NUMBER 12-35266**

I certify that:  (check appropriate option(s))

☐1.  Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached _____ brief is

☐ Proportionately spaced, has a typeface of 14 points or more and contains _____ words (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 14,000 words; reply briefs must not exceed 7,000 words),

**or is**

☐ Monospaced, has 10.5 or fewer characters per inch and contains _____ words or _____ lines of text (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 14,000 words or 1,300 lines of text; reply briefs must not exceed 7,000 words or 650 lines of text).

☒2.  The attached brief is **not** subject to the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because

☐ This brief complies with Fed. R. App. P. 32(a)(1)-(7) and is a principal brief of no more than 30 pages or a reply brief of no more than 15 pages,

☒ This brief complies with a page or size-volume limitation established by separate court order dated <u>February 11, 2014</u> and is

☒ Proportionately spaced, has a typeface of 14 points or more and contains <u>16,711</u> words,

**or is**

☐ Monospaced, has 10.5 or fewer characters per inch and contains _____ pages or _____ words or _____ lines of text.

☐3.  *Briefs in Capital Cases*

☐ This brief is being filed in a capital case pursuant to the type-volume limitations set forth at Circuit Rule 32-4 **and is**

☐ Proportionately spaced, has a typeface of 14 points or more and contains _____ words (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 21,000 words; reply briefs must not exceed 9,800 words),

**or is**

☐ Monospaced, has 10.5 or fewer characters per inch and contains _____ words or _____ lines of text (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 75 pages or 1,950 lines of text; reply briefs must not exceed 35 pages or 910 lines of text).

☐ 4.  *Amicus Briefs*

☐ Pursuant to Fed. R. App. P. 29(d) and 9th Cir. R. 32-1, the attached amicus brief is proportionally spaced, has a typeface of 14 points or more and contains 7,000 words or less,

**or is**

☐ Monospaced, has 10.5 or fewer characters per inch and contains not more than either 7,000 words or 650 lines of text,

**or is**

☐ **Not** subject to the type-volume limitations because it is an amicus brief of no more than 15 pages and complies with Fed. R. App. P. 32(a)(1)(5).

DATED this 28th day of March, 2014.

**PERKINS COIE LLP**

By /s/ *Zachary P. Jones*_____,
Attorneys for Lani Blazier, Marnie Gaede, Bob Talbot, Robert Wintner, and Ben Zuckerman

**CERTIFICATE OF SERVICE**

**When All Case Participants are Registered for the
Appellate CM/ECF System**

U.S. Court of Appeals Docket Number(s):  12-35266

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on March 28, 2014.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature:    /s/ Zachary P. Jones

LEGAL28625608.50